## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**ROGER JAMES, *individually and on behalf of all others similarly situated*,**

      **Plaintiff,**

**v.**

**BOYD GAMING CORPORATION and KANSAS STAR CASINO, LLC,**

      **Defendants.**

**Case No. 19-2260-DDC-JPO**

## MEMORANDUM AND ORDER

Plaintiff Roger James works for Kansas Star Casino, LLC ("Kansas Star"), located not far from Wichita. His lawsuit alleges that Kansas Star and its owner, Boyd Gaming Corporation ("Boyd Gaming"), violated the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201–219 ("FLSA"). The FLSA is an historic example of federal legislation. It's designed to protect employees in the workforce by requiring their employers to follow certain rules for how they run their business and treat their staff. *See Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 706 (1945) ("The statute was a recognition . . . that due to the unequal bargaining power as between employer and employee, certain segments of the population required federal compulsory legislation to prevent private contracts . . . which endangered national health and efficiency and as a result the free movement of goods in interstate commerce.").

Plaintiff is suing Kansas Star and Boyd Gaming individually and on behalf of all others similarly situated.[1] He alleges that Boyd Gaming and Kansas Star violated the FLSA in two

---

[1] Since plaintiff filed his Complaint (Doc. 1), 16 additional current or former employees of the relevant Boyd Gaming casinos have joined this lawsuit as plaintiffs. *See* Docs. 5, 9, 11, 29, 41, 76, 77.

respects.  First, he claims, they paid tipped employees below minimum wage without complying with the FLSA's tip credit notice provisions.  Second, plaintiff asserts, defendants maintain a mandatory tip pool that doesn't comply with the FLSA's rules for these arrangements.  *See* Doc. 1.

This matter comes before the court on plaintiff's Motion for Conditional FLSA Certification and Issuance of Notice to Similarly Situated Employees (Doc. 59).  Plaintiff's motion seeks conditional certification of his FLSA claims as a collective action under 29 U.S.C. § 216(b).  He also asks the court to set parameters governing when and how to provide notice to putative class members, if the court grants his motion for conditional certification.  Defendants have filed a Response opposing certification and some of plaintiff's requests involving notice (Doc. 67).  And plaintiff has filed a Reply (Doc. 70).

But that's not all.  Defendants also filed a Motion for Leave to File a Sur-reply in Response to Plaintiff's Reply and in Opposition to Plaintiff's Motion for Conditional FLSA Certification (Doc. 71).  Plaintiff opposes defendants' motion (Doc. 72), and defendants replied (Doc. 73).

For reasons explained below, the court grants conditional certification and grants some, but not all, of plaintiff's other requests.  And, the court grants in part but denies in part defendants' Motion for Leave to File a Sur-reply.

## I.  Background and Procedural History

Boyd Gaming owns a number of casinos and similar gaming entertainment establishments across America, including—as relevant here—in Illinois, Indiana, Iowa, Kansas, Louisiana, Mississippi, and Pennsylvania.  Doc. 65 at 6.  These casinos are operated through separate, subsidiary legal entities, like Kansas Star Casino, LLC.  Although this arrangement

means that each casino runs its own show in many respects, Boyd Gaming is an employer of everyone who works at the 13 individual establishments implicated in this lawsuit.[2]

Plaintiff is a table games dealer at Kansas Star.  It's what the FLSA calls a non-exempt position, and it pays a base hourly wage that is less than the applicable federal minimum wage. In addition to his subminimum base hourly wage (*i.e.*, a base hourly wage below the federal minimum wage), plaintiff receives tips through Boyd Gaming's tip pooling arrangement among his casino's table games dealers.

Plaintiff seeks to represent two collectives of current or former employees of defendants, who, in the three-year and 60 day period before this Order,[3] either were:  (1) tipped employees who were paid a subminimum base hourly wage, or (2) table games dealers who participated in a tip pooling arrangement.

## A. Plaintiff's First Collective:  The "Tip Credit Notice Collective"

For the first collective, plaintiff alleges that defendants paid tipped employees a subminimum base hourly wage without complying with an important federal regulation.  *See* 29 U.S.C. § 203(m).  The FLSA requires that employees receive a minimum wage of $7.25 an hour.

---

[2]     The 13 Boyd Gaming casinos implicated in this lawsuit are:  Par-A-Dice Gaming Corporation (Illinois), Blue Chip Casino, LLC (Indiana), Diamond Jo Worth, LLC (Iowa), Diamond Jo, LLC (Iowa), Kansas Star Casino, LLC (Kansas), The Belle of New Orleans LLC (Louisiana), Boyd Racing L.L.C. (Louisiana), The Old Evangeline Downs, L.L.C. (Louisiana), Red River Entertainment of Shreveport, L.L.C. (Louisiana), Treasure Chest Casino, L.L.C. (Louisiana), IP Exec Casino Resort and Spa (Mississippi), Sam's Town Tunica (Mississippi), and Valley Forge (Pennsylvania).

[3]     Plaintiff requested certification for the three-year period before he filed his Complaint.  *See* Doc. 59 at 2; Doc. 65 at 14, 22.  But, defendants correctly note that courts in this district conditionally certify FLSA collective actions for the three years preceding the date of the court's order granting conditional certification, instead of the three years before the complaint's filing.  *See* Doc. 67 at 39–40.  Plaintiff concurs, but he also thinks the parties' agreed 60-day tolling period should apply—*i.e.*, that the applicable time period is three years and 60 days from the date of this order.  *See* Doc. 70 at 37; *see also* Doc. 56 at 2 (Joint Motion to Amend Scheduling Order noting "the parties have agreed to tolling for a period of 60 days—*i.e.*, suspending for 60 days the running of the limitations period for putative collective action members' claims").

29 U.S.C. § 206(a)(1)(C).  But, section 203(m) permits an employer to pay their tipped employees less than that—a subminimum base hourly wage—and apply a so-called "tip credit" to make up the difference.  *See* 29 U.S.C. § 203(m)(2)(A); *see also* 29 C.F.R. § 531.51 ("The wage credit permitted on account of tips . . . may be taken only with respect to wage payments made . . . to those employees whose occupations in the workweeks for which such payments are made are those of tipped employees." (internal quotation marks omitted)).

The additional amount an employer takes as a tip credit "may not exceed the value of the tips actually received by the employee."  29 U.S.C. § 203(m)(2)(A).  And, an employer can use the tip credit only if:  (1) the employer informs the employee "of the provisions of" § 203(m), and (2) the employee retains all tips received (subject to permitted tip pooling arrangements among employees "who customarily and regularly receive tips").  *Id.*  The FLSA also prohibits employers from "keep[ing] tips received by its employees for any purposes, including allowing managers or supervisors to keep any portion of employees' tips, regardless of whether or not the employer takes a tip credit."  29 U.S.C. § 203(m)(2)(B).

Plaintiff contends defendants didn't notify their tipped employees about § 203(m)'s provisions, as the statute requires.  *See* 29 U.S.C. § 203(m)(2)(A).  He also relies on 29 C.F.R. § 531.59(b), a federal regulation relating to the FLSA and spelling out exactly what employers need to tell their employees before they can claim a tip credit.  It requires:

> Pursuant to [29 U.S.C. § 203(m)], an employer is not eligible to take the tip credit unless it has informed its tipped employees in advance of the employer's use of the tip credit of the provisions of [29 U.S.C. § 203(m)], i.e.:  The amount of the cash wage that is to be paid to the tipped employee by the employer; the additional amount by which the wages of the tipped employee are increased on account of the tip credit claimed by the employer, which amount may not exceed the value of the tips actually received by the employee; that all tips received by the tipped employee must be retained by the employee except for a valid tip pooling arrangement limited to employees who customarily and regularly receive tips; *and that the tip credit shall not apply to any employee who has not been informed of these requirements*

> in this section. . . .  With the exception of tips contributed to a valid tip pool as described in § 531.54, the tip credit provisions of [29 U.S.C. § 203(m)] also require employers to permit employees to retain all tips received by the employee.

29 C.F.R. § 531.59(b) (emphasis added).  Plaintiff contends defendants didn't notify its tipped employees about all of § 203(m)'s provisions, as detailed in 29 C.F.R. § 531.59(b).  And so, he asks the court to conditionally certify the first collective—the "Tip Credit Notice Collective"—for tipped employees.  Doc. 59 at 1.

### B.  Plaintiff's Second Collective:  The "Tip Pool Collective"

Plaintiff also asks the court to conditionally certify a second group of employees, which the court calls the "Tip Pool Collective."  *See* Doc. 65 at 11.  For this collective, plaintiff argues that defendants violated two other requirements contained in § 203(m).  *First*, he contends that defendants didn't limit participation in their tip pooling arrangements for table games dealers to employees "who customarily and regularly receive tips."[4]  29 U.S.C. § 203(m)(2)(A).  *Second*, he alleges the tip pooling arrangements allowed supervisors to keep a portion of employees' tips, thus violating § 203(m)(2)(B).

More specifically, plaintiff asserts defendants violated these provisions by allowing employees who work in a dual role—as a floor supervisor and as a table games dealer (a "Dual Rate Supervisor")[5]—to accrue paid time off ("PTO") while working as a floor supervisor (a non-

---

[4]     As noted previously, § 203(m) doesn't prohibit tip pooling arrangements, which allow the employer to "redistribute[] the tips to the employees upon some basis to which they have mutually agreed among themselves."  29 C.F.R. § 531.54.  When employees who regularly and customarily receive tips participate in a tip pool, the redistributed amounts "received and retained by each individual as his own are counted as his tips for purposes of the Act."  *Id.*  Valid mandatory tip pools under § 203(m) "can only include those employees who customarily and regularly receive tips," and "an employer must notify its employees of any required tip pool contribution amount, may only take a tip credit for the amount of tips each employee ultimately receives, and may not retain any of the employees' tips for any other purpose."  *Id.*

[5]     Defendants refer to an employee in this role as a "Dual Rate Dealer."  The court—at least at this point—doesn't discern any advantage or prejudice to the competing terminologies, so it uses them interchangeably in this Order.

tipped position), only to then pay them for that PTO at a table games dealer's rate of pay.  As plaintiff sees things, this procedure involves taking money from the tip pool to pay for certain supervisors' time off.  He asks the court to conditionally certify the second collective for table games dealers.  Doc. 59 at 2.

### C.  Bifurcated Discovery Plan

On August 20, 2019, the court entered a Scheduling Order that bifurcated discovery into two phases.  Doc. 15 at 4.  Phase I discovery was focused on conditional certification issues.  *Id.* at 4–5.  The Order set a deadline of April 30, 2020 for limited Phase I discovery before the deadline to file the motion for conditional certification.  *Id.* at 2, 5, 7.  Later, the court extended this deadline to June 29, 2020.  (Doc. 57).

The court deferred setting deadlines for Phase II discovery on merits-related issues until the court rules on conditional certification.  *Id.* at 5, 11.  Over the course of Phase I discovery, the parties served Rule 26(a) disclosures, conducted written discovery, and took depositions of several individuals, including the named plaintiff, Boyd Gaming's Vice President of Human Resources, Kansas Star's Director of Human Resources, and a corporate representative of Boyd Gaming.  Plaintiff filed his Motion for Conditional FLSA Certification on July 20, 2020.  (Doc. 59).  And, as described above, now the matter is fully briefed and ready for the court's ruling.

### II.  Legal Standard

Section 216(b) of the FLSA allows an employee to bring claims against his or her employer on behalf of employees who are "similarly situated" to plaintiff.  29 U.S.C. § 216(b). Unlike class actions under Fed. R. Civ. P. 23, "[n]o employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought."  *Id.*  In other words, any putative class

members who wish to join this lawsuit must "opt-in" to do so.  *See In re Bank of Am. Wage & Hour Emp. Litig.*, 286 F.R.D. 572, 576 (D. Kan. 2012) ("Section 216(b) of the FLSA provides for an opt-in class action on behalf of employees who are 'similarly situated' to the plaintiffs.")

Section 216(b) doesn't define the term "similarly situated."  However, the Tenth Circuit has approved a two-step approach for determining whether plaintiffs in a proposed opt-in collective action are "similarly situated" for purposes of this section.  *Thiessen v. Gen. Elec. Cap. Corp.*, 267 F.3d 1095, 1105 (10th Cir. 2001).  Under this approach, courts make an initial "notice stage" determination whether a group of plaintiffs are "similarly situated."  *Id.* at 1102 (citation and internal quotation marks omitted).  "That is, the court determines whether a collective action should be certified for purposes of sending notice of the action to potential class members."  *In re Bank of Am. Wage & Hour Emp. Litig.*, 286 F.R.D. at 576.  Plaintiff must not send notice to putative class members of their right to opt-in unless the court has conditionally certified the collective action.  *Folger v. Medicalodges, Inc.*, No. 13-1203-MLB, 2014 WL 2885363, at *2 (D. Kan. June 25, 2014).

For conditional certification at the notice stage, courts "'require nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan.'"  *Thiessen*, 267 F.3d at 1102 (quoting *Vaszlavik v. Storage Tech. Corp.*, 175 F.R.D. 672, 678 (D. Colo. 1997) (internal alteration omitted)).  As a result, "the standard of proof at this stage typically results in certification."  *In re Bank of Am. Wage & Hour Emp. Litig.*, 286 F.R.D. at 576 (citing *Young v. Dollar Tree Stores, Inc.*, No. 11-CV-01840-REB-MJW 2012 WL 3705005, at *1 (D. Colo. Aug. 24, 2012)); *see also Zavala v. Wal Mart Stores Inc.*, 691 F.3d 527, 536 (3rd Cir. 2012) (explaining that that "'conditional certification' is not really a certification" so much as it is "actually the district court's exercise of [its] discretionary

power . . . to facilitate the sending of notice to potential class members" (citation and internal quotation marks omitted)).

The second stage analysis comes after discovery is complete. *Thiessen*, 267 F.3d at 1102–03; *Folger*, 2014 WL 2885363, at *2. At this stage, defendant may file a motion to decertify, and courts apply a stricter standard to determine whether plaintiffs are similarly situated. *Id*. During the second stage analysis, courts review several factors, including the disparate factual and employment settings of the individual plaintiffs, the various defenses available to the defendant which appear to be individual to each plaintiff, and fairness and procedural considerations. *Thiessen*, 267 F.3d at 1103.

## III. Analysis

Plaintiff's motion seeks only notice stage certification of his FLSA claims. Doc. 65 at 13. Defendants likewise recognize the Tenth Circuit's two step approach. Doc. 67 at 22. So, at this stage of the litigation, the court applies the lenient standard appropriate for notice stage certification. The parties have completed only Phase I discovery. And final certification isn't appropriate until "merits discovery is closed (or largely complete) and the case is ready for trial." *In re Bank of Am. Wage & Hour Emp. Litig.*, 286 F.R.D. at 577.

Before turning to the parties' arguments for and against conditional certification, the court first addresses defendants' Motion for Leave to File a Sur-reply in Response to Plaintiff's Reply and in Opposition to Plaintiff's Motion for Conditional FLSA Certification (Doc. 71). Then, the court considers whether to conditionally certify the two collectives.

### A. Defendants' Sur-reply

Defendants seek leave to file a sur-reply to plaintiff's conditional certification motion. Under D. Kan. Rule 7.1(c), briefing on motions is limited to the motion (with memorandum in

8

support), a response, and a reply.  Sur-replies typically aren't allowed.  *Taylor v. Sebelius*, 350 F. Supp. 2d 888, 900 (D. Kan. 2004), *aff'd on other grounds*, 189 F. App'x. 752 (10th Cir. 2006).

Instead, sur-replies are permitted only with leave of court and under "rare circumstances" after good cause is shown.  *Humphries v. Williams Nat. Gas Co.*, No. 96-4196-SAC, 1998 WL 982903, at *1 (D. Kan. Sept. 23, 1998) (citations and internal quotation marks omitted); *see also Ambac Assurance Corp. v. Fort Leavenworth Frontier Heritage Cmtys., II, LLC*, No. 15-CV-9596-DDC-JPO, 2017 WL 1035953, at *1 (D. Kan. Mar. 17, 2017).  For example, when a moving party uses their reply to present new material—*i.e.*, new evidence or new legal arguments—and if the court *relies* on that new material, it should give the nonmoving party an opportunity to respond.  *Green v. New Mexico*, 420 F.3d 1189, 1196 (10th Cir. 2005); *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1139 n.13 (10th Cir. 2003); *see also E.E.O.C. v. Int'l Paper Co.*, No. 91-2017-L, 1992 WL 370850, at *10 (D. Kan. Oct. 28, 1992).

The rules governing sur-replies are based on common sense.  They "are not only fair and reasonable, but they assist the court in defining when briefed matters are finally submitted and in minimizing the battles over which side should have the last word."  *Humphries*, 1998 WL 982903, at *1 (citation and internal quotation marks omitted); *see also Int'l Paper Co.*, 1992 WL 370850, at *10 (explaining that briefing between parties "must have an end point and cannot be permitted to become self perpetuating").

Defendants contend a sur-reply is warranted because plaintiff raised new arguments in his Reply.  Doc. 71 at 1–2.  Defendants specify five areas of plaintiff's Reply that, they assert, amount to "new arguments [raised] for the first time:"

> **(1)** 35 cases cited by plaintiff for the first time,
> **(2)** plaintiff's argument that he doesn't have to rely on admissible evidence to support his motion,

**(3)** plaintiff's argument that the court should disregard certain declarations submitted by defendants,
**(4)** plaintiff's "incorrect[] claim" that cases cited by defendants didn't address a notice regulation, and
**(5)** plaintiff's statements about Dual Rate Dealers that, defendants contend, aren't supported by evidence.

*Id.* at 2.

Naturally, plaintiff disagrees.  He argues each of these five issues aren't "new arguments" at all.  Instead, he says they constitute responses addressing points raised by defendants.  Accordingly, plaintiff contends, they aren't improper.  Doc. 72 at 1–2; *see also Pehr v. Rubbermaid, Inc.*, 87 F. Supp. 2d 1222, 1237 (D. Kan. 2000) (denying plaintiff's request to file a sur-reply to respond to defendant's reply argument because defendant's assertion wasn't "improperly raised" where defendant only could make the argument after reviewing plaintiff's response).

Plaintiff says defendants' proposed sur-reply merely rehashes arguments already made just so they can have the last word.  Doc. 72 at 2, 4.  And, plaintiff correctly notes that the proposed sur-reply itself improperly attempts to make arguments for the first time.  *Id.* at 4; *see also* Doc. 71-1 at 3 n.2 (proposed sur-reply asserting for the first time that the court should apply an intermediate standard of review, rather than notice stage review, based on the amount of discovery conducted in Phase I).  Plaintiff then addresses each of defendants' arguments, in turn.  And so it goes.

The next few pages, using numbers that correlate to the five areas of purportedly new argument identified above, address all five topics in dispute.

**(1)** Plaintiff asserts that citing new cases in a reply to support legal theories already raised in an opening brief doesn't warrant a sur-reply.  Doc. 72 at 2.  He's right.  *See Dodson Int'l Parts, Inc. v. Williams Int'l Co., LLC*, No. 2:16-CV-02212-JAR-ADM, 2020 WL 4904049, at *2

(D. Kan. Aug. 20, 2020); *see also Mosaic Potash Carlsbad, Inc. v. Intrepid Potash, Inc.*, Nos. 16-CV-0808-KG-SMV, 17-CV-1268 KG-SMV, 2020 WL 1033172, at *1 (D.N.M. Mar. 3, 2020) (collecting cases); *Carter v. Spirit Aero Sys., Inc.*, No. 16-01350-EFM, 2019 WL 3732684, at *12 (D. Kan. Aug. 8, 2019) (explaining "citing new legal authority is not synonymous with raising new legal arguments").  And, "a reply which merely responds to matters placed in issue by the response, and does not spring upon the opposing party new reasons" to grant conditional certification "is entirely proper."  *Carter*, 2019 WL 3732684, at *12 (citation, internal quotation marks, and brackets omitted).  So, a reply "may properly highlight the deficiencies" in a response "without opening the door to additional pleadings."  *Id.*

It appears that's what plaintiff has done here.  The new cases cited in his Reply and that defendants seek to refute with their Sur-reply are used to respond to defendants' arguments against certification.  They provide additional support to plaintiff's legal theories raised in his initial conditional certification motion.  For example, plaintiff cites several cases in his Reply that address defendants' argument that the court shouldn't consider certain evidence submitted by plaintiff per Fed. R. Evid. 407.  On this issue, defendants' Sur-reply focuses on cases that plaintiff cites to support his initial argument that conditional certification of the Tip Credit Notice Collective is appropriate.  *Compare* Doc. 70 at 18 n.17 (Plaintiff's Reply noting the "cases cited in [p]laintiff's opening brief . . . are representative of a broader body of case law that support conditional certification" and citing additional cases) *with* Doc. 71-1 at 4–5 & n.5 (using the proposed Sur-reply to distinguish the new cases cited by plaintiff from the facts of this case but also to repeat arguments already made in defendants' Response); *see also In re Motor Fuel Temperature Sales Practices. Litig.*, No. 07-1840-KHV, 2011 WL 5506259, at *2 (D. Kan. Nov.

10, 2011) (holding new cases cited in a reply did not "constitute new legal argument" because they stood "for the very same proposition as the cases cited in" the original motion).

Defendants' Motion for Leave and Reply don't explain why plaintiff's new cases constitute new and improper legal arguments. Instead, defendants merely reiterate that plaintiff cited these cases for the first time in his Reply. *See* Doc. 73 at 1. And, they rely on a previous order of this court, where the court granted an *unopposed* motion for leave to file a sur-reply because defendant's reply didn't just address plaintiff's response arguments but also made new arguments for the first time. *See* Doc. 73 at 1; *Griffitts & Coder Custom Chopping, LLC v. CNH Indus. Am. LLC*, 438 F. Supp. 3d 1206, 1214 n.2 (D. Kan. 2020).

Despite defendants' citation to this case, their Sur-reply doesn't explain how the 35 new cases plaintiff cites raise *new arguments*. By defendants' logic, plaintiff also deserves an opportunity to respond to each new case that defendants cite in their proposed Sur-reply. This would create a seemingly endless cycle. And, this logic produces an outcome that is worrisome for more than one reason. First, it misunderstands what might call for leave of court to file a sur-reply. Citing new cases in support of existing arguments is not a qualifying circumstance. Second, this logic precipitates the sort of legal merry-go-round that the court rejected in *Humphries*. 1998 WL 982903, at *1.

In short, defendants' first reason for seeking leave to file a sur-reply fails for two different reasons. *First*, plaintiff did nothing wrong by responding "to the arguments raised in [defendants'] Response and point[ing] out deficiencies in [defendants'] Response." *Carter*, 2019 WL 3732684, at *12, *aff'd on other grounds*, 827 F. App'x 864 (10th Cir. 2020). *Second*, even if these newly cited cases constituted new legal arguments—and they do not—the court doesn't have to consider them, which again obviates the need for a sur-reply on this point. *See Doebele*,

342 F.3d at 1139 n.13 (explaining that district courts have "two permissible courses of action" in scenarios such as the present one:  they either may allow a sur-reply or decline to rely on new material contained in a reply brief).

(2) Plaintiff contends his argument that he needn't rely on admissible evidence to support his conditional certification motion isn't a new argument at all.  Plaintiff's point represents a counterargument to defendants' assertion that the court should disregard certain of plaintiff's evidence under Fed. R. Evid. 407.  Doc. 72 at 3.  Indeed, plaintiff cited evidence to support conditional certification, defendants responded to it by arguing plaintiff's evidence is inadmissible under Rule 407, and plaintiff replied explaining why he believes he can rely on this evidence to support his motion.  *See* Doc. 65 at 14–15; Doc. 67 at 28; Doc. 70 at 16–18.  This strikes the court as something that happens all the time in spirited litigation.  A reply serves its purpose when it responds "to matters placed in issue by the [R]esponse," rather than providing new legal arguments for conditional certification.  *Carter*, 2019 WL 3732684, at *12.

Still, the court has considered defendants' arguments in the proposed Sur-reply on this issue—constituting one lonely footnote in their nine-page Sur-reply.  *See* Doc. 71-1 at 4 n.3. There, they give one example of a Missouri federal court that required admissible evidence at the conditional certification stage.  Plaintiff's initial brief set out the Tenth Circuit's standard for conditional certification, which requires "nothing more than substantial allegations."  Doc. 65 at 12.  But, his initial motion never argued explicitly that evidence used to support conditional certification needn't be admissible, as he did in his Reply.  *See Pehr*, 87 F. Supp. 2d at 1237 (denying leave to file sur-reply where defendant had "clearly set forth plaintiff's evidentiary burden on summary judgment in its opening brief").

So, the court grants defendants leave to file the proposed Sur-reply to respond to plaintiff's Reply on this issue.  But, defendants' sur-reply argument purportedly responding to plaintiff's second "new argument" merely repeats assertions already made in their Response or focuses on "new cases" cited by plaintiff that aren't even about the topic of admissible evidence. *See* Doc. 71-1 at 3–5.  A sur-reply isn't merited just to have the last say.

**(3)** Next, plaintiff argues his objection to defendants' declarations—that defendants never produced them during Phase I discovery—isn't a new argument warranting a sur-reply.  He sees them as challenging the sufficiency of the evidence defendants raise in their Response.  Doc. 72 at 3.  So, plaintiff wants the court to "entirely disregard these declarations at this juncture as procedurally and substantively improper."  Doc. 70 at 20.

In defendants' view, "these declarations are properly before this Court" because each individual at issue was in some way identified during Phase I of discovery.  Doc. 71-1 at 6.  For this reason, and in light of one case from the Eastern District of Missouri, they think court should consider them all.  *Id.*; *see also Mayberry v. SSM Health Bus.*, No. 4:15-CV-1680-CEJ, 2017 WL 67525, at *1–2 (E.D. Mo. Jan. 6, 2017) (rejecting plaintiff's motion to strike declarations from several defense witnesses on the basis that "defendant's disclosures were adequate under Rule 26(a)(1)" and that, "even if the disclosures were insufficient, the defendant's failure to specifically name the declarants was harmless").

First, an important reminder:  sur-replies are the exception, not the rule.  *Taylor*, 350 F. Supp. 2d at 900 (explaining that "[s]urreplies are typically not allowed" and, only with leave of court "in rare cases").  Second, even in cases that may involve good cause for permitting a sur-reply, courts have more than one option.  That is, the court can consider the new material and therefore grant the sur-reply or it can elect to do nothing with those new materials, at least when

the information isn't outcome determinative. *See Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1164–65 (10th Cir. 1998) (explaining that district court did not abuse its discretion at summary judgment when it elected to deny party's request to file a sur-reply but also "grant[ed] summary judgment for the movant without relying on the new materials").

Here, the court doesn't need to consider the declarations at this stage of the litigation. Defendants want to leverage these materials to advance their argument that individualized policies across multiple properties show that no common policy existed, and also that notice was provided. They seem to think the declarations will show that the putative plaintiffs aren't similarly situated. But defendants couldn't make a clearer argument, with or without the declarations. They attack plaintiff's failure to cite any cases to support his view of this point, but what cases could he cite? This isn't that type of claim. The declarations don't matter at this stage of the litigation because the court isn't assessing the merits. Plus, now that everyone knows about them, defendants are certainly free to bring them back during Phase II.

**(4)** Plaintiff argues defendants' next reason for a sur-reply—that they need the opportunity to respond to plaintiff's supposedly incorrect claims about cases they cite—lacks merit. According to plaintiff, he "was directly responding to [d]efendants' merit-based arguments and citation to cases that do not reflect current law." Doc. 72 at 3–4. And, plaintiff correctly explains that what qualifies as an FLSA compliant notice is a merits-based argument beyond the scope of plaintiff's current conditional certification motion. *Id.* at 4; *see also* Doc. 71-1 at 5–6 n.5 (proposed Sur-reply recognizing the court won't resolve the parties' dispute about "what information is required for sufficient tip credit notice . . . on this motion").

From what the court can gather, defendants contend they need a sur-reply to respond to one footnote in plaintiff's Reply. It stated: "The other cases string cited by Defendants . . . are

likewise distinguishable as they do not analyze or discuss the impact of the enactment of 29 C.F.R. § 531.59, which specifies the required content of an FLSA-complaint tip credit notice for the period beginning May 5, 2011." Doc. 70 at 12 n.7 (plaintiff's Reply); Doc. 71 at 2 (defendants' Motion for Leave to File a Sur-reply contending plaintiff has made a "new argument" by "incorrectly claim[ing] cases Defendants relied on . . . did not address 29 C.F.R. § 531.59"). Rather than using their proposed Sur-reply to respond to this purportedly "new argument," defendants again address their fourth reason for needing a Sur-reply in a single footnote, *see* Doc. 71-1 at 5–6 n.5. This footnote simply points out that two of the cases defendants cited in Response were decided after the Department of Labor codified 29 C.F.R. § 531.59.

Defendants' fourth reason is deficient. Plaintiff was entitled to reply to the arguments and legal authority raised in defendants' Response. And by doing so, plaintiff didn't improperly raise new material—evidence or legal argument—that would then entitle defendants to a sur-reply. *See Green*, 420 F.3d at 1196; *Carter*, 2019 WL 3732684, at *12. As explained next, defendants' fifth argument for a sur-reply suffers the same problem.

**(5)** Plaintiff aptly points out that while defendants contend a sur-reply is needed to address certain statements plaintiff made about Dual Rate Dealers that aren't supported by evidence, defendants' Motion for Leave never specifies the statements they challenge on this basis. Naturally, this means that defendants also don't explain how those statements constitute new material opening the door for a sur-reply. Doc. 72 at 4. The proposed Sur-reply attached to defendants' motion doesn't make this clear either.

Instead, defendants' proposed Sur-reply repeats their arguments why plaintiff hasn't shown table games dealers are similarly situated and that, on this basis, the court shouldn't

conditionally certify the Tip Pool Collective.  *See* Doc. 71-1 at 7–9.  Perhaps their point is to suggest that the court categorically should toss plaintiff's contentions about Dual Rate Dealers. But that isn't what they've written.  Doc. 71 at 2 ("Plaintiff makes statements regarding Dual Rate Dealers that are not supported by evidence.").  And regardless, this suggestion is defendants' top line argument altogether, meaning the court already is familiar with it.  *See, e.g.*, Doc. 67 at 21.  This fifth reason doesn't call for a sur-reply either.

Similarly, defendants identify one statement they contend merits a sur-reply:  plaintiff's assertion that Dual Rate Dealers are "supervisors" under the FLSA.  Doc. 73 at 2.  Again, this strikes the court as a merits-based argument not appropriate for Phase I conditional certification. Likewise, the court can't decipher how the proposed Sur-reply is necessary to address new legal arguments or evidence on this fifth point.  Instead, defendants' proposed Sur-reply appears to reiterate their attack on plaintiff's common policy claim, which they've already done in their Response.  Defendants also fail to cite to anything specifically in plaintiff's arguments that clearly makes their point, leaving guesswork for the court about an argument that itself seems opaque.

Here's where the dispute stands:  plaintiff asserts that defendants failed to segregate PTO payout policies properly in the same way they do for timekeeping when it comes to Dual Rate Dealers.  That's a big problem, plaintiff says.  Dual Rate Dealers are getting paid out for PTO using funds that should've stayed with the table games dealers because that revenue was raised through tips—*their* tips.  Floor supervisors aren't tipped employees, and so the court should find this practice violates the FLSA.  That point is clear.  And, the court can resolve it during the second phase of this case, but not now.  A sur-reply isn't merited on this issue.  *See Folger*, 2014 WL 2885363, at *3 (explaining that, at the notice stage of an FLSA lawsuit, "the court does not

weigh evidence, resolve factual disputes, or rule on the merits of plaintiffs' claims" (citations omitted)).

Defendants contend the proposed Sur-reply is "narrowly focused on responding to new arguments and authority raised . . . for the first time on reply." Doc. 73 at 1. That's simply not correct. The majority of defendants' Sur-reply tries to have the last word, mainly by retelling arguments already made. It's not, at least for the most part, a response to new legal arguments or evidence. The court permits defendants to file their proposed Sur-reply insofar as doing so enables them to raise their argument about the admissibility of evidence at this stage of the litigation. Doc. 71-1 at 4 n.3. But that's it.

With this secondary dispute settled, the court now turns to the main event.

**B. The Court Grants Conditional Certification of Plaintiff's FLSA Claims**

Notice stage certification "'require[s] nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan.'" *Thiessen*, 267 F.3d at 1102 (quoting *Vaszlavik*, 175 F.R.D. at 678). "In determining whether plaintiffs are victims of a single policy, the court can consider the substantial allegations of the complaint along with any supporting affidavits or declarations." *Folger*, 2014 WL 2885363, at *3. But, "the court does not weigh evidence, resolve factual disputes, or rule on the merits of plaintiffs' claims" at the notice stage. *Id.*

**1. The Tip Credit Notice Collective**

First, plaintiff seeks conditional certification of the following collective:

> All persons employed at a relevant Boyd Gaming casino[6] during the relevant time period[7] and paid a base hourly wage of less than the applicable federal minimum wage of $7.25 per hour.

Doc. 59 at 1.  If certified, the class could consist of almost 5,800 employees.  Doc. 65 at 14.  Plaintiff contends that defendants failed to inform him and other similarly situated tipped employees of the information in § 203(m).[8]  Doc. 65 at 10.  So, he asserts, the FLSA prohibited defendants from taking a tip credit for these employees until they provided a Tip Credit Notice complying with the FLSA's requirements.  And, plaintiff contends, they didn't do so until the spring of 2019.  Doc. 65 at 17.  ("Prior to the [s]pring of 2019, no comparable written tip credit notice form was ever provided to . . . employees at the relevant Boyd Gaming casinos.").

Plaintiff seeks to conditionally certify as a collective action all of defendants' hourly employees paid a subminimum wage during the last three years and 60 days.  To do so, plaintiff must demonstrate that he and other putative class members are "similarly situated."  29 U.S.C. § 216(b).  At this early stage of an FLSA action, "plaintiff['s] burden is not heavy," but he "must establish that the entire class . . . were together the victims of a single, decision, policy or plan."  *Folger*, 2014 WL 2885363, at *4 (citation and internal quotation marks omitted).

---

[6]       The relevant Boyd Gaming casinos for the first collective are:  Par-A-Dice Gaming Corporation (Illinois), Blue Chip Casino, LLC (Indiana), Diamond Jo Worth, LLC (Iowa), Diamond Jo, LLC (Iowa), Kansas Star Casino, LLC (Kansas), The Belle of New Orleans LLC (Louisiana), Boyd Racing L.L.C. (Louisiana), The Old Evangeline Downs, L.L.C. (Louisiana), Red River Entertainment of Shreveport, L.L.C. (Louisiana), Treasure Chest Casino, L.L.C. (Louisiana), IP Exec Casino Resort and Spa (Mississippi), Sam's Town Tunica (Mississippi), and Valley Forge (Pennsylvania).

[7]       The relevant time period extends from three years and 60 days before the date of this Order until the date in or around the spring of 2019 when Boyd Gaming's existing tipped employees were provided a written Tip Credit Notice form.  Doc. 59 at 1–2; *see also* note 3.

[8]       The federal regulations under the FLSA provide that "[t]ips are the property of the employee whether or not the employer has taken a tip credit under section 3(m) of the FLSA."  29 C.F.R. § 531.52.

Plaintiff asserts that defendants' policy of failing to inform employees about § 203(m)'s provisions before taking a tip credit victimized this putative class.  In other words, plaintiff's claim here isn't so much that one singular policy affected this group of purported similarly situated individuals.  Rather, plaintiff contends that he and others together were the victims of a commonly inadequate approach to FLSA notice by defendants.

Plaintiff contends he and the proposed class members are similarly situated because, in the spring of 2019, Boyd Gaming distributed a written Tip Credit Notice form to all of its tipped employees at the relevant casino locations.  Although the precise language contained in the 2019 Tip Credit Notice varies slightly depending on the casino location, each form contained roughly the same information.  *See* Doc. 65-6 (Tip Credit Notices for each location).  Plaintiff doesn't dispute that the 2019 Tip Credit Notice complies with the FLSA's tip credit requirements.  But, before the spring of 2019, defendants hadn't provided any similar written tip credit notice to tipped employees.  Neither Boyd Gaming nor the casinos had adopted a written policy about federal tip credit requirements before that date.  Doc. 65-5 at 32 (Smith Dep. 121:7–16).

For the period preceding the spring of 2019, and as plaintiff sees things, Boyd Gaming adopted a "flawed unwritten policy and practice of hopeful compliance" with the FLSA's notice requirements.  Doc. 65 at 18.  He says these shortcomings produced "obvious deficiencies."  *Id.* Plaintiff contends that statements from Boyd Gaming's own leadership manifest as much, particularly that these efforts allegedly reflected a hodgepodge of disjointed and poorly communicated messages to relevant employees.  *Id.* ("[A]s Boyd Gaming describes it, [there was] 'some combination of written and verbal communications and information about tips and the tip credit' to Mr. James and other tipped employees." (first quoting Doc. 65-3 at 6–7 (Boyd Gaming's Answers to First Set of Interrogatories); then quoting Doc. 65-11 at 5–6 (Kansas Star's

Answers to First Set of Interrogatories); then citing Doc. 65-2 at 2–11 (Plaintiff's Supplemental

Responses to First Set of Interrogatories)).  In other words, and although some of these messages

involved component parts of the whole of what the FLSA requires for notice, none of these

efforts—according to plaintiff—cumulatively constructed an FLSA-compliant notice.  Doc. 65 at

19 (explaining that while "Mr. James does not contest that he and other members of the . . . Tip

Credit Notice Collective were told the amount of the base hourly wage they were being paid,"

these employees "had never been informed of any of that other information").

Plaintiff contends this sequence of events brings his case full circle in this sense:  placing

these earlier dynamics alongside Boyd Gaming's subsequent, and largely uniform notice to staff

in the spring of 2019 shows that the putative class members were subject to a common policy.

*Id.* at 20.  And, "[b]y uniformly directing such common notice to all of its tipped employees,

together with the prior lack of any written policy or training with respect to the FLSA's tip credit

notice requirements, and as further supported by Mr. James' own experience, a reasonable

factual inference exists that Boyd Gaming's written Tip Credit Notice form issued in the [s]pring

of 2019 was . . . intended to remedy or otherwise cure prior common deficiencies with respect to

notifying its tipped employees of the FLSA's tip credit requirements."  *Id.*

Defendants disagree.  In their view, two different arguments supply sufficient reason for

the court to deny plaintiff's request:

> (1) Plaintiff has not shown there is a single, unlawful decision, policy or plan
> applicable to all putative collective members, or (2) that Plaintiff is similarly
> situated to thousands and thousands of current and former employees from over a
> dozen casino properties, working in different departments, for different supervisors
> around the country.

Doc. 67 at 23.  "Absent a single policy or plan that violated the FLSA with respect to the tip credit notice," defendants warn, "this case quickly devolves into a myriad of individualized inquiries that render conditional certification inappropriate."  *Id.*[9]

> **a.  Has plaintiff identified "a single . . . decision, policy or plan applicable to all putative collective members[?]"  (Doc. 67 at 23)**

The court considers the parties' competing arguments, below.  And, the court approaches each side's arguments with *Thiessen*'s instructions in mind:  "notice stage" determinations of whether a plaintiff and purported FLSA class are similarly situated "require[] nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan."  267 F.3d 1095, 1102 (10th Cir. 2001) (citation and internal quotation marks omitted).  It's a low bar for plaintiff to clear.  *In re Bank of Am. Wage & Hour Emp. Litig.*, 286 F.R.D. 572, 576 (D. Kan. 2012) ("[T]he standard of proof at this stage typically results in certification." (citation and internal quotation marks omitted)).  In other words, the court doesn't require airtight proof of plaintiff's case—or anything close to it—to find that conditional certification is merited.  It can kick the tires, but the court can't open the hood.

Defendants argue that the court can't certify plaintiff's proposed class because he "has not identified an unlawful tip credit notice policy or plan applicable to all thirteen casino

---

[9]  The court notes that defendants' argument mimics language used by the court in *Wysincavage v. Penn Nat'l Gaming, Inc.*, No. 2:16-CV-1063, 2017 WL 5129003, at *4–5 (S.D. Ohio Oct. 23, 2017).  It's an interesting tactic.  In *Wysincavage*, the court noted:  "[d]efendants next argue that they were permitted to satisfy their notification obligation . . . through a combination of ways, and, therefore . . . whether an individual Plaintiff received proper notice *would necessarily devolve into a host of individualized inquiries*."  *Id.* at 5 (emphasis added).  The Ohio federal court rejected that argument.  *Id.* ("While there may be individual questions . . . this does not defeat conditional certification.").

Here, defendants slot similar language beside the same point essentially.  Doc. 67 at 23 ("Absent a single policy or plan that violated the FLSA . . . this case *quickly devolves into a myriad of individualized inquiries that render conditional certification inappropriate*." (emphasis added)).  To quote the *Wysincavage* court:  "[T]his does not defeat conditional certification." *Wysincavage*, 2017 WL 5129003, at *5.

properties."  Doc. 67 at 25.  Defendants contend that tip credit notifications "were different and unique depending on a myriad of factors," including where an employee worked, an employee's job training and job title, his or her respective supervisors, when the employee worked for one of these casinos, and more.  *Id.* at 26.  Based on these differences, defendants say, it would "completely defeat[] the purpose of the FLSA collective mechanism" for this court to certify the Tip Credit Notice Collective.  *Id.* at 26.

Defendants' only argument from their Sur-reply that the court considers could turn the tables, if it worked.  They contend that "[p]laintiff claimed for the first time on reply he is not required to provide admissible evidence on a conditional certification motion."  Doc. 71-1 at 4. They're right.  Plaintiff raised this point "for the first time on reply," and so the court allows defendants to address this detail through their Sur-reply.  *Id.*

Defendants acknowledge that "[t]he Tenth Circuit has not ruled on whether conditional certification motions must be supported by admissible evidence."  *Id.* at 4 n.3.  But, they think a decision from the Eastern District of Missouri should sway the court.  *Id.* at 4 n.3 (citing *Jost v. Commonwealth Land Title Ins. Co.*, No. 4:08-CV-734-CDP, 2009 WL 211943, at *3 (E.D. Mo. Jan. 27, 2009) ("Affidavits and other testimony must be based on admissible evidence.")).  This point dovetails with another one of defendants' key arguments:  that the Federal Rules of Evidence disqualify the court from considering the 2019 Tip Credit Notice.  Doc. 67 at 28.  The Tip Credit Notice that defendants provided in 2019 is an important point for plaintiff.  Without this argument, he might have a hard time showing that a common policy affected each of the constituent casinos.

Defendants argue that plaintiff's "theory is without merit and has routinely been rejected as a method of proving culpability."  *Id.*  They cite Fed. R. Evid. 407 for this point.  Indeed, that

Rule bars evidence of so-called subsequent remedial measures "to prove [] negligence; culpable conduct; a defect in a product or design; or a need for a warning or instruction." Fed. R. Evid. 407. And, defendants say, this Rule precludes the court from considering the 2019 Tip Credit Notice because—at least as they read plaintiff's argument—it qualifies as a subsequent remedial measure under Rule 407.[10]

But defendants' argument doesn't work. "Requiring a plaintiff to present evidence at this stage that meets the standards of the Federal Rules of Evidence fails to take into account that the plaintiff has not yet been afforded an opportunity, through discovery, to test fully the factual basis of his case." *Swartz v. D-J Eng'g, Inc.*, No. 12-CV-1029-JAR, 2013 WL 5348585, at *4 (D. Kan. Sept. 24, 2013) (citations and quotation marks omitted). The court agrees with the conclusion that our court has reached on this issue. This case is far from over. There's no need to adopt a more demanding standard at this early stage when Tenth Circuit guidance instructs that Phase II of discovery will afford both sides an opportunity to dig deeper into the facts. *See Thiessen*, 267 F.3d at 1103.

Still, defendants are right that "[t]he Tenth Circuit has not ruled on" this issue. Doc. 71-1 at 4 n.3. But one circuit has. And its thoughts on the matter don't look good for defendants. *Novick v. Shipcom Wireless, Inc.*, 946 F.3d 735, 740 (5th Cir. 2020) (explaining that, where defendant employer acted in furtherance of a legal duty that already existed under the FLSA, Fed. R. Evid. 407 didn't bar evidence because the Rule's "social policy" of "encouraging . . . or at least not discouraging [individuals] from taking [] steps in furtherance of added safety" was not disturbed (internal quotation marks omitted)). While the court is inclined to agree,

---

[10] At the same time, defendants don't believe their actions amount to a subsequent remedial measure at all. In their view, the 2019 Tip Credit Notice form served to streamline existing procedures. Doc. 67 at 28 ("[T]he evidence shows the 2019 Tip Credit Notice was only meant to simplify the information already being provided.").

determining this question—one that decides the merits of the claim—is reserved for Phase II of the litigation. *See Gieseke v. First Horizon Home Loan Corp.*, 408 F. Supp. 2d 1164, 1168 (D. Kan. 2006) ("[C]onditional certification of a collective action and the issuance of a notice do not require this Court to adjudicate the merits." (citation and internal quotation marks omitted)).

### b. Has plaintiff shown that he is similarly situated to other members of the Tip Credit Notice Collective?

Defendants also argue that plaintiff's claim should fail because he can't show that he is similarly situated to "thousands and thousands of current and former employees from over a dozen casino properties." Doc. 67 at 23. Defendants' arguments are somewhat muddled. They organize clearly their first argument—that "[t]here was no single decision, policy or plan"—via a designated, titled section of their brief. *Id.* at 25–26. But they don't use a similar approach for their second argument. *Id.* at 23.

Here, defendants hum a tune that echoes across their arguments: that too many individualized scenarios requiring too many individualized inquires preclude conditionally certifying this class. But, aside from those arguments already addressed, and which were couched within defendants' section dedicated to the first of their two stated arguments, the court only can wonder what else defendants meant when they wrote that plaintiff and the putative class aren't similarly situated. *Id.*

What matters most at this juncture, and what the court must ask, is "What has plaintiff alleged?" Is it *substantial*? *See Thiessen*, 267 F.3d at 1102. The court concludes it is, but it's also a close call. Plaintiffs in an FLSA case often submit a variety of declarations to advance their claim. *See, e.g.*, *Renfro v. Spartan Comput. Servs., Inc.*, 243 F.R.D. 431, 433 (D. Kan. 2007) (referencing 20 declarations provided by plaintiffs in support of their FLSA lawsuit).

Here, plaintiff just submits his own deposition transcript.  Doc. 65-12 (James Dep.).  And it doesn't tell the court much about what happens at casinos other than Kansas Star.

But that isn't all the court has to consider.  For instance, defendants responded in their Answers and Objections to Plaintiff's First Set of Interrogatories that "the Relevant Subsidiary Casino Properties have separately and individually used some combination of written and verbal communications and information" to provide their employees with notice of the tip credit, as the FLSA requires.  Doc. 65-3 at 6–7.  These details bolster plaintiff's central theme—that Boyd Gaming failed to provide adequate notice across all of its casino properties.  The court discusses that theme in greater length, below.

Plaintiff also deposed defendants' Vice President of Human Resources, Chris Smith.  Mr. Smith recalled his "surprise" when he learned of this lawsuit, in large part because no other employees had reported similar concerns.  Doc. 65-5 at 31 (Smith Dep. 117:3–118:16).  So, he "just didn't think it was an issue."  *Id.*  Mr. Smith expressed a "belief" that these casinos operated in compliance with the FLSA.  *Id.* at 118:1.  But, he offered nothing to support that belief except a lack of employee complaints.  *Id.* at 118:5–10.

So, before the court is deposition testimony from one of Boyd Gaming's senior officials in human resources.  And his confidence in the casinos' compliance amounts to a "belief" based predominantly on metrics that look to employee feedback to confirm the company's compliance with its affirmative legal duties.  *Id.* at 118:4–10.  At a minimum, these details supply an inference that the properties weren't FLSA compliant.  *Id.*

Defendants lean on decentralization of decision making as a key theme.  Their point makes some sense alongside a strictly literal reading of the Tenth Circuit's guidance.  This guidance instructs that conditional certification requires "nothing more than substantial

allegations that the putative class members were together the victims of a single decision, policy, or plan." *Thiessen*, 267 F.3d at 1102 (citation and internal quotation marks omitted).  "Plaintiff has not identified an unlawful tip credit notice policy or plan applicable to all thirteen casino properties," so, defendants argue, his claim must fail.  Doc. 67 at 25.[11]  In other words, defendants contend they should prevail unless plaintiff shows that they uniformly violated federal law.  That strikes the court as a rather unlikely way to streamline a business.

Defendants' point also withers when situated alongside the "twin goals of collective actions," that is, enforcement and efficiency.  *Bigger v. Facebook*, 947 F.3d 1043, 1049 (7th Cir. 2020).  The court is mindful of the enforcement prong.  Specifically, collective actions empower individuals to band together and pursue common justice in disputes that otherwise might entail an enormous imbalance of power.  Boyd Gaming owns these properties and it profits from them. Yet, they argue they should reap the financial benefits of casino ownership while maintaining such an obviously convenient escape hatch from liability over that ownership.  In other words, because the individual casinos call the shots with respect to their own notice policies, Boyd Gaming argues it isn't on the hook for anything.

But, that argument misses the mark for a few reasons.  Boyd Gaming calls the shots to some extent because it administered a nearly uniform tip credit notice to all of these casinos in the spring of 2019.  *See* Fed. R. Evid. 407 ("[T]he court may admit this evidence for another purpose, such as . . . —if disputed—proving . . . control, or the feasibility of precautionary

---

[11]     Defendants misapprehend the legal landscape by emphasizing a purportedly "unlawful" common plan, policy, or decision.  *Struck v. PNC Bank N.A.*, No. 2:11-CV-00982 2013 WL 571849, at *4 (S.D. Ohio Feb. 13, 2013) (explaining that defendant's use of nearly verbatim language was "inapposite at this stage of the analysis" because "the relevant inquiry at this juncture is whether Plaintiff's claims are united by common *theories* of defendant's statutory violations") (citing *O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d 567, 585 (6th Cir. 2009) *abrogated on other grounds by Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016).

measures.").  And, no one contests that the 2019 Tip Credit Notice involved bringing each property under a common, FLSA complaint policy.

More to the central point at this stage, the court must consider *what* plaintiff seeks to certify.  Plaintiff doesn't argue that *all* of Boyd Gaming's tipped employees are identical in their various jobs.  And this wouldn't matter anyway.  The court looks for *similar*, not identically situated parties.  Likewise, plaintiff doesn't argue that the putative class is similarly situated because they are simultaneously the victims of a single policy in the glaringly obvious sort of way that defendants consider essential.

Plaintiff appears to approach his arguments based on a different reading of what *Thiessen* requires.  His point is that all of the purported class members are similarly situated by virtue of Boyd Gaming's common failure to provide adequate legal notice according to what § 203(m) requires.  In a sense, there *is* a common policy.  It's Boyd Gaming's alleged common failure to follow the law.  Surely, no one would expect defendants or any other company to inscribe as much onto a plaque for all of the world to see.  That's not how omissions work.  And plaintiff's case is focused centrally on omissions.  That's his common theme.  And that's the "single decision, policy, or plan" to which plaintiff purports he and any other members of the Tip Credit Notice Collective, as "victims," are similarly situated.  *Thiessen*, 267 F.3d at 1102 (citation and internal quotation marks omitted).

Viewing plaintiff's arguments alongside the other information so far revealed through discovery, the court finds that plaintiff has made the requisite showing of "substantial allegations" to conditionally certify the Tip Credit Notice Collective.  *Id.*  He has done so by piecing together details sufficient to bring forth substantial allegations pointing to a common failure under the FLSA by Boyd Gaming.  That's how things are supposed to work at this stage,

and why conditional certification is so common.[12]  It's "a lenient standard which typically results in conditional certification."  *Renfro*, 243 F.R.D. at 432.

These details are enough for the court to conditionally certify the Tip Credit Notice Collective.[13]  So, the court grants plaintiff's motion to certify conditionally the Tip Credit Notice Collective.

### 2.  The Tip Pool Collective

Next, plaintiff seeks conditional certification of the following collective:

All persons employed as a table games dealer and included within a tip pooling arrangement at a relevant Boyd Gaming casino[14] during the relevant time period.[15]

Doc. 59 at 2.  Plaintiff contends defendants' tip pooling arrangement for table games dealers violates the FLSA in two respects:  (1) failing to limit participation in the pool to employees who customarily and regularly receive tips and (2) violating the prohibition against employers

---

[12]    Defendants want the court to deviate from this trajectory based almost exclusively on a single case from the Western District of Missouri, in which a district court—applying a ratcheted-up standard of review—declined to conditionally certify a purported FLSA class.  Order at 12, *Allen v. Pinnacle Ent., Inc.*, No. 17-00374-CV-W-GAF (W.D. Mo. July 24, 2018), ECF No. 150.  Here, the court applies the standard of review chosen by binding Tenth Circuit precedent.  *Thiessen*, 267 F.3d at 1105.  *Allen* is not a proper analog because that court's calculus hinged on a different standard of review that itself was based on a different legal landscape.

[13]    These details *are* enough.  But, the court also notes that plaintiff cites statements from defendants' human resources leadership which evidences a common lack of training for their staff about the notice requirements.  *See* Doc. 65-5 at 38 (Smith Dep. 147:4–9); Doc. 65-4 at 29 (Bair Dep. 112:7–113:11).  This too supports plaintiff's request to conditionally certify the Tip Credit Notice Collective.

[14]    The relevant Boyd Gaming casinos for the second collective are:  Par-A-Dice Gaming Corporation (Illinois), Blue Chip Casino, LLC (Indiana), Diamond Jo Worth, LLC (Iowa), Kansas Star Casino, LLC (Kansas), The Belle of New Orleans LLC (Louisiana), Red River Entertainment of Shreveport, L.L.C. (Louisiana), Treasure Chest Casino, L.L.C. (Louisiana), Sam's Town Tunica (Mississippi), and Valley Forge (Pennsylvania).

[15]    The relevant time period extends from three years and 60 days before the date of this Order to present.  Doc. 59 at 2; *supra* note 3.

keeping tips received by employees for any purpose—including allowing supervisors to keep a portion of the tips.  Doc. 65 at 11.

Specifically, plaintiff alleges defendants' PTO policy violates the FLSA's tip pool requirements because they distribute tips from the table games dealers' tip pool to Dual-Rate Supervisors as a way of paying for PTO.  *Id.*  Dual-Rate Supervisors are non-tipped employees who, plaintiff argues, serve in a supervisory capacity.  *Id.*  According to plaintiff, this violates the FLSA.  *Id.*

 Plaintiff contends defendants don't track separately whether Dual Rate Supervisors are accruing PTO hours while working as a supervisor or a dealer.  Doc. 65-2 at 9.  And, plaintiff alleges defendants then use money from the dealer tip pool to pay Dual Rate Supervisors for the use of PTO accrued while working as a supervisor.  This, according to plaintiff, violates the FLSA's requirements for limiting the tip pool to employees customarily receiving tips and prohibiting supervisors from keeping a portion of employees' tips.  *Id.* at 9–10.  Plaintiff believes the Tip Pool Collective, if certified, could include "nearly 1,900 table games dealers."  Doc. 65 at 22.

### a.  Factual Background

Plaintiff's claim involves a series of technical details about the relevant casinos and their PTO policies for two different-but-related job posts within each establishment's table games department.  The court provides an introductory overview of these details before turning to plaintiff's specific allegations.

### 1.)  Table Games Dealers

First, plaintiff describes the relationship between table games dealers and floor supervisors:  "[T]able games dealers at the relevant Boyd Gaming casinos are not permitted to

retain their own tips (sometimes referred to as 'tokes')."  Doc. 65 at 23.  Instead, they all participate in a mandatory tip pooling arrangement through which "tips are collected, pooled and distributed based on a specific formula" that enables each dealer to receive a portion of the total daily tips through their respective paychecks.  *Id.*  Plaintiff doesn't challenge the legality of a mandatory tip pooling arrangement for employees in this position.

"[A]n employee that works exclusively in a table games department's dealer position accrues PTO pursuant to a set schedule based on each individual hour the employee works in a pay period at a rate per hour that is determined by the employee's length of service."  *Id.* at 27. When a table games dealer elects to use some of his or her PTO, the "PTO hours are classified as hours worked as a dealer and included in part of the distribution of the dealers' pooled tips during that pay period."  *Id.*  In other words, when tables games dealers take PTO, they'll receive a portion of pooled tips "the same as if he or she had actually worked those PTO hours as a dealer."  *Id.*  Plaintiff doesn't contest this payout plan.

### 2.) Floor Supervisors

Second, plaintiff explains that floor supervisors work alongside table games dealers, but in a distinct capacity.  For one thing, floor supervisors are paid a "straight hourly rate" that exceeds the federal minimum wage.  Doc. 65 at 25.  For this reason, presumably, floor supervisors serve in a non-tipped position.  *Id.*  ("As a common practice, hours actually worked . . . in the position of a floor supervisor are not included in the table games dealers' tip pooling arrangement.").

Floor supervisors accrue PTO "pursuant to a set schedule based on each individual hour the employee works in a pay period at a rate per hour that is determined by the employee's length of service."  *Id.* at 27.  In other words, and in keeping with Boyd Gaming's policy of

paying floor supervisors at a different rate than table games dealers, "an employee that works exclusively as a floor supervisor is paid for each hour of PTO taken at his or her supervisor rate of pay . . . and never receives any portion of the dealers' pooled tips." *Id.* at 28.  Plaintiff doesn't object to Boyd Gaming paying floor supervisors at a rate above the federal minimum wage or calculating their PTO according to these criteria.

### 3.) Dual-Rate Supervisors

Things gets messier, plaintiff says, when it comes to Dual-Rate Supervisors.  These employees work as both table games dealers *and* floor supervisors, "but never . . . in both positions at the same time."  Doc. 65 at 24.  The relevant federal regulations call this type of position a "dual job,"[16] and Boyd Gaming calls these employees Dual Rate Dealers.  *Id.*  Stated simply, "an individual that holds these two positions sometimes works as a dealer and at other times works as a floor supervisor."  *Id.*

Dual-Rate Supervisors are paid at an hourly rate that depends on the job they're performing at the time.  *Id.* at 25.  So, a Dual-Rate Supervisor earns a table games dealer's hourly wage when working as a dealer (including tips) and earns the higher hourly wage of a floor supervisor when serving in that more senior position.  *Id.*  Boyd Gaming tracks each Dual-Rate Supervisor's time according to the job the employee is performing.  So, one employee's timesheet could reflect two separate tracking documents, if they're a Dual-Rate Supervisor.  *Id.*

"Just like dealers and floor supervisors, Dual-Rate Supervisors accrue PTO pursuant to a set schedule based on each individual hour the employee works in a pay period at a rate per hour that is determined by the employee's length of service."  *Id.* at 28.  But, plaintiff asserts that Boyd Gaming doesn't distinguish between these jobs when it's time to pay out for PTO.  *Id.* at

---

[16]        29 C.F.R. § 531.56(e).

26.  And this "is where things go off the rails for Boyd Gaming," plaintiff argues.  *Id.* at 28.

Specifically, plaintiff asserts that "Boyd Gaming has a common practice of not distinguishing for

PTO accrual purposes between the individual hours a Dual-Rate Supervisor worked in a tipped,

dealer position from the individual hours worked in a non-tipped, supervisor position."  *Id.*

Plaintiff calls this a "fatal flaw."  *Id.* at 30.  "Boyd Gaming routinely distributes tips from

its table games dealers' pooled tips to Dual-Rate Supervisors when they take PTO without regard

to whether such PTO hours accrued based on the individual hours worked in a tipped, dealer

position or a non-tipped, supervisor position."  *Id.*  The result is two-fold.  On the one hand,

plaintiff alleges, this approach satisfies Boyd Gaming's economic self-interest because it enables

the company to pay Dual-Rate Supervisors for PTO at the cheapest possible hourly rate.  *Id.* at

30 n.10.  And on the other hand, plaintiff asserts, this purported common policy leads to

"skimming all the other dealers out of their money" because funds from the tip pool go toward

PTO payments for time accrued in non-tipped positions.  *Id.* at 31.

### b.  Similarly Situated

Plaintiff argues these facts self-evidence a basis for the court to conditionally certify the

Tip Pool Collective.  Not so fast, defendants say.  In brief, they contend:

> [T]his collective cannot be conditionally certified because (1) there is *no* common
> tip pool policy or procedure among the properties; (2) any attempt to analyze the
> merits of the tip pool claim requires numerous highly individualized inquiries; and
> (3) Plaintiff was a Dual Rate Dealer, so he lacks standing to bring this claim and
> has a direct conflict with the Table Games Dealers that precludes conditional
> certification.

Doc. 67 at 31.

*First*, defendants argue, "through varying combinations of toke committees, bylaws,

and/or other documents," table games dealers "decide how they will distribute their tips or tokes,

including whether individuals who take PTO will receive" them.  *Id.*  Defendants' point here

33

encapsulates two discrete arguments, that (1) "table games dealers have autonomy over their tips," and (2) "[t]here is no overarching policy establishing a singular method for tip distribution amongst those in the Table Games Dealer tip pools across the properties." *Id.* at 31, 33.  It's a common theme for defendants.  As they see things, the inquiry is too individualized for plaintiff to prevail at even this initial stage of an FLSA lawsuit.

But it's more than just that.  Defendants assert that *employees* exercise autonomy over their tips and their respective tip pools, including whether and to what extent those funds can go toward PTO payouts.  So plaintiff's effort should fail, in part, because he seeks an outcome that is undemocratic in light of these arrangements.  *Id.* at 30–31 ("Plaintiff simply wants to impose his legally unfounded idea on thousands of Table Games Dealers at nine separate casinos over the express wishes of those thousands of actual Table Games Dealers." (emphasis omitted)).  On top of that, defendants say, the FLSA doesn't prohibit any of this.  *Id.* at 34 n.13 ("There is no violation of the FLSA when Dual Rate Dealers receive tokes when they take PTO based on rules exclusively devised by those who participate in the tip pool." (emphasis omitted)).  And perhaps most of all, defendants contend, these facts show a variety of policies at play, rather than just one.

*Second*, defendants doubt the feasibility of certification.  *Id.* at 34–36.  Their point is a familiar one.  Here, defendants contend that multiple layers of individualized inquiries doom plaintiff's prospects.  There's "the first individual question" whether each Dual Rate Dealer earned enough in tips to qualify under the FLSA.  *Id.*  And, they say, there's questions downstream about each individual employee's principal duties.  *Id.*

*Third*, defendants argue that plaintiff can't bring this claim at all because *he* is a beneficiary of precisely the sort of arrangement that his lawsuit puts at issue.  *Id.* at 37–38.

They're right, at least about plaintiff's job title.  Plaintiff was a Dual Rate Dealer at Kansas Star

in its table games department "from November 2016 until shortly after he filed this lawsuit."  *Id.*

at 37 (emphasis omitted).  Defendants call this a conflict of interest because "[t]he ironic

conclusion of Plaintiff's flawed and incorrect legal theory is that he, if anyone, benefitted by

wrongfully taking tips out of the tip pools from other dealers."  *Id.* (emphasis omitted).

Because plaintiff's position as a Dual-Rate Dealer "directly conflict[s] with employees

who worked exclusively as Table Games Dealers," defendants say a conflict of interest exists

"and Plaintiff cannot have it both ways."  *Id.*  Plaintiff, they argue, "has no standing for this

claim, [so] conditional certification should be denied."  *Id.* at 38.  The court addresses each of

defendants' three arguments separately, below.

### 1.  Does a conflict of interest preclude certification?

The court begins its analysis with defendants' third point.  It's important to consider first

their allegation that plaintiff lacks standing to bring this claim—on the basis of his purported

conflict of interest—because it could obviate any need for further inquiry.  But the court

disagrees with defendants and will explain its reasoning.

Defendants' third point is really two separate-but-related arguments.  They say plaintiff

lacks standing to bring this claim "on behalf of Table Games Dealers as he was a Dual Rate

Dealer."  Doc. 67 at 38.  And defendants cite Judge Murguia's decision in *Stubbs* as the basis for

their assertion.  *Stubbs v. McDonald's Corp.*, 227 F.R.D. 661, 665 (D. Kan. 2004).

In that case, the court faced a plaintiff who purported to represent two categories of

employees—so-called first and second assistant managers.  *Id.*  The plaintiff in *Stubbs* "only held

the position of second assistant manager" and had "never held the position of first assistant

manager."  *Id.*  He also failed to supply the court with any evidence to demonstrate similarities

across the two positions.  *Id.*  So, Judge Murguia concluded, "plaintiff does not have standing to represent first assistant managers."  *Id.*

Defendants also direct the court to Missouri's Western District.  There, a court concluded that an FLSA plaintiff "lack[ed] standing to bring claims on behalf of the proposed classes of non-exempt employees" because, among other things, the plaintiff conceded that he was an exempt employee.  *Stagner v. Hulcher Servs., Inc.*, No. 16-1036-CV-W-FJG, 2017 WL 3166841, at *3 (W.D. Mo. July 25, 2017).  The court reasoned that this plaintiff therefore could not show that he was similarly situated to the purported class because his job was different fundamentally from those he sought to represent.  *Id.*

Both cases differ from the matter at hand.  In *Stubbs*, the court confronted a different context because the plaintiff sought to represent individuals working in a job that *he* never performed.  *Stubbs*, 227 F.R.D. at 665.  In *this* case, it's undisputed that plaintiff worked as a table games dealer because his pay stubs demonstrate as much.  Doc. 65-14.  This is not a complicated issue.  Defendants designed the Dual-Rate Supervisor position as one in which, as plaintiff puts it, "an individual that holds these two positions . . . sometimes works as a dealer and other times works as a floor supervisor."  Doc. 65 at 24.  The parties use different terminology—Dual-Rate Supervisor and Dual Rate Dealer—but the meaning is all the same.  Put simply, this plaintiff is not like the plaintiff in *Stubbs*.

*Stagner* is different, too.  There, the plaintiff purported to represent non-exempt employees when he was an exempt employee.  *Stagner*, 2017 WL 3166841, at *3.  Here, Dual-Rate Supervisors are non-exempt employees, and so are their component parts—table games dealers and floor supervisors.  Plaintiff explains this point, and it is manifested by the PTO policies at issue.  Doc. 65 at 26 ("Boyd Gaming offers PTO as a benefit to all hourly, non-

exempt employees."). And, plaintiff alleges, both table games dealers and floor supervisors participate in this PTO plan. *Id.* at 28 ("Just like dealers and floor supervisors, Dual-Rate Supervisors accrue PTO."). So, one can't say that this plaintiff is like the plaintiff in *Stagner*.

But that's not all. Defendants also contend that plaintiff can't bring his claim on behalf of the purported Tip Pool Collective because, as a Dual-Rate Supervisor, he "benefitted from the system he now challenges," which means there's "an inherent conflict" of interest. Doc. 67 at 37. Defendants direct the court to the Southern District of New York, where a district court considering an FLSA action, they say, declined to issue conditional certification because of a similar conflict of interest. *Schear v. Food Scope Am., Inc.*, 297 F.R.D. 114, 122 (S.D.N.Y. 2014). In that case, restaurant employees disagreed about who should participate in a tip pool collective. *Id.* The court decided a conflict existed because the plaintiff's claim would divest from the tip pool some of the same folks who the plaintiff alleged to represent. *Id.*

But this case is different. For one thing, plaintiff doesn't seek to divest Dual-Rate Supervisors from the tip pool in the same sense. He just thinks defendants should pay Dual-Rate Supervisors for PTO accrued as supervisors at a supervisor's rate of pay—a *higher* price point. In other words, plaintiff thinks *defendants* did wrong by "skimming" money out of the table games dealers' tip pool. Doc. 65-12 at 14. After all, plaintiff is suing Boyd Gaming, not table games dealers.

But more to the point, *Schear* shared the court's insights and they inform this court's understanding why defendants miss the mark. These details weren't hard to find because *Schear* addressed them immediately after concluding that a conflict of interest existed—*i.e.*, the portion of the opinion that defendants cite. So, that case might offer one or two sentences that benefit defendants here. But, the broader context heavily favors plaintiff.

In that case, the court considered whether an alternative finding—one in the plaintiff's favor—might mean that employees who allegedly shouldn't have gotten tips would then have to pay money back to cover costs. *Schear*, 297 F.R.D. at 122–23. They wouldn't. *Id.* at 123. Citing another case from the Southern District, the court reasoned that no support existed for "the proposition that an employer may recover from its employees money that the employees received as a result of an improper tip distribution." *Id.* (citing *Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F. Supp. 2d 253, 281–82 (S.D.N.Y. 2011)).

The court also concluded that a claim wouldn't be possible under a theory of unjust enrichment "because . . . disgorging tips from employees who did nothing but receive the money [their] employer paid [them] did not satisfy the claim's third element." *Schear*, 297 F.R.D. at 123 (citation and internal quotation marks omitted); *see also id.* ("[U]njust enrichment is based on the equitable principles that a person shall not be allowed to enrich himself unjustly at the expense of another, and the tip ineligible employees were enriched [] at the expense of the other employees, not [the defendant]." (citation and internal quotation marks omitted)). Under plaintiff's claim in this case, any money owed to putative class members would have to come from Boyd Gaming—and not the Dual-Rate Supervisors. Defendants' citations and analogies are misguided. So, the court rejects this argument against conditional certification.

## 2.   Is there a common policy?

The court now returns to defendants' first argument against certification. Defendants believe that conditional certification is unmerited because the tip pools at relevant casinos vary in more than one way. For instance, employees exercise a great deal of autonomy when deciding how their tip pool is structured. Doc. 67 at 31, 33. This detail provides at least two reasons not to certify the collective, defendants contend. *First*, it shows there's not a common policy

because the tip pools all have their own quirks. *Id.* at 33 ("There is no overarching policy establishing a singular method for tip distribution amongst those in the Table Games Dealer tip pools across the properties."). *Second*, it wrests autonomy from employees, given they have a strong say in each tip pool's structure. *Id.* at 30–31 ("Plaintiff simply wants to impose his legally unfounded idea on thousands of Tables Games Dealers.").

To their first point, the court returns to defendants' most common theme: individualized differences as a reason to conclude no single policy exists. Generally, these sorts of attacks are better-suited for merits-based analyses in the second stage of an FLSA lawsuit. But in this context, defendants' point is well-taken. Here, they mean that plaintiff can't show a single policy at play because of differences pervasive across the individual casinos. Still, defendants are incorrect.

Plaintiff alleges a common practice at each of the named casinos involving Boyd Gaming's failure to segregate PTO hours based on time worked as a table games dealer from those accrued as a supervisor. *See, e.g.*, Doc. 65-9 at 11 (describing the policy at Par-A-Dice casino of combining all PTO for Dual-Rate employees into one "bucket" no matter the origin of the hours accrued). So, plaintiff has provided a substantial allegation involving a common policy.

Next, it doesn't matter that employees have a hand in crafting their respective tip pools when it comes to what the FLSA requires of Boyd Gaming. That's just not how the law works. And, this argument places an onus on employees when the FLSA's purpose places that burden on employers. "FLSA rights cannot be abridged by contract or otherwise waived because this would nullify the purposes of the statute and thwart the legislative policies it was designed to effectuate." *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 740 (1981) (citations

and internal quotation marks omitted).  This argument also raises merits-based assertions, which are reserved for the second stage of this litigation.  But, the court still recognizes that Boyd Gaming can't duck its legal duties by outsourcing them to their staff.  So, the court rejects defendants' first argument against certifying the Tip Pool Collective.

### 3.  Do individualized inquiries predominate and prevent certification?

Last, the court addresses defendants' second argument against certification.  Defendants assert that so many individualized inquiries are required for this part of plaintiff's lawsuit that conditional certification isn't feasible.  Doc. 67 at 34–36.  Specifically, they argue that determining whether Dual Rate Dealers "may properly receive tokes when they take PTO" requires more than one layer of individualized inquiries.  *Id.* at 34.  This point is also misguided.

For one, and at least in this context, the court doesn't consider the issue of individualized inquiries.  *See Struck v. PNC Bank N.A.*, No. 2:11-CV-00982, 2013 WL 571849, at *5 (S.D. Ohio Feb. 13, 2013) (explaining that individualized inquiries are inappropriate at the notice stage of an FLSA lawsuit because they risk "apply[ing] a Rule-23 type analysis as to whether individualized questions will predominate" (citation and internal quotation marks omitted)).  That "individualized questions will predominate" is exactly what defendants argue here.  *Id.*  The court will save those questions for the second stage of an FLSA lawsuit, where they belong.[17]

The court finds that plaintiff is similarly situated to the proposed Tip Pool Collective.  This, in turn, calls into question defendants' last argument on this front:  that he's not.  Plaintiff believes he's similarly situated to other tables games dealers because "Boyd Gaming is [their] common, acknowledged employer" and because, regardless of whether the time accrued while

---

[17]     Defendants acknowledge this point.  They title the relevant section of their brief "Further Individualized Inquiries Related to the 'Dual Rate Dealer' Role Would Be Required to Resolve the *Merits* of Plaintiff's Claims."  Doc. 67 at 34 (emphasis added).

working as a floor supervisor, "Boyd Gaming pays out PTO to Dual-Rates at their dealer rate, *plus* tips . . . from its dealers' pooled tips under identical or nearly the same circumstances across the casinos at issue."  Doc. 70 at 24–25.

Defendants point out that plaintiff doesn't personally know about employees' experiences at the other casinos because he's never worked there.  Doc. 67 at 38.  And they're right.  But, that's not all the court considers at this stage of the litigation.  Among the materials produced during Phase I of discovery, defendants provided ample evidence supporting an inference that each of the casinos included in this collective—and despite their differences—also have a lot in common.  And that's all plaintiff needs to show for now.

More specifically, neither party disputes that Boyd Gaming plays an ownership role in this arrangement.  *See* Doc. 67-4 at 3 ("For purposes of only this litigation . . . Boyd Gaming . . . will not dispute its status as a joint employer under the Fair Labor Standards Act ("FLSA") with respect to workers at the Relevant Boyd Casino Properties.").  And no one disputes that Boyd Gaming regularly tracks Dual-Rate Supervisors separately for their time worked, depending on whether they were working as a dealer or a floor supervisor.  Nor does either party refute that Boyd Gaming doesn't track separately the PTO that each of these individuals accrues through the time they're working.

So, defendants end up with more than one time record for Dual-Rate Supervisors.  But, they maintain only one "bucket" for their PTO.  This is the case even though paid time off is *earned* by virtue of time *worked* in more than one job, not to mention jobs that pay different rates.  After all, this isn't exactly free money.  One can trace it back to hours spent furthering Boyd Gaming's pecuniary interests.  Boyd Gaming seems to know this because it actively traces

all of this time to each respective role.  It ensures Boyd Gaming doesn't pay its staff a higher wage than it must.

And that's where things get wacky for Boyd Gaming, plaintiff contends.  Obviously, if an employee accrues PTO based on jobs that pay different wages but which only ends up in a single repository, Boyd Gaming can't say for certain that PTO payouts aren't going to some supervisors using money that came from tipped table dealers.  If plaintiff can come forward with facts proving these allegations, it could pose a problem for Boyd Gaming.  The federal regulations governing the FLSA provide, in pertinent part, that "[a]n employer may not keep tips received by its employees for any purposes, including allowing . . . supervisors to keep any portion of employees' tips."  29 U.S.C. § 203(m)(2)(B).

That's plaintiff's point, in a nutshell.  As he argues:

> [T]he result of Boyd Gaming's common PTO policy and related pay practice across the casinos at issue is the unlawful retention and improper distribution by Boyd Gaming of a portion of its dealers' pooled tips to Dual-Rates for the payout of PTO hours that Dual-Rates earned (accrued) based on the individual hours they worked as a floor supervisor (a non-tipped, supervisory position).

Doc. 70 at 25–26.

It's unsurprising that differences emerge when these properties are viewed under a microscope.  It's equally understandable that logical inquiries will arise about the proper legal designation of each floor supervisor, as defendants note.  Doc. 67 at 34–36 ("The Court would be confronted with even more individualized inquiries relating to whether Dual Rate Dealers may properly receive tokes when they take PTO.").  Those individualized differences, and the fact-specific questions they conjure, are for the court to resolve at stage two of this action.

And on these points, defendants may indeed still prevail.  That's why they'll have an opportunity—when the court does take Phase II's microscope to these distinctions—to file a

motion to decertify both collectives. *Folger*, 2014 WL 2885363, at *2 ("At that stage, defendants may file a motion to decertify [the class] and the court then applies a stricter standard to assure that plaintiffs are actually similarly situated.").

For present purposes, plaintiff just needs to clear a low bar. *Renfro v. Spartan Comput. Servs., Inc.*, 243 F.R.D. 431, 432 (D. Kan. 2007) ("This initial step creates a lenient standard which typically results in conditional certification of a representative class."). By putting forth substantial allegations that the putative class members have together sustained injury through a common failure in Boyd Gaming's PTO policies, plaintiff has cleared that hurdle.

So, the court conditionally certifies the Tip Pool Collective for purposes of advancing this FLSA action to its next stage.

## C.  Other Issues

In addition to conditional certification, plaintiff asks the court to:

**(1)** require defendants to provide plaintiff, within 10 days of this Order and for each of the relevant Boyd Gaming casinos, an electronic spreadsheet containing the full name, employee ID, position(s), dates of employment, and all available contact information (including last known address, telephone number(s) and email address) for each member of the conditionally certified collectives; and

**(2)** direct the parties to meet and confer about a proper notice, consent-to-join form, and email and/or text messages to collective members, and submit the agreed forms to the court no later than 14 days from this Order (or, if the parties cannot agree, allow plaintiff to file a motion within 21 days of this Order seeking approval of proposed forms, followed by seven day response and seven day reply deadlines). Doc. 59 at 2–3.

The court addresses each issue, in turn, below.

### 1.   Information About Putative Class Members

Defendants' Response doesn't address plaintiff's first request regarding the specific file format and contents of any documents shared between the parties for purposes of identifying potential opt-in plaintiffs.  It's "not uncommon" for plaintiffs to request information about putative class members in FLSA collective actions.  *See Allen v. Mill-Tel, Inc.*, No. 11-1143-EFM-KGS, 2012 WL 2872160, at *7 (D. Kan. July 12, 2012).  This request is unsurprising given the nature of these lawsuits.  Courts have found that "such information may be useful for locating . . . employees," including where a putative class member's address is no longer valid. *Id.* (citation and internal quotation marks omitted).

The court finds the same here:  plaintiff requires the requested information to notify putative class members of this conditionally certified collective action.  The court thus grants plaintiff's request for putative class members' full names, employee IDs, positions, dates of employment, and all available contact information (including last known addresses, telephone numbers, and email addresses).  And in keeping with this finding, the court directs defendants to provide this information in an electronic and importable format.[18]

But, giving defendants 10 days to perform this work is asking too much.  The court finds that 30 days is a more realistic deadline.

### 2.   Meet and Confer About Proposed Notice

Plaintiff asks the court to issue an order "directing the parties to confer and agree on a proper notice, consent-to-join form, and email/text message to collective members."  Doc. 65 at 35.  And, defendants "agree the parties should meet and confer on the proper form of notice." Doc. 67 at 41.  If only all things were so easy.

---

[18]     If plaintiff is unable to locate potential class members using the information defendants make available to him, he may file a motion explaining his need for additional information.

Alas, the details fall apart from there.  The court addresses their disagreements, below.

> **a.      What contact information must defendants share with plaintiff?  And in what ways may plaintiff use this information?**

Plaintiff requests a broad assortment of information about current and former Boyd Gaming employees who might qualify to opt-in to this lawsuit.  Specifically, plaintiff wants the court to require that defendants share, among other things, these folks' last known address, telephone number(s), and email address.  Doc. 65 at 34.  And, plaintiff evidently wants to use this information to send emails and text messages about opting-in to the lawsuit.  It's unclear if plaintiff also plans on calling them the old-fashioned way.  But, the court will address this issue, too.

Defendants say that's too much.  In their view, sending notice via email and text message is "excessive and unwarranted as regular mail would be sufficient."  Doc. 67 at 41.  They don't discuss plaintiff's request for phone numbers beyond the context of text messaging.  But, the court suspects their point includes as much overall—that is, the court shouldn't permit plaintiff to call potential opt-in plaintiffs.

Defendants ground their argument in *Davenport*.  *Davenport v. Charter Commc'ns, LLC*, No. 4:12-CV-0007-AGF, 2014 WL 1272783, at *8 (E.D. Mo. Mar. 27, 2014) (denying workplace postings where there was no evidence that notification via regular mail wouldn't suffice).  And, they also direct the court to *Sharma*, where a court denied a request for email notice.  *Sharma v. Burberry Ltd.*, 52 F. Supp. 3d 443, 463 (E.D.N.Y. 2014).  Defendants also rely on *McCoy*, although they misapprehend the court's ruling in that case.  Doc. 67 at 41 (asserting incorrectly that *McCoy* "den[ied] text message notice absent a 'special need' and allow[ed] email notice only if the notice via registered mail was returned"); *McCoy v. RP, Inc.*, No. 2:14-CV-3171-PMD, 2015 WL 6157306, at *6 (D.S.C. Oct. 19, 2015) ("[T]he third-party

administrator is authorized to send out a Notice to each potential class member by *both* U.S. Mail and email, but is not authorized to send a Notice by text message." (emphasis added)).

Plaintiff replies that defendants' objection seeks to suppress participation. He argues that notice through regular mail, email, and text messages is appropriate in today's digital world. Doc. 70 at 37. Plaintiff's point is supported by *Dickensheets v. Arc Marine, LLC.*, 440 F. Supp. 3d 670 (S.D. Tex. 2020). *See id.* at 672 ("In light of this reality and the overarching goal of providing potential class members the opportunity to join the case, I find that providing notice via text message in addition to traditional notice methods will almost always be appropriate in modern society."). Plaintiff also points to *Hancock v. Lario Oil & Gas Co.*, No. 2:19-CV-02140-JAR-KGG, 2019 WL 3494263 (D. Kan. Aug. 1, 2019). *See id.* at *4 ("Courts in this Circuit have recognized that notice by email or text message is reasonable in today's mobile society."). *Irvine v. Destination Wild Dunes Management, Inc.* also supports plaintiff's position. 132 F. Supp. 3d 707, 711 (D.S.C. 2015) (explaining that plaintiff's "request that notice be distributed via direct mail, email and text messaging appears eminently reasonable" because our society "has become . . . much more mobile" and "one's email address and cell phone number serv[e] as the most consistent and reliable method of communication").

The court agrees with plaintiff, at least generally. But, the court also has strong concerns about data protections and privacy. "Because traditional methods of communication via regular mail and land line telephone numbers [are] quickly becom[ing] obsolete," there's good reason to wonder whether courts ought to adapt their approach to providing notice for FLSA actions. *Id.* at 711. At the same time, "cell phones differ in both a quantitative and qualitative sense from other objects" that we use in our daily lives. *Riley v. California*, 573 U.S. 373, 393 (2014). For one

thing, "[t]he term cell phone is itself misleading shorthand; many of these devices are in fact minicomputers that also have the capacity to be used as a telephone." *Id.*

So, this issue requires a bit of a tightrope walk. On one end of the wire, there's an undeniable reality that cell phones and related technological developments—like text messaging—have largely supplanted traditional methods of communication. And, on the other end, there's an adjacent reality that these trends carry with them substantial data privacy risks. A lot hangs in the balance, and the court takes these concerns seriously.

"[T]he purpose of notice is to inform potential class members of the lawsuit and provide them the opportunity to join the case[.]" *Wade v. Furmanite Am., Inc.*, No. 3:17-CV-00169, 2018 WL 2088011, at *7 (S.D. Tex. May 4, 2018). It's an important premise because "[t]he benefits of a collective action 'depend on employees receiving accurate and timely notice concerning the pendency of the collective action, so that they can make informed decisions about whether to participate.'" *Hancock*, 2019 WL 3494263, at *3 (quoting *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989)).

At the same time, this court is hardly the first to wonder whether expanding access to individuals' cell phones might offend privacy concerns. For instance, when "technology has enhanced the Government's capacity to encroach upon areas normally guarded from inquisitive eyes," the Supreme Court "has sought to 'assure [] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted.'" *Carpenter v. United States*, 138 S. Ct. 2206, 2214 (2018) (quoting *Kyllo v. United States*, 533 U.S. 27, 34 (2001)). To be certain, the legal landscape here isn't the same one as cases involving law enforcement surveillance. But, the concern for "inquisitive eyes" is similar. *Id.* And so, this court must

confront what it considers to be a close call in a conflict between modern technological trends and Founding Era principles.

Ultimately, the FLSA's animating purpose carries the day.  Were this court to restrict notice so that plaintiff could only provide it through methods that may become even more outmoded tomorrow than they are now, it would do a disservice to both the legacy and future of collective actions.  But, it bears repeating:  this case is a close call.  So, as the court will describe below, the court provides a basic roadmap for the parties to follow.  It aims to embrace evolving technologies and trends while respecting truly timeless concerns about "the privacies of life." *Boyd v. United States*, 116 U.S. 616, 630 (1886).

Permitting notice only via traditional mail won't suffice.  This approach runs the risk that putative class members fail to receive notice.  Many individuals may qualify to opt-in because they now or previously earned minimum wage through their employment with Boyd Gaming.  So, imagining that these folks might be renting, rather than buying, their abodes hardly stretched credulity.  By their terms, leases expire and tenants often move.  So, it's plausible—if not probable—that Boyd Gaming's physical address records won't fully encapsulate the pool of potential plaintiffs.  Traditional mail alone won't do.  That would run afoul of the FLSA's aims. Defendants must oblige plaintiff's request for last known mailing address, but that's not all.

Email seems the least invasive approach to providing notice.  It doesn't require that recipients pause their activities to take a phone call or read a text message.  And, for anyone familiar with burgeoning trends in telemarketing and other scams targeting cell phone numbers, this detail might be appreciated.  *See* FED. COMMC'N COMM'N, WATCH OUT FOR AUTO WARRANTY SCAMS (2019),

https://www.fcc.gov/sites/default/files/watch_out_for_auto_warranty_scams.pdf.  So, defendants

are ordered to provide known information about potential plaintiffs' physical *and* email addresses. And, plaintiff may use this information to send notice—via physical mail and email—about the opportunity to join this lawsuit.

If email provides the least invasive approach to sending notice, direct phone calls are quite the opposite. Be it through a landline or cellular device, most readers understand the pain of ongoing and unwanted telephonic solicitations from strangers. Try as they might, Congress can't seem to stop the barrage of telemarketing shakedowns. *See generally* Telephone Consumer Prot. Act, 47 U.S.C. § 227 *et seq*. ("TCPA"). And while direct calls to potential plaintiffs isn't exactly telemarketing under the TCPA, the concern involves a similar species. *See Hancock*, 2019 WL 3494263, at *5 ("[N]otice is not a telemarketing communication and thus not contemplated by the [TCPA].").  So, the court won't permit plaintiff to call potential opt-in plaintiffs directly. *See Irvine*, 132 F. Supp. 3d at 711 ("[D]irect calling of putative class members would be unduly intrusive and difficult to regulate."). But, that ruling doesn't mean defendants needn't share this information with plaintiff.

To the contrary, and as the court will explain, the court allows plaintiff to use this information to send notice via text message. Just as individuals may move their residences—thereby meriting use of email notice—they also may throw out their landline telephones for related reasons. It's obvious that Americans are cutting cords across the board with increasing frequency—from telephones to televisions—and the court won't ground its decisions in ruling that don't keep pace with the society they control. *See Deakin v. Magellan Health, Inc.*, 328 F.R.D. 427, 436 (D.N.M. 2018) ("The [c]ourt continues to find that notice by email and text is reasonable in today's mobile society and that these methods of communication may offer a more

reliable means of reaching an individual even if that individual is away from home or has moved." (citation and internal quotation marks omitted)).

But, the court's permission isn't boundless. Plaintiff is required to limit the frequency of this form of notice to ensure that opt-in plaintiffs aren't overwhelmed and annoyed. And, plaintiff can offset these limitations by virtue of the ample opportunities the court permits for providing notice. The court is confident the parties can agree to a reasonable approach on this front. And, as the next subsection will explain, such agreement is required.

So, defendants must share all known telephone information with plaintiff for purposes of providing notice via text message. But, plaintiff must heed the court's instructions and limit use of these phone numbers to text messages and to a reasonable frequency. The court will explain, below.

      **b.**    **What's required—in terms of timeline and approach—for the notice and consent-to-join form?**

Defendants oppose plaintiff's proposed timeline for filing responses and replies if the parties can't agree on the proposed notice form. Doc. 67 at 41. Instead of seven days, defendants want twice that, as D. Kan. Rule 6.1(d)(1) permits. Doc. 67 at 41 ("Defendants maintain . . . that they should have 14 days to respond to any motion filed by Plaintiff under the Local Rules."); *see also* D. Kan. Rule 6.1(d)(1) (stating that responses and replies are due within 14 days "[u]nless the court orders otherwise"). Plaintiff maintains that his proposal is reasonable for resolving the form of notice. Doc. 70 at 37.

On this timing kerfuffle, the court agrees with defendants. But, the court doesn't wish to incentivize further filings pointed in opposite directions. So, the parties are directed to meet and confer about a proper notice and consent-to-join form. They shall submit the agreed forms to the court no later than 14 days from the date of this Order's entry. And, if the parties can't agree on

all aspects of a proposed notice, they must file a joint motion.  This motion should identify clearly the portions of the notice about which the parties can and cannot agree.  For areas of disagreement, the parties shall set forth their respective positions.  The court encourages use of different colored fonts to differentiate between disputed passages and the parties' positions.

Whether they concur on their own or require a joint motion, the parties must agree to terms that limit the amount and frequency of notice via text messages.  The parties are represented by capable and reasonable counsel.  So, the court won't dictate a precise formula.  Instead, the court requires the parties come together and agree upon a *reasonable* vision for providing notice via text messaging that keeps the following concerns in mind:

**(1)** *First*, the court reminds plaintiff that his goals won't be well-served if potential opt-in plaintiffs discard his outreach based on a mistaken belief that it's a scam.  Likewise, defendants are reminded that overly-restrictive approaches to notice undermine the purpose of FLSA litigation.  *See Hoffmann-La Roche*, 493 U.S. at 170 (explaining that collective actions exist to provide "plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources" while also benefitting the judicial system "by efficient resolution in one proceeding").  In other words, the parties must find a middle ground.

**(2)** *Second*, and similarly, the parties must strive to achieve a healthy balance of quality over quantity.  Much like the court's concern, above, the parties should keep in mind that frequency isn't necessarily the best way to move this action along.  At the same time, this action *won't* move along if defendants adopt an obstructionist strategy to providing notice.  Again, the parties must find middle ground.

**(3)** *Third*, the parties are ordered to respect and protect these individuals' privacy.  Here, the court takes it cue from *Sharma*.  52 F. Supp. 3d at 465 ("The list [of contact information] . . .

is to be treated by the parties as confidential.").  And, like in *Sharma*, if "the parties have not previously entered into a Stipulation and Order of Confidentiality, they are ordered to do so."  *Id.*

The parties must file this joint motion, if it's needed, no later than 30 days from the date of this Order's entry.  The parties are encouraged to find agreement on these details without the court's intervention.  They are represented by experienced and able counsel who can distinguish disputes that matter and ones that don't.  The court urges the parties to listen to them.

### 3.  Tolling the Statute of Limitations

The Tenth Circuit has not addressed when, if ever, equitable tolling is appropriate in an FLSA collective action.  However, district courts in this Circuit uniformly have agreed that tolling can, in some circumstances, apply in a lawsuit like this one.  *Compare In re Bank of Am. Wage & Hour Emp. Litig.*, No. 10-MD-2138-JWL 2010 WL 4180530, at *5 (D. Kan. Oct. 20, 2010) (tolling the limitations period for the FLSA putative class until the court rules on the motion for conditional certification), *and Stransky v. HealthONE of Denver, Inc.*, 868 F. Supp. 2d 1178, 1181–82 (D. Colo. 2012) (tolling the statute of limitations because "allowing Opt-In Plaintiffs' claims to diminish or expire due to circumstances beyond their direct control would be particularly unjust."), *with Greenstein v. Meredith Corp.*, No. 11-2399-RDR, 2013 WL 4028732, at *2 (D. Kan. Aug. 7, 2013) (declining to toll the statute of limitations but concluding that tolling is appropriate in some circumstances).

Generally, the courts in this Circuit to consider the issue have followed the approach pioneered by the Sixth Circuit.  *See In re Bank of Am. Wage & Hour Emp. Litig.*, 2010 WL 4180530, at *6 (adopting the Sixth Circuit's approach to evaluate whether to toll the statute of limitations in an FLSA collective action); *Stransky*, 868 F. Supp. 2d at 1181 (same); *Greenstein*, 2013 WL 4028732, at *2 (same).  Under the Sixth Circuit's approach, courts analyze five

factors:  "1) lack of notice of the filing requirement; 2) lack of constructive knowledge of the filing requirement; 3) diligence in pursuing one's rights; 4) absence of prejudice to the defendant; and 5) the plaintiff's reasonableness in remaining ignorant of the particular legal requirement."  *Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 561 (6th Cir. 2000) (citation omitted).  Not every factor will apply in every case.  *Id.*  And, "the propriety of equitable tolling must necessarily be determined on a case-by-case basis."  *Id.* (citation and internal quotation marks omitted).

Following the guidance from other district courts in our Circuit, the court is inclined to use the Sixth Circuit's approach here.  However, the court finds it premature to conduct this analysis now.  Plaintiff seeks a blanket ruling that all putative class members are entitled to equitable tolling.  That is, he asks the court to determine that the above-listed factors favor potential plaintiffs who are not yet identified and who may never join as parties to this action.

A plaintiff's diligence is relevant to the tolling analysis.  For instance, some plaintiffs may or should have known about this lawsuit from other sources.  At this point, the court lacks sufficient information about the potential class members to determine if they were reasonably diligent under the Sixth Circuit's factors.  This approach is in keeping with the wisdom of other courts that have previously confronted FLSA claims.  *See In re Amazon.com, Inc. Fulfillment Ctr. Fair Labor Standards Act (FLSA) & Wage & Hour Litig.*, MDL No. 2504, 2014 WL 3695750, at *3 (W.D. Ky. July 24, 2014) (delaying decision whether to toll the statute of limitations on the putative plaintiffs' FLSA claims until the close of the opt-in period).

Admittedly, other courts have ordered the type of blanket tolling plaintiff seeks here.  *See In re Bank of Am. Wage & Hour Emp. Litig.*, 2010 WL 4180530, at *7; *Struck v. PNC Bank N.A.*, 931 F. Supp. 2d 842, 846 (S.D. Ohio 2013).  But, given the importance of this issue to both

parties, and the necessity that the court approach the issue with a case-specific perspective, the better course is to delay this decision until the opt-in period has closed and the court has more information about the putative class members.

Accordingly, the court denies plaintiff's request to toll the statute of limitations. The request is premature. Plaintiff may raise this issue again at the end of the opt-in period. *Accord In re Amazon.com*, 2014 WL 3695750, at *3 (holding that "the kind of blanket tolling Plaintiffs request is not precluded" but was also "premature" given that, in prior decisions to invoke equitable tolling, "the court had already granted conditional certification and, often, that motion had been pending for quite some time").

## IV. Conclusion

As discussed above, the court grants in part but also denies in part plaintiff's Motion for Conditional FLSA Certification and Issuance of Notice to Similarly Situated Employees (Doc. 59). And, the court grants in part but also denies in part defendants' Motion for Leave to File a Sur-reply in Response to Plaintiff's Reply and in Opposition to Plaintiff's Motion for Conditional FLSA Certification (Doc. 71). Specifically, the court:

(1) grants plaintiff's motion for conditional class certification of the Tip Credit Notice Collective under § 216(b) of the FLSA;

(2) grants plaintiff's motion for conditional class certification of the Tip Pool Collective under § 216(b) of the FLSA;

(3) denies without prejudice plaintiff's request to toll the statute of limitations because this request is premature;

(4) grants defendants' motion for leave to file a sur-reply, but only with respect to their arguments about evidence admissibility, and denies the remainder of the motion;

(5) orders the parties to submit the following to the court:

    a.   their Joint Proposed Notice, within 14 days of this Order's entry, or;

    b.   if the parties cannot agree on all aspects of a proposed Notice, they must submit a Joint Motion identifying the portions of the Notice on which they can and cannot agree and setting forth their respective positions on areas of disagreement, within 30 days of receipt of plaintiff's Proposed Notice, and;

    c.   a Stipulation and Order of Confidentiality regarding potential opt-in plaintiffs' contact information;

(6) orders defendants to provide plaintiff with an electronic and importable list containing all putative class members' full names, employee IDs, positions, dates of employment, and all available contact information (including last known physical address, telephone number, and email address) within 30 days of this Order;

Finally, the court appoints plaintiff Roger James as class representative for this collective action and appoints plaintiff's counsel as class counsel.[19]

---

[19]    Plaintiff's motion doesn't request that the court specifically designate any other opt-in plaintiffs as class representatives, so the court assumes he intends to serve as such.  Plaintiff may file a motion with the court to outline any related requests, should they arise.

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiff's Motion for Conditional FLSA Certification and Issuance of Notice to Similarly Situated Employees (Doc. 59) is granted in part and denied in part as set out in this Order.

**IT IS FURTHER ORDERED THAT** defendants' Motion for Leave to File a Sur-reply in Response to Plaintiff's Reply and in Opposition to Plaintiff's Motion for Conditional FLSA Certification (Doc. 71) is granted in part and denied in part as set out in this Order.  Accordingly, the court directs defendants to file the approved portions of their proposed sur-reply.

**IT IS SO ORDERED.**

**Dated this 2nd day of March, 2021, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**

56