**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **ROGER JAMES, individually, and on behalf of all others similarly situated,** | | |
| **Plaintiff,** | | |
| **v.** | | **Case No. 2:19-CV-02260-DDC-JPO** |
| **BOYD GAMING CORPORATION, and KANSAS STAR CASINO, LLC,** | | |
| **Defendants.** | | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF UNOPPOSED MOTION**
**FOR APPROVAL OF FLSA COLLECTIVE ACTION SETTLEMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. iv

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND AND PROCEDURAL POSTURE................................................. 3

I.    The Nature of Plaintiff James' FLSA Claims.......................................................... 3

      A.    Defendants' failure to provide notice of the FLSA's tip credit requirements. ....... 3

      B.    Defendants' illegal tip pooling under the FLSA...................................................... 5

II.   The Parties Litigated the Case Extensively and Through Phase I. ...................... 6

      A.    Threshold disputes existed regarding the schedule and joint employment............. 6

      B.    The parties conducted significant discovery............................................................ 7

      C.    Plaintiff obtained collective certification after briefing complex, nuanced
            issues of fact and law under the FLSA. ................................................................. 8

      D.    Plaintiff's counsel conducted a thorough and time-consuming opt-in process. ... 10

III.  The Parties Engaged in Arm's-Length Settlement Negotiations. ....................... 11

IV.   Plaintiff's Counsel Sent Notice of Settlement to the 828 Collective Members............... 12

SUMMARY OF SETTLEMENT TERMS.................................................................... 13

I.    The Scope of the Settlement is Limited to Opt-Ins............................................. 13

II.   Payments to Collective Members. .................................................................... 13

III.  The Release of Claims is Reasonable. ............................................................. 15

IV.   The Parties Have Allocated a Modest Service Award to Plaintiff James......................... 15

V.    The Parties Have Separately Negotiated a Lodestar Fee to Plaintiff's Counsel............... 15

ARGUMENT ................................................................................................................ 16

I.    The Settlement Should Be Approved as a Fair and Reasonable Resolution of a
      Bona Fide Dispute Under the FLSA.................................................................... 16

      A.    Plaintiff's claims present two bona fide disputes of liability under the FLSA..... 16

      B.    The settlement is a fair and equitable resolution of disputed claims. ................... 18

i.      The collective settlement was fairly and honestly negotiated at arm's-length through a mediator. ....................................................... 18

ii.     Substantial question of law and fact remain in dispute, placing the ultimate outcome of the litigation in doubt. ................................. 19

iii.    Given the near make-whole relief, immediate recovery outweighs the possibility of increasing the recovery through trial. ................................. 20

iv.     The settlement provides collective members considerable relief. ............ 20

v.      Plaintiff's counsel's support for the settlement is informed by significant experience in casino wage and hour litigation. ...................... 21

vi.     The reaction of collective members weighs in favor of approval............. 22

vii.    The plan of allocation to collective members is fair and equitable because it is based on each collective member's damages. ...................... 22

II.     The Court Should Grant Final Collective Certification. .................................................... 23

III.    The Court Should Approve the Separately Negotiated Award of Attorneys' Fees to Plaintiff's Counsel as Reasonable. ...................................................................................... 25

        A.    The compromise fee, a negative multiplier on Plaintiff's counsel's lodestar, is reasonable, agreed to by the parties, and should be approved. ............................ 25

        B.    The *Johnson* factors weigh in favor of approving the fee. ................................... 28

              i.      The time and labor required to achieve this settlement was significant. .. 28

              ii.     This case involved novel and complicated FLSA issues. ........................ 30

              iii.    This case and the settlement required significant skill from Plaintiff's counsel. ................................................................................................. 31

              iv.     The sheer volume of time required by this case precluded other employment for Plaintiff's counsel. ......................................................... 32

              v.      The customary fee in statutory fee-shifting cases is the lodestar fee........ 32

              vi.     The contingent nature of the fee weighs in favor of approving the fee. ... 33

              vii.    The time limitations involved in this case weigh in favor of approving the fee. .................................................................................... 33

              viii.   The excellent recovery weighs in favor of approving the fee.................. 34

ix.     Plaintiff's counsel have significant experience, skill, and reputation in wage and hour class and collective actions ................................................ 34

x.     The fee is reasonable compared to awards in similar cases. ...................... 35

IV.   The Court Should Award Plaintiff's Counsel's Reasonable Litigation Expenses ............ 36

V.    The Court Should Approve the Service Award to Plaintiff James for His Considerable Efforts on Behalf of the 800+ Collective Members. ......................................................... 37

CONCLUSION ................................................................................................................. 40

CERTIFICATE OF SERVICE ........................................................................................ 401

# TABLE OF AUTHORITIES

## Cases

*Acosta v. Las Margaritas, Inc.*,
2018 WL 6812370 (E.D. Pa. Dec. 27, 2018) ............................................................. 5

*Acosta v. Mezcal*, *Inc.*,
2019 WL 2550660 (D. Md. June 20, 2019) ................................................................. 4

*Adams v. Aztar Indiana Gaming Co.*, *LLC*,
-- F.Supp.3d--, 2022 WL 593911 (S.D. Ind. Feb. 25, 2022) ................................... 31

*Barbee v. Big River Steel*, *LLC*,
927 F.3d 1024 (8th Cir. 2019) ................................................................................. 28

*Barbosa v. Nat'l Beef Packing Co.*, *LLC*,
2015 WL 4920292 (D. Kan. Aug. 18, 2015) .................................................... 16, 35

*Barbosa v. Nat'l Beef Packing Co.*, *LLC*,
2014 WL 5099423 ................................................................................................... 18

*Bartakovits v. Wind Creek Bethlehem LLC*,
2022 WL 702300 ............................................................................................... 21, 35

*Boeing Co. v. Van Gemert*,
444 U.S. 472 (1980) ................................................................................................. 36

*Bruner v. Sprint/United Mgmt. Co.*,
2009 WL 2058762 (D. Kan. July 14, 2009) ...................................................... 27, 37

*Cope v. Let's Eat Out, Inc.*,
2019 WL 11790417 (W.D. Mo. Sept. 6, 2019) ........................................................ 21

*Enegren v. KC Lodge Ventures LLC*,
2019 WL 5102177 (D. Kan. Oct. 11, 2019) ..................................................... passim

*Fisher v. SD Prot. Inc.*,
948 F.3d 593 (2d Cir. 2020) .................................................................................... 26

*Flerlage v. US Foods*, *Inc.*,
2020 WL 4673155 (D. Kan. Aug. 12, 2020) ............................................................ 26

*Flitton v. Primary Residential Mortg.*, *Inc.*,
614 F.3d 1173 (10th Cir. 2010) ............................................................................... 25

*Foster v. Robert Brogden's Olathe Buick GMC*, *Inc.*,
2019 WL 1002046 (D. Kan. Feb. 28, 2019) ............................................................ 12

*Freebird, Inc. v. Cimarex Energy Co.*,
   46 Kan. App. 2d 631 (2011) ................................................................. 38

*Garcia v. Palomino, Inc.*,
   738 F. Supp. 2d 1171 (D. Kan. 2010) ...................................................... 4

*Garcia v. Tyson Foods, Inc.*,
   770 F.3d 1300 (10th Cir. 2014) ..................................................... 26, 32

*Garcia v. Tyson Foods, Inc.*,
   2012 WL 5985561 (D. Kan. Nov. 29, 2012) ...................................... 21, 26, 34, 36

*Gottlieb v. Barry*,
   43 F.3d 474 (10th Cir. 1994) ............................................................. 28

*Hapka v. CareCentrix, Inc.*,
   2018 WL 1879845 (D. Kan. Feb. 15, 2018) ............................................. 28

*Hensley v. Eckerhart*,
   461 U.S. 424 (1983) ............................................................. 27, 32, 34

*Hershey v. ExxonMobil Oil Corp.*,
   2012 WL 5306260 (D. Kan. Oct. 26, 2012) ............................................. 37

*Hoffman v. Poulsen Pizza LLC*,
   2016 WL 2848919 (D. Kan. May 16, 2016) ............................................. 37

*Howe v. Hoffman-Curtis Partners Ltd., LLP*,
   215 Fed. App'x 341 (5th Cir. Jan. 30, 2007) ........................................... 26

*In re Bank of Am. Wage & Hour Emp. Litig.*,
   No. 10-MD-2138-JWL, 2013 WL 6670602 (D. Kan. Dec. 18, 2013) ...................... 27

*In re Sprint Corp. ERISA Litig.*,
   443 F. Supp. 2d 1249 (D. Kan. 2006) .................................................... 38

*In re Syngenta AG MIR 162 Corn Litig.*,
   357 F.Supp.3d 1094 (D. Kan. 2018) ............................................. 27, 33, 34

*In re Viropharma Inc. Sec. Litig.*,
   2016 WL 312108 (E.D. Pa. Jan. 25, 2016) ............................................... 18

*James v. Boyd Gaming Corp.*,
   522 F.Supp.3d 892 (D. Kan. 2021) .................................................. passim

*Johnson v. Georgia Highway Express, Inc.*,
   488 F.2d 714 (5th Cir.1974) ............................................................. 28

*Koehler v. Freightquote.com, Inc.*,
    2016 WL 3743098 (D. Kan. July 13, 2016) ........................................................ 37

*Kyem v. Merakey*,
    *U.S.*, 2022 WL 425584 (E.D. Pa. Feb. 11, 2022) ................................................. 37

*Melgar v. OK Foods*,
    902 F.3d 775 (8th Cir. 2018) ............................................................................. 27

*Montano v. Montrose Rest. Assocs., Inc.*,
    800 F.3d 186 (5th Cir. 2015) ............................................................................... 5

*Nieberding v. Barrette Outdoor Living, Inc.*,
    129 F.Supp.3d 1236 (D. Kan. 2015) ............................................................. 37, 38

*Perez v. Lorraine Enterprises, Inc.*,
    769 F.3d 23 (1st Cir. 2014) ................................................................................. 4

*Porter v. West Side Restaurant, LLC*,
    2014 WL 1642152 (D. Kan. Apr. 24, 2014) ...................................................... 3, 4

*Ross v. Jenkins*,
    325 F. Supp. 3d 1141 (D. Kan. 2018) ...................................................... 25, 26, 35

*Solis v. Top Brass, Inc.*,
    2014 WL 4357486 (D. Colo. Sept. 3, 2014) ....................................................... 18

*Thiessen v. Gen. Elec. Capital Corp.*,
    267 F.3d 1095 (10th Cir. 2001) ..................................................................... 23, 24

*Tommey v. Computer Scis. Corp.*,
    2015 WL 1623025 (D. Kan. Apr. 13, 2015) ....................................................... 16

**Statutes**

29 U.S.C. § 203 .............................................................................................. passim

29 U.S.C. § 206 ...................................................................................................... 3

29 U.S.C. § 216 .............................................................................................. passim

**Rules**

Fed. R. Evid. 408 ................................................................................................. 29

## **INTRODUCTION**

Plaintiff Roger James worked for Boyd Gaming Corporation in large part as a table games dealer (*i.e.*, the casino employees who deal games like blackjack, craps, and roulette) earning a sub-minimum wage plus tips at Kansas Star Casino near Wichita, Kansas.  Plaintiff James asserted two Fair Labor Standards Act claims that would invalidate Boyd Gaming's[1] entitlement to a tip credit and, as a result, require Boyd Gaming to pay each worker the difference between their sub-minimum direct cash wage and $7.25 for each hour worked during the limitations period.

Following significant litigation spanning nearly three years—including deposing two of Boyd Gaming's human resources leaders, producing Plaintiff James for an all-day deposition, reviewing over 5,000 pages of documents from 13 casino properties, completing Phase I discovery, briefing and winning conditional certification, conducting the opt-in notice process, and a mediation to negotiate the claims of the collectives presided over by noted wage and hour mediator Francis X. Neuner followed by a distinct negotiation to settle Plaintiff's counsel's separate entitlement to attorneys' fees under the FLSA—Plaintiff James and Boyd Gaming have reached a non-reversionary collective action settlement that provides near make-whole relief to collective members.  The $1,200,000 common fund represents approximately 88% of claimed tip credit damages at issue and results in an average per capita settlement check (net of all costs and expenses) of over $1,300.  These are meaningful payments that will be distributed automatically to collective members upon approval with no claims process and no reversion to Boyd Gaming.

---

[1] Plaintiff James alleged that Boyd Gaming Corporation was the joint employer of Plaintiff along with Kansas Star Casino, LLC. *See* Complaint, Doc. 1 at ¶¶ 38-42. During discovery, Boyd Gaming stipulated that it would not contest that it jointly employed Plaintiff James under the FLSA along with all of the workers in the collectives at the 13 casino properties at issue here for purposes of this case only. *James v. Boyd Gaming Corp.*, 522 F.Supp.3d 892, 921 (D. Kan. 2021) (quoting the stipulation on joint employment). Plaintiff James refers to Boyd Gaming generally in this brief as encompassing the Boyd Gaming enterprise spanning the 13 casinos at issue.

In addition to the significant relief going to collective members, Boyd Gaming has agreed to separately pay Plaintiff's counsel's attorneys' fees under the FLSA's mandatory fee-shifting provision (*see* 29 U.S.C. § 216(b)) in the agreed-upon amount of $1,100,000. This figure—negotiated separate from and in addition to the relief going to collective members—represents a compromise and considerable discount on Plaintiff's counsel's lodestar. This is a further benefit to the collective members in that their settlement payments are not reduced by a significant percentage (often upwards of 40+ percent) to compensate Plaintiff's counsel for their time.

In exchange for these material settlement payments, collective members will release only those claims premised on tip pooling and tip credit violations (as opposed to a general release or a wage and hour release). This is an outstanding result for the employees, which is underscored by the fact that, as of the date of this filing, no collective member has objected.

Because the settlement is a fair and reasonable resolution of a bona fide dispute, Plaintiff James requests the Court approve the parties' settlement and grant final collective certification. Plaintiff James further requests the Court appoint Analytics Consulting LLC as the third-party settlement administrator and to authorize the following awards: (i) Plaintiff's counsel's attorneys' fees in the amount of $1,100,000 to be paid separately by Boyd Gaming; (ii) Plaintiff's counsel's litigation expenses in the amount of $85,000 to be paid from the common fund; (iii) a $5,000 service award to Plaintiff James to be paid from the common fund; and (iv) the $16,436 cost of settlement administration to be paid to Analytics Consulting LLC from the common fund.

## FACTUAL BACKGROUND AND PROCEDURAL POSTURE

**I.     The Nature of Plaintiff James' FLSA Claims.**

Plaintiff James filed this lawsuit on May 24, 2019 alleging Defendants Boyd Gaming and Kansas Star violated the FLSA. Complaint, Doc. 1.  Plaintiff brought the action individually and on behalf of all other similarly situated hourly, non-exempt employees who worked at 13 casinos operating under Boyd Gaming's banner. *Id.* at ¶¶ 43-44.

**A.     Defendants' failure to provide notice of the FLSA's tip credit requirements.**

In Count One of the Complaint, Plaintiff James alleged Boyd Gaming and its subsidiary entities failed to pay him and all other similarly situated employees the federal minimum wage for each hour worked. *Id.* at ¶ 19.  Specifically, Boyd Gaming paid Plaintiff James and all other similarly situated employees a direct cash wage less than $7.25 per hour plus tips and then attempted to claim a tip credit under the FLSA that did not comply with the FLSA's tip credit notice requirements. *Id.* at ¶¶ 17-23.

The FLSA requires every employer to pay covered employees a minimum hourly wage of no less than $7.25 per hour. 29 U.S.C. § 206(a)(1)(C).  On exception to that bedrock principle is the "tip credit."  FLSA Section 203(m) allows employers of regularly tipped employees to pay a sub-minimum base hourly wage and claim a tip credit to make up the difference. 29 U.S.C. § 203(m)(2). "In order to be eligible to take a tip credit, the employer must first notify the employees of the requirements of the law regarding minimum wages and of the employer's intention to take the tip credit." *Porter v. West Side Restaurant, LLC*, 2014 WL 1642152, *8 (D. Kan. Apr. 24, 2014) (internal quotations omitted); 29 U.S.C. § 203(m)(2)(A).

A 2011 Department of Labor regulation specifies the content of the notice an employer must provide its employees to be eligible to claim the tip credit:

> Pursuant to section 3(m), an employer is not eligible to take the tip credit unless it has informed its tipped employees in advance of the employer's use of the tip credit of the provisions of section 3(m) of the Act, *i.e.:* The amount of the cash wage that is to be paid to the tipped employee by the employer; the additional amount by which the wages of the tipped employee are increased on account of the tip credit claimed by the employer, which amount may not exceed the value of the tips actually received by the employee; that all tips received by the tipped employee must be retained by the employee except for a valid tip pooling arrangement limited to employees who customarily and regularly receive tips; and that the tip credit shall not apply to any employee who has not been informed of these requirements in this section.

29 C.F.R. § 531.59(b); *see also* 29 C.F.R. § 516.28(a)(3).

It is not sufficient that employees simply and generally be aware of the FLSA's tip credit provisions. Rather, Section 3(m) affirmatively requires employers to *inform* employees of the provisions contained in Section 3(m), as more fully described in 29 C.F.R. § 531.59(b). *See Acosta v. Mezcal, Inc.*, 2019 WL 2550660, at *7-8 (D. Md. June 20, 2019).

The employer has the burden to prove a valid tip credit notice and compliance with all FLSA tip credit notice requirements. *See, e.g.*, *Porter*, 2014 WL 1642152, at *8 ("Defendants bear the burden of proving that they are entitled to take the tip credit."); *Acosta*, 2019 WL 2550660, at *7 ("the employer bears the burden of demonstrating eligibility for the exception"); *Perez v. Lorraine Enterprises, Inc.*, 769 F.3d 23, 27 (1st Cir. 2014) ("It is the employer's burden to show that it has satisfied all the requirements for tip-credit eligibility"). Failure to do so results in forfeiture of the tip credit and makes the employer liable for the difference between the direct cash wage and the federal minimum wage of $7.25 per hour. *See, e.g.*, *Garcia v. Palomino, Inc.*, 738 F. Supp. 2d 1171, 1177–78 (D. Kan. 2010) ("The employer has the burden of showing that the exemption is applicable. If it fails to make the requisite showing, the employer is liable for the difference between the amount it paid to its employees and the applicable minimum wage,

regardless of whether the employee has received and retained wages and tips that together satisfy the minimum wage requirement.").

### B.      Defendants' illegal tip pooling under the FLSA.

In Count Two of the Complaint, Plaintiff James alleged that Boyd Gaming maintained unlawful, mandatory tip pooling arrangements for its table games dealers by (1) failing to limit participation in the tip pool as required by the FLSA to tipped employees, *i.e.*, "employees who customarily and regularly receive tips," and (2) violating the FLSA's prohibition against an employer "keep[ing] tips received by its employees for any purposes, including allowing managers and supervisors to keep any portion of employees' tips." Complaint, Doc. 1 at ¶¶ 24-37; *see* 29 U.S.C. § 203(m)(2)(A-B).

The Court succinctly described Plaintiff James' tip pooling claim as follows:

> [P]laintiff alleges defendants' PTO policy violates the FLSA's tip pool requirements because they distribute tips from the table games dealers' tip pool to Dual-Rate Supervisors as a way of paying for PTO. Dual-Rate Supervisors are non-tipped employees who, plaintiff argues, serve in a supervisory capacity. According to plaintiff, this violates the FLSA.

> Plaintiff contends defendants don't track separately whether Dual Rate Supervisors are accruing PTO hours while working as a supervisor or a dealer. And, plaintiff alleges defendants then use money from the dealer tip pool to pay Dual Rate Supervisors for the use of PTO accrued while working as a supervisor. This, according to plaintiff, violates the FLSA's requirements for limiting the tip pool to employees customarily receiving tips and prohibiting supervisors from keeping a portion of employees' tips.

*James*, 522 F.Supp.3d at 914–15 (internal citations omitted). As the employer, Boyd Gaming bears the burden to prove it operates a valid tip pooling arrangement and complies with all FLSA tip pool requirements. *See, e.g.*, *Montano v. Montrose Rest. Assocs., Inc.*, 800 F.3d 186, 189 (5th Cir. 2015) (explaining the employer has "the burden of establishing its entitlement to the tip credit," which includes "the burden to prove it operated a legal tip pool") (internal citations omitted); *Acosta v. Las Margaritas, Inc.*, 2018 WL 6812370, at *7 (E.D. Pa. Dec. 27, 2018) (same).  If a tip

pool violates the FLSA's requirements, the employer is ineligible to claim the tip credit and is liable for the difference between its tipped employees' sub-minimum base hourly wage and the federal minimum wage and must reimburse all improperly distributed tips. *See* 29 U.S.C. § 216(b) ("Any employer who violates section 203(m)(2)(B) of this title shall be liable to the employee or employees affected in the amount of the sum of any tip credit taken by the employer and all such tips unlawfully kept by the employer").

## II.     The Parties Litigated the Case Extensively and Through Phase I.

This case was heavily litigated for years and myriad issues were contested. The parties disputed the schedule and how to phase discovery; engaged in significant discovery; fully briefed a contested conditional certification motion; and ultimately completed the opt-in collective notice process before agreeing to mediate (a second time). Ricke Decl. at ¶ 2.

### A.     Threshold disputes existed regarding the schedule and joint employment.

Following the parties' Rule 26(f) conference, the parties could not agree on a schedule. Plaintiff James urged the Court to bifurcate discovery with Phase I focused on whether putative collective members were similarly situated and Phase II focused on the merits, damages, and trial issues. Boyd Gaming sought to bifurcate discovery with Phase I focused on issues surrounding conditional certification but, critically, also the question of whether Plaintiff James was jointly employed by Boyd Gaming—an issue the company vigorously contested. Following a hearing, the Court ultimately agreed with Boyd Gaming that the joint employer issue should be included in Phase I of the case and set a deadline to move for summary judgment on the issue. Doc. 15 at 2; Ricke Decl. at ¶ 3.

In August and September 2019, Plaintiff James served his first set of interrogatories and requests for production of documents on Boyd Gaming. These discovery requests specifically targeted the joint employer issue given its inclusion in Phase I (among other issues). Following

issuance of this discovery, the parties entered into a stipulation in October 2019 whereby Boyd Gaming agreed not to contest its joint employer status for purposes of this case (though, as a general proposition, the company continues to dispute that it is Plaintiff's employer). This obviated the need for further joint employer discovery and removed a potential obstacle to conditional certification (*i.e.*, Plaintiff James no longer needed to prove Boyd Gaming employed the workers at each of the 13 casinos as a threshold predicate to conditional certification). Ricke Decl. at ¶ 4.

### B.     The parties conducted significant discovery.

Discovery in this case lasted from approximately August 2019 until June 2020.  During that time, the parties completed Phase I discovery on whether the proposed FLSA collectives were similarly situated. Ricke Decl. at ¶ 5.

Plaintiff James served three sets of interrogatories, three sets of requests for production of documents, and one set of requests for admission on Boyd Gaming. In addition to providing written responses to Plaintiff's discovery requests, Boyd Gaming produced over 5,000 pages of documents from 13 different casino properties. Plaintiff's counsel reviewed, analyzed, and annotated these documents within Stueve Siegel Hanson's Relativity document management system for use in discovery, conditional certification, and, ultimately, trial. Ricke Decl. at ¶ 6.

In January 2020, Plaintiff's counsel deposed the highest-ranking human resources official at Boyd Gaming—Chris Smith, the Vice Present of Human Resources. That same month, Plaintiff's counsel also deposed the highest-ranking human resources official for the Kansas Star casino property—Allison Bair, Kansas Star's Director of Human Resources. Ricke Decl. at ¶ 7.

Boyd Gaming served requests for production and interrogatories on Plaintiff James and ten pre-certification opt-ins.  With the assistance of Plaintiff's counsel, Plaintiff James and the ten opt-ins responded to these discovery requests, and Plaintiff James produced over 170 pages of

documents. Ultimately, Boyd Gaming's counsel examined Plaintiff James during an all-day deposition. Ricke Decl. at ¶ 8.

Though the parties ultimately resolved these issues short of Court intervention, the parties engaged in many discovery meet and confer calls and exchanged several letters regarding discovery disputes. *See, e.g.*, Docs. 26, 32, 36, 48 (orders granting consent motions to extend time to move to compel discovery responses under Local Rule 37.1(b) to facilitate meet and confer process). Ricke Decl. at ¶ 9.

### C. Plaintiff obtained collective certification after briefing complex, nuanced issues of fact and law under the FLSA.

Following the conclusion of Phase I discovery, Plaintiff James moved for conditional certification spanning 13 of Boyd Gaming's casinos in seven different states. Plaintiff's motion was thoroughly supported, vigorously opposed, and presented an issue of first impression as to tip pooling and an infrequently analyzed issue as to tip credit notice. Ricke Decl. at ¶ 10.

Plaintiff sought to certify the following tip credit notice collective:

All persons employed at a relevant Boyd Gaming casino[2] during the relevant time period[3] and paid a base hourly wage of less than the applicable federal minimum wage of $7.25 per hour.

Plaintiff also sought to certify the following tip pooling collective:

---

[2] The relevant Boyd Gaming casinos include the following: (1) Par-A-Dice (Il.); (2) Blue Chip (In.); (3) Diamond Jo Dubuque (Ia.); (4) Diamond Jo Worth (Ia.); (5) Kansas Star (Ks.); (6) Amelia Belle (La.); (7) Delta Downs (La.); (8) Evangeline Downs (La.); (9) Sam's Town Shreveport (La.); (10) Treasure Chest (La.); (11) IP Biloxi (Ms.); (12) Sam's Town Tunica (Ms.); and (13) Valley Forge (Pa.).

[3] The relevant time period for this collective extends from May 24, 2016 (three years prior to the filing of the Collective Action Complaint) to the date in or around the Spring of 2019 when Boyd Gaming's existing tipped employees were provided a written tip credit notice form.

All persons employed as a table games dealer and included within a tip pooling arrangement at a relevant Boyd Gaming casino[4] during the relevant time period.[5]

Plaintiff James' opening brief in support of his motion for conditional certification was 30 pages, supported by 23 exhibits spanning more than 500 pages. In support of certification of the tip credit collective, Plaintiff James argued Boyd Gaming had *no policy* to comply with its affirmative obligations to provide notice of the tip credit and that the common lack of a policy applied throughout the organization. Doc. 65 at 9–16. Plaintiff argued Boyd Gaming's organization-wide decision to issue a remedial tip credit notice and institute a notice policy for the first time was evidence that there had not previously been a policy. *Id*.

With respect to the tip pooling collective, Plaintiff James argued all collective members were dealers required to pool all of their tips; that each tip pool included a category of "dual job" employees called Dual Rate Supervisors who work as both dealers and supervisors; that Boyd Gaming had a common PTO accrual policy for all employees; that Boyd Gaming did not track the accrual of PTO in separate buckets for Dual Rate Supervisors based on their dual jobs; that each tip pool paid PTO out to Dual Rate Supervisors (in at least some capacity) from the dealer's tip pool; and that Dual Rate Supervisors perform the same non-tipped, supervisory duties nationwide, meaning they were not eligible participate in the tip pool for those hours. *Id*. at 18–29.

Boyd Gaming opposed conditional certification with a 35-page brief supported by 60+ exhibits. It argued no common tip credit notice policy existed and that tip credit notice was provided in a variety of ways at different casinos. Doc. 67 at 17–24.  With respect to the tip pooling

---

[4] The relevant Boyd Gaming casinos include the following: (1) Par-A-Dice; (2) Blue Chip; (3) Diamond Jo Worth; (4) Kansas Star; (5) Amelia Belle; (6) Sam's Town Shreveport; (7) Treasure Chest; (8) Sam's Town Tunica; and (9) Valley Forge.
[5] The relevant time period for tip pooling collective extends from May 24, 2016 (three years prior to the filing of the Complaint) to the date of the Court's Order granting certification.

collective, Boyd Gaming argued principally that the dealers control their own tip pools, that Dual Rate Supervisors are able to receive tips from the dealer tip pools, and that Plaintiff James lacked standing because he had worked as a Dual Rate Supervisor at one point. *Id.* at 27–33.

Plaintiff James then addressed Boyd Gaming's arguments in a 30-page reply brief, which prompted Boyd Gaming to submit a motion for leave to file a sur-reply, which attached a nine-page sur-reply. Doc. 79. Plaintiff opposed the motion, arguing a sur-reply was not appropriate because any new cases or arguments in Plaintiff's reply were not "new" and were simply responding to Boyd Gaming's arguments.  The contested and voluminous nature of the conditional certification briefing demonstrated how unique and challenging this case was. Ricke Decl. at ¶ 11.

In March 2021, this Court issued a 56-page order addressing each of the parties' arguments and granting conditional certification of Plaintiff's proposed collectives. Doc. 78. The decision was ultimately reported—*James v. Boyd Gaming Corp.*, 522 F.Supp.3d 892 (D. Kan. 2021).

### D.     Plaintiff's counsel conducted a thorough and time-consuming opt-in process.

Plaintiff's counsel worked with a third-party notice administrator (Angeion) to implement a notice program designed to reach as many potential collective members as possible and to communicate the nature of the case in easy-to-understand terms. Plaintiff's counsel directed and implemented the creation of a case website, notice form, opt-in form, email protocol, text message protocol, and mailing protocol. Ultimately, the administrator sent notice of this case to 4,218 individual Boyd Gaming workers by U.S. Mail and (where possible) email and text. Of those nearly 4,200 potential collective members, approximately 1,200 were eligible to join both the tip credit and tip pooling collectives. Ricke Decl. at ¶ 12.

After a 90-day notice period concluding in August 2021, approximately 828 collective members opted into the case by the filing of an executed Consent to Join Form.[6] Plaintiff's counsel then communicated with each collective member and coded their information into Plaintiff's counsel's proprietary client database, tracking important information for each member including the casino property where the client worked, their period of employment, and data regarding their limitations period. This was a significant undertaking. *Id*. at ¶ 13.

### III.     The Parties Engaged in Arm's-Length Settlement Negotiations.

The parties initially mediated pursuant to the Court's Scheduling Order in January 2020. Michael F. Delaney, a labor and employment attorney at Spencer Fane in Kansas City, presided over the mediation. The mediation was not successful due to distance between the parties' respective positions on the structure and amount of any settlement. *Id*. at ¶ 14.

In the Fall of 2021, with the notice and opt-in process complete, the parties agreed to explore settlement for the certified collectives. The parties engaged noted wage and hour mediator Francis X. Neuner of Neuner Mediation & Dispute Resolution (previously the managing partner of, and employment litigator at, Spencer Fane's St. Louis office) for a mediation on November 30, 2021. In advance of the mediation, the parties fully briefed their positions on the merits and damages to the mediator. In addition, Plaintiff's counsel analyzed thousands of individual daily time records for each collective member to create a collective-wide damage model. *Id*. at ¶ 15.

On November 30, 2021, after an all-day in-person mediation at Polsinelli's Kansas City office, the parties reached an agreement and signed a term sheet containing the substantive terms of the settlement for the collective with an agreement to separately negotiate Plaintiff's counsel's

---

[6] Thirty individuals sent executed Consent to Join forms to the settlement administrator who were ultimately not eligible to participate and were not on the collective lists provided by Boyd Gaming. This is a common phenomenon when notice is sent to large workplaces (like casinos) in FLSA cases. Those 30 people are not included in the 828 settlement participants discussed above. *Id*.

entitlement to attorneys' fees under the FLSA. *See* 29 U.S.C. § 216(b). On December 16, 2021, the parties again reconvened at Polsinelli and conducted an all-day negotiation among counsel regarding Plaintiff's counsel's attorneys' fees. That night, the parties reached a negotiated resolution on attorney's fees. Ricke Decl. at ¶ 16.

The parties then spent the next approximately three months negotiating the terms of the Joint Stipulation of Settlement and Release ("Settlement Agreement"), attached to the Ricke Declaration as **Exhibit 1**, which is now before the Court. *Id*. at ¶ 17.

## IV.    Plaintiff's Counsel Sent Notice of Settlement to the 828 Collective Members.

Consistent with this Court's case law on providing notice of FLSA settlements and opportunity to object to post-conditional certification opt-ins,[7] Plaintiff's counsel engaged third-party settlement administrator Analytics Consulting LLC to distribute notice of the settlement to the 828 collective members. The notice advised collective members of their projected settlement amounts, how the awards were calculated, the scope of the release, the amount of attorneys' fees and expenses, the amount of the service award, and the parties' positions on the claims. A copy of the template notice is attached to the Ricke Declaration as **Exhibit 2**.

On April 21, 2022, Analytics Consulting LLC sent the notice by email to 773 collective members and by U.S. Mail to 55 collective members. The notice explained that members must send any objections by May 12, 2022 (21 days later). Emails were returned as undeliverable from 38 collective members, so Analytics Consulting LLC mailed each a paper Notice by U.S. Mail. As of May 4, 2022, seven of those paper notices had been returned undeliverable, and Plaintiff's

---

[7] *Foster v. Robert Brogden's Olathe Buick GMC, Inc*., 2019 WL 1002046, at *9 n.4 (D. Kan. Feb. 28, 2019) (Crabtree, J.) ("when a hearing is not requested, the plaintiff … must notify the court that the opt-in plaintiffs had notice of the settlement and an opportunity to object.").

counsel called each collective member and sent a copy of the notice by email. Mitchell Decl. at ¶¶ 7-10.

As of the date of this filing, no collective members have objected to the terms of the settlement. The objection period will run until May 12, 2022. On May 16, 2022, Plaintiff's counsel will provide the Court with a status report to update the Court regarding whether any collective member objects to the settlement agreement. Ricke Decl. at ¶ 24.

## SUMMARY OF SETTLEMENT TERMS

### I.   The Scope of the Settlement is Limited to Opt-Ins.

The settlement is limited to the 828 members of the tip credit notice collective and the tip pool collective conditionally certified by the Court who returned consent to join forms. Settlement Agreement, Ex. 1 at ¶¶ I.B.1, I.B.2.

### II.   Payments to Collective Members.

Boyd Gaming will create a $1,200,000 common fund that will: (1) pay awards to collective members; (2) pay the cost of settlement administration (capped at $16,436); (3) pay a proposed service award to Plaintiff James ($5,000); and (4) reimburse Plaintiff's counsel's advanced litigation expenses ($85,000). *See id*. at ¶¶ IV.B.4 (settlement administrator's expenses); IV.B.4 (service award); IV.B.3.c (Plaintiff's counsel's advanced expenses). After expenses, the Settlement Agreement allocates 51% of the net fund to the tip credit notice collective and 49% of the net fund to the tip pooling collective. This distribution tracks the approximate distribution of damages between the two claims. The Settlement Agreement provides for distribution of settlement payments pro rata to collective members based on their respective damages within each collective. *Id*. at ¶¶ IV.B.2.a, IV.B.2.b. Boyd Gaming will separately pay its share of employer-side payroll taxes in addition to the $1,200,000 fund. *Id*. at ¶ IV.B.6.

Plaintiff's counsel calculated tip credit damages of $1,323,163 through July 2021 based on the wage and hour data Boyd Gaming produced for mediation. Using that data, Plaintiff's counsel extrapolated an additional $30,482.91 in tip credit damages for the modest number of collective members who were dealers, still working working at Boyd Gaming, *and* still participating in a dealer tip pool through the release date of December 31, 2021 (as the Court will recall, the tip credit notice damages stopped accruing when Boyd Gaming issued the remedial notice in 2019). The $1,200,000 fund represents 88% of claimed tip credit damages.[8] Ricke Decl. at ¶ 21.

The mean average *per capita* settlement payment is over $1,320. The largest settlement payment is over $6,200.  And 200 collective members will receive settlement payments over $2,000 while no collective member will receive less than $50. Ricke Decl. at ¶ 20. These payments are meaningful; particularly considering the high percentage of recovery and that the Settlement Agreement insulates the fund from being reduced to pay Plaintiff's counsel's attorneys' fees.

Approval of the Settlement Agreement will allow members to receive payments in short order. Within 14 days of the Court's order approving the settlement, Boyd Gaming will fund the qualified settlement fund. Within 30 days of the Court's order approving the settlement, the

---

[8] An additional measure of damages is available under the FLSA for the tip pooling claim, which is "all such tips unlawfully kept by the employer." *See* 29 U.S.C. § 216(b).  The tip credit is far and away the primary driver of damages in this tip pooling claim. Assuming that all of the tips distributed to Dual Rate Supervisors were *unlawfully* distributed—a point Boyd Gaming would have certainly contested through the use of expensive and time-consumer expert testimony—each opt-in would be entitled to his or her pro rata share of the unlawfully distributed tips. Boyd Gaming produced data showing that in 2017, 2018, 2019, 2020, and 2021, it distributed $902,738.56 in dealer tips to Dual Rate Supervisors for PTO. There were 1,632 workers eligible to participate in the tip pool collective and 388 workers opted into the tip pool collective (*i.e.*, 24%). Assuming *all* of the tips paid to Dual Rate Supervisors were unlawful, *all* off the tips were inside the limitations periods for each collective member, and *all* collective members were working during those workweeks, collective members' proportional share of those tips could reasonably be calculated to be approximately $216,657 (24% of the total). When including this best-day damages scenario into the total damages figure, the $1,200,000 common fund still represents 76% of tip credit and misallocated tip damages. By any measure, this is a strong recovery. Ricke Decl. at ¶ 22.

settlement administrator will issue checks directly to collective members. Settlement Agreement, Ex. 1 at ¶ IV.H.1. For purposes of settlement, the settlement payments to collective members will be treated as 50% wages and 50% non-wages. *Id*. at ¶ IV.H.2. If a collective member does not deposit his or her settlement check within 120 days, the settlement payment will be paid to the unclaimed property division of the state where the collective member lives to be held on his or her behalf. *Id*. Under no circumstances will the payments revert to Boyd Gaming. *Id*.

### III.     The Release of Claims is Reasonable.

As set out more fully in the Settlement Agreement, collective members will release claims against Boyd Gaming and its affiliates based on tip credit and tip pooling through December 31, 2021. *Id*. at ¶ IV.C.1. However, "nothing in this [Settlement Agreement] will be considered a waiver of any claims by Opt-In Plaintiffs that may arise after December 31, 2021." *Id*. at ¶ IV.C.3.

### IV.     The Parties Have Allocated a Modest Service Award to Plaintiff James.

For his efforts on behalf of the collective, including, as discussed at length below, producing documents, being deposed, and bringing this case against his then-current employer, the parties agreed to allocate Plaintiff James a $5,000 service award payable from the common fund and subject to the Court's approval. *Id*. at IV.B.4.

### V.     The Parties Have Separately Negotiated a Lodestar Fee to Plaintiff's Counsel.

Also detailed below, Boyd Gaming has agreed to pay Plaintiff's counsel $1,100,000 in attorneys' fees as part of the settlement, which represents a material discount on Plaintiff's counsel's lodestar. This payment is separate from and in addition to the considerable relief being paid to collective members pursuant to the FLSA's mandatory attorneys' fee shifting provision, 29 U.S.C. § 216(b). *Id*. at IV.B.3.

## ARGUMENT

I.    **The Settlement Should Be Approved as a Fair and Reasonable Resolution of a Bona Fide Dispute Under the FLSA.**

"[W]hen parties settle FLSA claims, they must present the settlement to the court to review and decide whether the settlement is fair and reasonable." *Enegren v. KC Lodge Ventures LLC*, 2019 WL 5102177, at *4 (D. Kan. Oct. 11, 2019) (Crabtree, J.) (citing *Tommey v. Computer Scis. Corp.*, 2015 WL 1623025, at *1 (D. Kan. Apr. 13, 2015)). As explained by this Court, settlement approval requires the court to determine whether (1) the litigation involves a bona fide dispute; (2) the proposed settlement is fair and equitable to all parties; and (3) the proposed settlement contains an award of reasonable attorney's fees. *Id.* (citing *Barbosa v. Nat'l Beef Packing Co., LLC*, 2015 WL 4920292, at *5 (D. Kan. Aug. 18, 2015)).

### A.    Plaintiff's claims present two bona fide disputes of liability under the FLSA.

First, the Court must determine whether the dispute regarding FLSA coverage is bona fide. The party seeking approval must provide the Court with: (1) a description of the nature of the dispute; (2) a description of the employer's business and the type of work performed by the employees; (3) the employer's reasons for disputing the employees' right to a minimum wage or overtime; (4) the employees' justification for the disputed wages; and (5) if the parties dispute the computation of wages owed, each parties' estimate of the number of hours worked, and the applicable wage. *Enegren*, 2019 WL 5102177, at *5.

Section I.A-B above describes the tip credit notice and tip pooling claims under the FLSA at length. Further, the Court aptly described the nature of the claims and the parties' respective positions in its order granting conditional certification. *James*, 522 F. Supp. 3d at 899–901. With respect to the tip credit notice collective, Plaintiff alleges Boyd Gaming failed to provide notice of the FLSA's tip credit notice requirements prior to claiming a tip credit and paying a sub-minimum

wage to members of the tip credit notice collective. *See* 29 U.S.C. § 203(m); 29 C.F.R. § 531.59(b). The remedy is the difference between the collective members' direct cash wage and $7.25 for each hour worked during the limitations period. *James,* 522 F. Supp. 3d at 899-900.  This is a binary proposition. Boyd Gaming either provided the notice or it did not. Boyd Gaming contends it provided proper notice. Settlement Agreement, Ex. 1 at ¶ I.A.

With respect to the tip pooling claim, Plaintiff contends Boyd Gaming maintained unlawful tip pools for dealers due to the inclusion of non-tipped, supervisory employees called Dual Rate Supervisors. *See* 29 U.S.C. § 203(m)(2)(A)(ii).  Plaintiff's damages are voiding the tip credit and return of the unlawfully distributed tips. 29 U.S.C. § 216(b). Again, this is an all-or-nothing proposition. Dual Rate Supervisors may either participate in the tip pool for PTO hours accrued in their non-tipped, supervisory roles or they cannot. Boyd Gaming argued Dual Rate Supervisors are permitted to participate in the dealer tip pool due to the nature of their roles. Settlement Agreement, Ex. 1 at ¶ I.A.  A genuine dispute of FLSA coverage exists in this case and, with respect to the tip pooling, Plaintiff's counsel is unaware of any Court that has definitively applied the FLSA to facts akin to that presented to the Court in this case.

Further, this case has been vigorously litigated.  As described above, this case entailed two high-level depositions of Boyd Gaming's executives, a deposition of Plaintiff, production of more than 5,000 pages of documents, contested briefing on conditional certification (that itself resulted in a 50+ page opinion from this Court), and a lengthy opt-in process followed by mediation. The Court can readily conclude that this is a settlement of a bona fide dispute under the FLSA. *Enegren*, 2019 WL 5102177, at *5 (finding the claims and defenses asserted by the parties framed a bona fide dispute about FLSA provisions in case where no contested conditional certification motion was filed).

**B.      The settlement is a fair and equitable resolution of disputed claims.**

"To be fair and reasonable, an FLSA settlement must provide adequate compensation to the employee and must not frustrate the FLSA policy rationales." *Enegren*, 2019 WL 5102177 at *5 (quoting *Solis v. Top Brass, Inc.*, 2014 WL 4357486, at *3 (D. Colo. Sept. 3, 2014)). This Court has identified four factors that bear on fairness: (1) whether the proposed settlement was fairly and honestly negotiated; (2) whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt; (3) whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; and (4) the judgment of the parties that the settlement is fair and reasonable. *Id.* (quoting *Barbosa*, 2014 WL 5099423, at *7). Each factor weighs in favor of approving the Settlement Agreement.

**i.      The collective settlement was fairly and honestly negotiated at arm's-length through a mediator.**

The parties reached a settlement of collective members' claims with the assistance of well-regarded wage and hour mediator, Francis X. Neuner, through an all-day arm's-length mediation—their second mediation.  This Court has noted that settlement under such circumstances weighs in favor of settlement approval. *Enegren*, 2019 WL 5102177 at *6 (finding settlement was fairly and honestly negotiated where the parties resolved the case through an arms-length mediation with a capable and experienced mediator); *In re Viropharma Inc. Sec. Litig.*, 2016 WL 312108, at *8 (E.D. Pa. Jan. 25, 2016) (noting participation of an independent mediator "virtually [e]nsures that the negotiations were conducted at arm's length and without collusion between the parties").

After the substantive terms of the settlement were reached with the assistance of a mediator, Plaintiff's counsel and Boyd Gaming's counsel separately negotiated Plaintiff's counsel's entitlement to attorneys' fees under the FLSA. The resulting compromise fee of $1,100,000 represents a material discount on Plaintiff's counsel's lodestar. Ricke Decl. at ¶¶ 32-35.

ii.     **Substantial question of law and fact remain in dispute, placing the ultimate outcome of the litigation in doubt.**

Boyd Gaming contested nearly every aspect of this case. With respect to the tip credit notice claim, Boyd Gaming alleged it had provided notice of the tip credit through job offers, group trainings, individual trainings, orientation, paystubs, wage and hour posters, internal control documents regarding tips, Gaming Industry Tip Compliance Agreements, and certain tip credit forms. Doc. 67 at pp. 5-10. Further, Boyd Gaming argued these wide-ranging methods of allegedly providing notice varied from casino to casino and even department to department. *Id.* Likewise, Boyd Gaming disputed that the Department of Labor regulation at the heart of the tip credit notice claim (29 C.F.R. § 531.59(b)) controlled the analysis, arguing instead that something less was required. *Id.* at pp. 17-19. The parties substantially disagreed over the applicable law, whether Boyd Gaming adequately provided notice of the tip credit, and whether the case should proceed as a collective. *Enegren*, 2019 WL 5102177, at *6 (finding this factor satisfied where parties disputed threshold FLSA coverage issue of whether uniforms were a reimbursable business expense).

Boyd Gaming's opposition to the tip pooling claim was just as vigorous. For example, Boyd Gaming denied, as a threshold issue, that FLSA coverage even existed here. Boyd Gaming argued that, because the dealers allegedly "decide how they will distribute their tips," the FLSA's tip pooling protections do not apply. Doc. 67 at p. 25. Plaintiff argued in response that the tip pools were mandatory and that, as a result, Boyd Gaming could not offload their FLSA responsibilities to their employees. Doc. 70 at pp. 21-22. Likewise, Boyd Gaming argued that Dual Rate Supervisors were not "managers or supervisors" withing the meaning of Section 3(m). Doc. 67 at pp. 28-30.  And, though Plaintiff is confident he could have shown Dual Rate Supervisors are non-tipped, managerial or supervisory employees within the meaning of the FLSA, this would have

19

required significant discovery across casinos around the country.  Under these circumstances, the Court can be satisfied that these issues are both substantial and disputed.

### iii.   Given the near make-whole relief, immediate recovery outweighs the possibility of increasing the recovery through trial.

The parties settled this case after the conclusion of Phase I discovery and the opt-in process. Phase II of this case would have involved significant discovery of collective members (Boyd Gaming likely would have attempted to depose hundreds of collective members), discovery of managerial employees at 13 Boyd Gaming casino spread across seven states, cross motions for summary judgment, a motion to decertify the collectives, a trial, and appeal. Absent settlement, any monetary relief to these minimum wage workers was years away. Ricke Decl. at ¶ 23. Further, collective members have little to gain from additional litigation.  As discussed above, collective members are recovering approximately 88% of claimed tip credit damages (or, put another way, approximately 76% of tip credit plus best-day misallocated tip damages).  Although the best-case outcome of a trial could allow collective members to recover liquidated damages under the FLSA, the significant settlement payments right now outweigh the *chance* to obtain perhaps only nominally more at trial several years from now. *Enegren*, 2019 WL 5102177, at *6 (finding settlement fair and reasonable when the "[s]ignificant discovery and the likelihood of dispositive motions from both sides means a litigated resolution is years away").

### iv.   The settlement provides collective members considerable relief.

The terms of the Settlement Agreement, considered alongside the remedial purpose of the FLSA, establish that the proposed settlement is not only fair and reasonable, but a strong result. Collective members will recover 88% of claimed tip credit damages (or viewed another way, 76% of tip credit and best-day tip claw back damages), with the average settlement check totaling over $1,300. In lieu of a complicated claims process, collective members will be mailed checks

automatically upon approval. None of the funds will revert to Boyd Gaming. And, rather than take a percentage of the collective members' recovery for attorneys fees, Plaintiff's counsel's fees are being paid *separately* and *in addition* to the considerable relief going to the collectives. This is a strong result and compares favorably to other tip credit settlements.[9] Ricke Decl. at ¶¶ 20-24.

> **v.  Plaintiff's counsel's support for the settlement is informed by significant experience in casino wage and hour litigation.**

Plaintiff's counsel have considerable experience in litigating, trying, and resolving wage and hour disputes around the country. Following a successful class action wage and hour jury trial in the District of Kansas, Judge Marten noted regarding Stueve Siegel Hanson that "plaintiffs' counsel's experience in wage-hour class actions has unmatched depth." *Garcia v. Tyson Foods, Inc.*, 2012 WL 5985561, at *4 (D. Kan. Nov. 29, 2012), *aff'd*, 770 F.3d 1300 (10th Cir. 2014). More recently, Plaintiff's counsel has been described as "uniquely skilled and efficient in prosecuting casino wage and hour cases." *Bartakovits*, 2022 WL 702300, at *3. Having collectively prosecuted more than 20 casino wage and hour class and collective actions of the same or similar wage and hour claims, Plaintiff's counsel have an appreciation of the risks attendant to each claim. The high percentage of recovery, the limited release, the direct mailing of checks following approval, the absence of any reversion to Boyd Gaming, and Boyd Gaming's agreement

---

[9] *See, e.g.*, *Cope v. Let's Eat Out, Inc.*, Case No. 6:16-cv-03050-SRB, Doc. 316 at *12 (W.D. Mo. April 17, 2019) (motion for approval of settlement creating $650,000 common fund to resolve tip credit notice (and other unpaid wages claims) and noting "the settlement provides Opt-in Plaintiffs with 25% of their owed minimum wages."); *see Cope v. Let's Eat Out, Inc.*, 2019 WL 11790417 (W.D. Mo. Sept. 6, 2019) (granting approval of settlement); *see also Black v. P.F. Chang's China Bistro, Inc.*, Case No. 16-CV-3958, Doc. 92 at *7 n. (N.D. Ill. May 15, 2017) (motion to approve settlement of tip credit notice claim (and other unpaid wage claims impacting the tip credit) representing 35.5% of the value of the case and providing an average payment of $715 to opt-in plaintiffs); *id.* at Doc. 103 at ¶ 4 (granting approval of settlement); *Bartakovits v. Wind Creek Bethlehem LLC*, 2022 WL 702300 at *2 ("the common fund represents over 57% of the unpaid minimum wages" in tip credit notice and wage deduction class action); *Day v. PPE Casino Resorts, LLC*, Case No. 1:20-cv-01120-RDB, Doc. 43-1 (motion to approve settlement for 20% of tip credit damages) (D. Md.); *see id.* at Doc. 45 (approving settlement).

to pay Plaintiff's counsel's fees separately and in addition to the recovery to the workers all demonstrate a strong result for workers that could only be improved through a complete victory at trial *plus* award of liquidated damages.  The settlement merits approval as fair and reasonable. Ricke Decl. at ¶¶ 25-29; Stueve Siegel Hanson Firm Resume, **Exhibit 3** to Ricke Declaration).

### vi.    The reaction of collective members weighs in favor of approval.

As of the date of this filing, no collective members have objected to the settlement. The objection period runs through May 12, 2022, after which Plaintiff's counsel will file a status report to update the Court regarding objections, if any. Plaintiff's counsel followed the notice process outlined by this Court in *Enegren*, providing a three-week objection window after mailing and emailing a formal settlement notice. The notice explained the material terms of the settlement, including allocation, estimated settlement payments, tax reporting, the proposed service award, the proposed attorneys' fee and cost award, and the limited release of claims. Ricke Decl. at ¶ 24; *Enegren*, at *7. The lack of any objections after a reasonable notice process weighs in favor of approval of the settlement. *Id.*

The settlement provides real, meaningful payments to collective members,[10] particularly given the nature of these minimum wage claims, and should be approved as fair and reasonable.

### vii.   The plan of allocation to collective members is fair and equitable because it is based on each collective member's damages.

As detailed in the Settlement Agreement, the settlement payments to collective members are based on their pro rata damages in the two separate collectives. Settlement Agreement, Ex. 1 at ¶ IV.B.2.a.  The net settlement fund (*i.e.*, the $1,200,000 fund less expenses, costs, and service award pending approval by the Court) is allocated 51% to the tip credit notice collective and 49%

---

[10] One collective member responded to the notice with the following message: "from the bottom of my heart, thank you so much. I appreciate you." Ricke Decl. at ¶ 24.

to the tip pooling collective, which tracks the approximate distribution of damages between the two groups. *Id*. at ¶ IV.B.2.b.  Each individual collective member's damages are based on when they submitted their consent to join (*i.e.*, when their limitations period was tolled), the number of hours worked during the collective period, and their individual wage rates. However, there is a $50 minimum payment to all collective members that comes off the top to compensate them for the risk of participating in a wage and hour case against their employer. In Plaintiff's counsel's opinion, this is the most fair and equitable way to allocate the net settlement fund because it principally pays collective members for their pro rata damages while also rewarding all collective members with a nominal payment for participating in the case. *Enegren*, 2019 WL 5102177, at *7 (approving settlement as fair and reasonable where allocation formula is based principally on paying the most to employees with the highest damages).

## II.     The Court Should Grant Final Collective Certification.

Although this Court previously determined that the proposed collectives were similarly situated for purposes of conditional certification, the Court must nonetheless make a final collective certification decision. *Enegren*, 2019 WL 5102177 at *3 (citing *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1102–03 (10th Cir. 2001)). The Court considers the following factors in making that determination: (1) the disparate factual and employment settings of collective members; (2) various defenses available to Boyd Gaming which appear to be individual to each plaintiff; and (3) fairness and procedural considerations. *Id*.[11]

First, final collective certification is appropriate for the same reasons this Court granted conditional certification after reviewing a vigorously disputed Phase I discovery record. *See*

---

[11] Plaintiff's Reply in Support of Conditional Certification (Doc. 70) lists the myriad ways collective members are similarly situated within the tip credit notice collective (10 paragraphs of common characteristics, *see* Doc. 70 at pp. 2-4) and the tip pooling collective (15 paragraphs of common characteristics, *id*. at pp. 17-18).

*James*, 522 F.Supp.3d at 892.  Plaintiff alleged that Boyd Gaming jointly employed each collective member of the tip credit notice collective at one of its casinos, paid each member a direct cash wage less than $7.25 per hour plus tips, and attempted to take a Section 3(m) tip credit for each worker. Further, because the FLSA places the onus on the employer to show it is entitled to the tip credit (an exception to the FLSA's minimum wage requirements), all collective members are similarly situated as to Boyd Gaming's burden of showing how it provided them notice. As this Court aptly described in granting conditional certification:

> It's Boyd Gaming's alleged common failure to follow the law. Surely, no one would expect defendants or any other company to inscribe as much onto a plaque for all of the world to see. That's not how omissions work. And plaintiff's case is focused centrally on omissions.

*James*, 522 F.Supp.3d at 913–14 (citing *Thiessen*, 267 F.3d at 1102).

With respect to the tip pooling collective, Plaintiff alleged that each collective member was employed by Boyd Gaming, was a table games dealer subject to a mandatory tip pool, and that tip pool paid out some portion of dealer tips to for PTO to Dual Rate Supervisors. Whether the collective's claim prevails has much more to do with the tip pool rules and very little to do with the individual circumstances of the collective members. Because whether this practice violates the FLSA depends on the amount of PTO paid out to Dual Rate Supervisors, how that PTO was accrued, and whether Dual Rate Supervisors are non-tipped or supervisory employees. This claim is well-suited to collective treatment under the FLSA. *See James*, 522 F. Supp. 3d at 914-22.

Second, though there is the *potential* for individual defenses to the tip credit notice claim, that is not an issue in this case. Plaintiff alleges Boyd Gaming had *no policy* of ensuring its sub-minimum wage employees received notice of the tip credit. *James*, 522 F. Supp. 3d at 913–14. The analysis is even more straightforward regarding the tip pool claim where Plaintiff is unaware of any individual defenses offered by Boyd Gaming.

Third, fairness and procedural considerations weigh heavily in favor of final collective certification. It would not be efficient to burden the federal court system with 828 individual tip credit notice and tip pooling lawsuits, with a few thousand dollars in controversy each, when those individual claims all turn on the same set of common facts and law. And practically speaking, a collective *settlement* is far superior to piecemeal litigation or even collective litigation. *Enegren*, 2019 WL 5102177, at *4 ("the policy of encouraging settlement of litigation also favors final collective action certification"). The Court should grant final collective certification.

## III.   The Court Should Approve the Separately Negotiated Award of Attorneys' Fees to Plaintiff's Counsel as Reasonable.

Consistent with the FLSA's mandatory fee-shifting provision, Plaintiff's counsel negotiated attorneys' fees separate from and in addition to the relief to be paid to collective members. 29 U.S.C. § 216(b). Boyd Gaming agreed to pay Plaintiff's counsel $1,100,000 in attorneys' fees subject to Court approval. Settlement Agreement, Ex. 1 at ¶ IV.B.3. By any objective metric, this is a reasonable fee given the result achieved for collective members, the negative lodestar multiplier, and the *Johnson* factors.

### A.   The compromise fee, a negative multiplier on Plaintiff's counsel's lodestar, is reasonable, agreed to by the parties, and should be approved.

This Court should use the lodestar analysis to evaluate the reasonableness of the requested attorneys' fees because this is a statutory fee-shifting case and the parties have agreed to a separate lodestar fee. "[T]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Ross v. Jenkins*, 325 F. Supp. 3d 1141, 1178 (D. Kan. 2018) (Crabtree, J.) (quoting *Flitton v. Primary Residential Mortg., Inc.*, 614 F.3d 1173, 1176 (10th Cir. 2010)).

Detailed in full in the Declaration of Mr. Ricke, filed concurrently herewith, Plaintiff's counsel reasonably expended 2,991.6 hours for a lodestar of $2,169,227.50 at Plaintiff's counsel's

standard hourly rates. Ricke Decl. at ¶¶ 35-36. Thus, the agreed-upon attorneys' fee represents a negative lodestar multiplier of 0.507 that results in a blended hourly rate of $367 per hour. *Id.*

Plaintiff's counsel asks this Court to approve as reasonable the $367 blended hourly rate Plaintiff's counsel is recovering in this case. It is well below Plaintiff's counsel's standard hourly rates. And it is likewise well below the blended hourly rates Plaintiff's counsel have recovered in the District of Kansas and around the country over many years. *See* Ricke Decl. at ¶¶ 39-41.[12]

For example, the $367 blended hourly rate is only modestly higher than the $302.29 blended hourly rate awarded to Plaintiff's counsel following a class and collective wage and hour verdict *nearly ten years ago* in the District of Kansas. The contested fee in that case was affirmed by the Tenth Circuit as reasonable for similar wage and hour work before this Court. *Garcia v. Tyson Foods, Inc.*, 2012 WL 5985561, at *3 (D. Kan. Nov. 29, 2012) (Marten, J.), *aff'd*, 770 F.3d 1300 (10th Cir. 2014). Accounting for 2.2% average annual inflation over the ten years since *Garcia*, the $367 blended hourly rate is roughly equivalent to (*if not marginally less than*) the $302 blended hourly rate approved in *Garcia*. *See Ross v. Jenkins*, 325 F. Supp. 3d 1141, 1182 (D. Kan.

---

[12] The Settlement Agreement includes an attorneys' fee award that is only modestly less than the result for the collective. This Court has observed that "when the attorneys' fees do not come from the same fund as the class reward … it is more reasonable to award the attorney's lodestar without considering the percentage of the FLSA award." *Flerlage v. US Foods, Inc.*, 2020 WL 4673155, at *13 (D. Kan. Aug. 12, 2020) (Crabtree, J.). This is such a case. Plaintiff's counsel negotiated a recovery for the collective and then, separate from and in addition to the relief going to the workers, negotiated a reasonable lodestar attorneys' fee under the FLSA's fee-shifting provision. The fee-shift incentivizes plaintiff's counsel to vindicate important rights by allowing them to recover their attorneys' fees separately. Given the FLSA's remedial purpose, it is not uncommon for attorneys' fees and costs to even *exceed* the recovery to the employees. *Garcia v. Tyson Foods, Inc.*, 770 F.3d 1300, 1311 (10th Cir. 2014) (affirming over $3 million in fees to Stueve Siegel Hanson on a six-figure wage and hour verdict and holding "the fee award need not be proportionate to the damages award"); *Fisher v. SD Prot. Inc.*, 948 F.3d 593, 604 (2d Cir. 2020) ("a fee may not be reduced merely because the fee would be disproportionate to the financial interest at stake in the litigation"); *Howe v. Hoffman-Curtis Partners Ltd., LLP*, 215 Fed. App'x 341, 342 (5th Cir. Jan. 30, 2007) ("Given the nature of claims under the FLSA, it is not uncommon that attorney fee requests can exceed the amount of judgment in the case by many multiples.").

2018) (Crabtree, J.) ("The court believes it is appropriate to adjust to accommodate inflation. The inflation rate for both 2016 and 2017 was 2.1%.") (citing Kimberly Amadeo, *U.S. Inflation Rate by Year: 1929–2020*, The Balance (updated Jan. 15, 2018)).  The blended rate Plaintiff's counsel seeks is less than Plaintiff's counsel has been awarded within the District of Kansas[13] and should be approved as reasonable, particularly given Boyd Gaming agrees it is reasonable.

Prior to addressing the *Johnson* factors, several other factors weigh strongly in favor of approving the agreed fee as reasonable under the circumstances of this case.  First, the Supreme Court has instructed litigants to settle attorneys' fee disputes in statutory fee-shifting cases where possible, which is what the parties did here. *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) ("A request for attorney's fees should not result in a second major litigation. Ideally, of course, litigants will settle the amount of a fee"). Second, by settling the lodestar fee separate from, in addition to, and after the relief payable to the collective members, the settlement confers a significant benefit on collective members because their settlement payments are not reduced to compensate Plaintiff's counsel for their time. Though not binding on this Court, the Eighth Circuit has persuasively trended towards granting significant deference to negotiated attorneys' fee awards in situations where, like here, the parties have separately resolved the statutory entitlement to a fee under the FLSA after settling the plaintiff's claim. *Melgar v. OK Foods*, 902 F.3d 775, 779 (8th Cir. 2018) ("[R]eview of attorneys' fees included in a settlement agreement requires a certain level of

---

[13] *See, e.g., In re Bank of Am. Wage & Hour Emp. Litig.*, No. 10-MD-2138-JWL, 2013 WL 6670602, at *3 (D. Kan. Dec. 18, 2013) (Lungstrum, J.) (performing a lodestar cross-check and finding that 1.1 multiplier on $488 blended hourly rate "further reflects the reasonableness of the percentage fee award" where Stueve Siegel Hanson was lead counsel in wage and hour MDL); *Bruner v. Sprint/United Mgmt. Co.*, 2009 WL 2058762, at *10 (D. Kan. July 14, 2009) (Vratil, J.) (awarding Stueve Siegel Hanson a blended hourly rate of $590.91 on lodestar fee nearly 13 years ago); *In re Syngenta AG MIR 162 Corn Litig.*, 357 F.Supp.3d 1094, 1115 (D. Kan. 2018) (Lungstrum, J.) (performing a lodestar cross-check and finding that 1.4 multiplier on hourly rates "averaging under $ 500" was reasonable where Stueve Siegel Hanson was co-lead counsel).

deference by the district court to the parties' agreement"); *Barbee v. Big River Steel, LLC*, 927 F.3d 1024, 1027 (8th Cir. 2019) (same regarding settling fees in FLSA settlements). Third, the agreed-upon fee is a negative lodestar multiplier, which is reasonable. *Hapka v. CareCentrix, Inc.*, 2018 WL 1879845, at *2 (D. Kan. Feb. 15, 2018) (approving attorneys' fees and holding that a "negative multiplier (0.87) on [Stueve Siegel Hanson's] lodestar [] is inherently reasonable").

### B. The *Johnson* factors weigh in favor of approving the fee.

The Tenth Circuit requires all attorneys' fees awards to be considered in light of the *Johnson* factors. *Gottlieb v. Barry*, 43 F.3d 474, 483 (10th Cir. 1994) (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974)). The *Johnson* factors—(1) time and labor required; (2) novelty and difficulty of the questions presented in the case; (3) skill requisite to perform the legal service properly; (4) preclusion of other employment by the attorneys due to acceptance of the case; (5) customary fee; (6) whether the fee is fixed or contingent; (7) any time limitations imposed by the client or circumstances; (8) amount involved and results obtained; (9) experience, reputation, and ability of the attorneys; (10) undesirability of the case; (11) nature and length of the professional relationship with the client; and (12) awards in similar cases—weigh in favor of approving the agreed-upon fee.

#### i. The time and labor required to achieve this settlement was significant.

As noted above, Plaintiff's counsel expended almost 3,000 hours in furtherance of this case. This case has been litigated for three years with nearly every issue contested. As detailed above, the parties disputed the schedule, Plaintiff's counsel took two depositions of high-ranking Boyd Gaming human resources executives, Plaintiff's counsel served and reviewed three rounds of offensive discovery, Plaintiff's counsel worked with ten collective members to review and responded to written discovery, Plaintiff's counsel prepared and produced Plaintiff James for an all-day deposition, Plaintiff's counsel navigated countless discovery disputes, Plaintiff's counsel

reviewed over 5,000 pages of Boyd Gaming documents from 13 casinos, Plaintiff's counsel completed Phase I discovery, Plaintiff's counsel extensively researched complicated issues under the FLSA (*e.g.*, the validity and enforceability of the tip credit notice regulation (29 C.F.R. § 531.59(b)), whether Fed. R. Evid. 408 prohibited the use of Boyd Gaming's remedial tip credit notice in support of conditional certification and the merits, what constitutes a "manager or supervisor" for purposes of tip pooling under the FLSA (29 U.S.C. § 203(m)), Plaintiff's counsel briefed a fully contested conditional certification motion, and Plaintiff's counsel conducted a comprehensive notice program by U.S. Mail, email, and text message to over 4,000 potential opt-ins ultimately representing more than 800 collective members. Ricke Decl. at ¶¶ 2-13.

With respect to settlement, Plaintiff's counsel participated in two mediations presided over by mediators and one negotiation among counsel. As a part of those mediations, Plaintiff's counsel fully briefed prospects for final collective certification, liability, and damages. After a settlement was reached, Plaintiff's counsel took the lead on drafting the settlement agreement and notice. Plaintiff's counsel engaged in a four-month process of negotiating the final written settlement agreement with defense counsel. Plaintiff's counsel worked with Analytics Consulting LLC to administer notice to collective members of the proposed settlement and to calculate settlement payments. Plaintiff's counsel have communicated with approximately 75 collective members since the settlement notices issued with more calling and emailing daily to ask questions about the settlement, understand tax consequences, *etc*. Further, preparing this motion for approval has been a significant undertaking. And, following approval of the settlement, Plaintiff's counsel will expend additional time and resources communicating with the settlement administrator and collective members. The time and labor required was significant and supports the agreed-upon

fee. Ricke Decl. at ¶¶ 14-17, 24, 42; *Enegren*, 2019 WL 5102177, at *10 (explaining negative lodestar multiplier supported fee award in FLSA collective action).

**ii.    This case involved novel and complicated FLSA issues.**

This case raises a number of novel and complex legal issues that remain unsettled under Tenth Circuit law. These issues span from substantive disputes regarding the interpretation of the FLSA, to disputes over pure procedure. On a procedural note, at the conditional certification stage, the parties disputed the weight the Court may give to Boyd Gaming's remedial tip credit notice and whether Plaintiff needed to support its motion with admissible evidence—an unclear area of the law on which the Court's conditional certification acknowledged "the Tenth Circuit has not ruled." *James*, 522 F.Supp.3d at 911.

Turning to substance, Plaintiff's counsel has found no Tenth Circuit guidance on the interpretation of the recent FLSA amendment at the heart of Plaintiff's tip pooling claim: "[a]n employer may not keep tips received by its employees for any purposes, including allowing managers or supervisors to keep any portion of employees' tips, regardless of whether or not the employer takes a tip credit." 29 U.S.C. § 203(m)(2)(B). The parties vigorously debated the standard for what employees qualify as "managers or supervisors," particularly at conditional certification. *See, e.g.*, Doc. 67 at pp. 28-30 (Boyd Gaming's position); Doc. 70 at pp. 26-27 (Plaintiff's position).

Likewise, although several other district courts have granted conditional certification of tip credit notice claims, this Court was the first to grant conditional certification based on Plaintiff's theory of the case that the central policy was Boyd Gaming's *failure* to have a policy.  In other words, this Court fully analyzed this case based on an *omission* theory.  To Plaintiff's counsel's knowledge, this Court was the first to grant conditional certification of tip credit notice claims when so framed, which has subsequently led to other district courts granting conditional

30

certification on similar grounds. *James*, 522 F. Supp. 3d at 913 ("In a sense, there *is* a common policy. It's Boyd Gaming's alleged common failure to follow the law. Surely, no one would expect defendants or any other company to inscribe as much onto a plaque for all of the world to see. That's not how omissions work.") (emphasis in original).[14]   The uncertainty surrounding this question is why Boyd Gaming submitted a 36-page, full-throated opposition to conditional certification (Doc. 67) and moved to file a surreply (Doc. 71).  These types of highly-disputed and complex issues of first impression are but a sample of those confronted by the parties in this case, and collectively demonstrate how the relative complexity of this case both renders the outcome far from certain, and weighs in favor of approving the fee.

      iii.    **This case and the settlement required significant skill from Plaintiff's counsel.**

As noted above, this case was not a run-of-the-mill FLSA case about well-trodden overtime exemptions. Just the opposite. This case presented complicated questions about regulatory and statutory interplay under the FLSA (*cf* 29 U.S.C. § 203(m) *with* 29 C.F.R. § 531.59(b)), complicated conditional certification briefing, and a determined and well-defended employer in Boyd Gaming. This case required all the skill that Plaintiff's counsel brought to bear. And, as discussed below, Plaintiff's counsel's experience and capacity for complex wage and hour litigation is significant. Ricke Decl. at ¶¶ 25-30; Stueve Siegel Hanson Firm Resume, Ex. 3.

---

[14] *See, e.g., Adams v. Aztar Indiana Gaming Co., LLC*, -- F.Supp.3d--, 2022 WL 593911, at *5 (S.D. Ind. Feb. 25, 2022) (block quoting the "omission" section of this Court's conditional certification order in this case and finding "[t]here is a sound basis to permit the plaintiffs to proceed collectively in the claim that there was a casino-wide failure to comply with the tip credit requirements.").

### iv. The sheer volume of time required by this case precluded other employment for Plaintiff's counsel.

Plaintiff's counsel committed nearly 3,000 hours to this case over approximately three years. This commitment prohibited Plaintiff's counsel from taking on other work. Ricke Decl. at ¶ 42. This factor weighs in favor of approving the fee. *Enegren*, 2019 WL 5102177, at *10 (D. Kan. Oct. 11, 2019) (finding the 498 hours spent litigating a wage and hour collective action demonstrated the lawsuit "precluded plaintiffs' counsel from working on other matters").

### v. The customary fee in statutory fee-shifting cases is the lodestar fee.

"The Fair Labor Standards Act provides a right to attorneys' fees for prevailing plaintiffs." *Garcia v. Tyson Foods, Inc.*, 770 F.3d 1300, 1308 (10th Cir. 2014). Particular to each case based on its unique circumstances, what constitutes an appropriate fee hinges on the effort expended, the reasonable rate, and importantly, the results obtained. Accordingly, the Tenth Circuit has explained that achieving excellent results for a client generally entitles counsel to their lodestar fee. *See id*. at 1311 ("If the Plaintiffs' obtained 'excellent results,' they should fully recover their fees") (citing *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983)). Here, the excellent settlement Plaintiff's counsel achieved for their clients renders award of the full lodestar fee[15] appropriate. *See id*. (affirming lodestar fee awarded by district court, explaining "[t]he district court concluded that Plaintiffs' counsel obtained excellent results for their clients").

Even so, Plaintiff's counsel seeks less than the customary, full lodestar fee. In an effort to compromise consistent with Supreme Court guidance on this issue, Plaintiff's counsel and Boyd Gaming's separate fee negotiations resulted in the parties agreeing to a fee of $1,100,000; a figure that represents a negative multiplier on Plaintiff's counsel's lodestar. Given the appropriateness of a full lodestar award, Plaintiff's request for a materially reduced fee weighs in favor of approval.

---

[15] Calculated by multiplying the hours reasonably expended by the reasonable hourly rate.

### vi.     The contingent nature of the fee weighs in favor of approving the fee.

Plaintiff's counsel took this case on a contingency, a decision that comes with inherent risks. The most obvious risk is that Plaintiff's counsel could recover nothing, should Boyd Gaming's defenses be accepted by the Court or jury. Another and more relevant risk to this case is that Plaintiff's counsel, even if able to achieve an excellent result for the client, may nonetheless fail to collect a premium on their lodestar fees. The risks attendant to a contingency fee, including the risks partially realized by Plaintiff's counsel in this case, support awarding Plaintiff's requested fee here. *See* Ricke Decl. at ¶¶ 31-42; *In re Syngenta AG MIR 162 Corn Litig.*, 357 F. Supp. 3d 1094, 1115 (approving fee, describing the 1.4 lodestar multiplier as "extremely modest in light of the great risk undertaken in pursuing these claims on a contingent-fee basis").

### vii.     The time limitations involved in this case weigh in favor of approving the fee.

Not all *Johnson* factors are created equally.  While the "time limitations" factor is less weighty than, for example, the results achieved and time and labor required, important time limitations *did* exist in this case, and they weigh in favor of approval.  The limitations period for each FLSA collective member runs until the filing of a consent to join. 29 U.S.C. § 216(b) ("No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought"). Boyd Gaming's remediation of the tip credit notice issue in mid-2019 thus required Plaintiff's counsel to achieve conditional certification as quickly as possible mid-pandemic while balancing the need to develop a sufficient discovery record to support certification. Resolved to achieve a favorable outcome, Plaintiff's counsel dedicated their experience, time, and resources to diligently manage this case to a favorable conditional certification outcome with sufficient time to allow more than 800 workers to opt-in and ultimately recover, on average, $1,300 in the face of an ever-waning

limitations period. This factor weighs in favor of approving the agreed fee. *In re Syngenta*, 357 F.Supp.3d at 1112 (finding time limitations weighed in favor of approving fee where plaintiff's counsel faced time constraints to move case forward).

### viii.   The excellent recovery weighs in favor of approving the fee.

The Supreme Court regards the degree of success obtained as the "the most critical factor" in the fee award analysis. *Hensley*, 461 U.S. at 436. In this case, Plaintiff's counsel obtained an excellent result for the collective members. The average per capita settlement check is over $1,300, a considerable amount for minimum wage and tipped workers. *Enegren*, 2019 WL 5102177, at *11 (finding this factor supported the requested fee where minimum wage and part time workers recovered on average $1,500). That this settlement is an excellent result is perhaps best illustrated by the percentage of unpaid minimum wages and tips it recovers: 88% of claimed tip credit damages or, put another way, 76% of tip credit damages *and* best-day misallocated tips damages. This represents an excellent recovery by any measure, even without consideration to the risk of summary judgment, decertification, and loss at trial that collective members would otherwise face. Ricke Decl. at ¶ 23.  Other tip credit notice settlements around the country, to which this settlement compares favorably, including in the casino context, confirm the excellent result achieved here. *See* FN 9.  Further, not only has no collective member objected to the settlement, but no collective member has objected to the fee. In short, the excellent results achieved support the fee's approval.

### ix.   Plaintiff's counsel have significant experience, skill, and reputation in wage and hour class and collective actions.

Plaintiff's counsel have considerable experience, skill, and reputation in specifically prosecuting wage and hour class and collective actions against casino operators. In his order awarding a full lodestar fee. Judge Marten described Stueve Siegel Hanson's "experience in wage-hour class actions" as having "unmatched depth." *Garcia*, 2012 WL 5985561, at *4. Likewise,

Judge Leeson of the Eastern District of Pennsylvania recently described Plaintiff's counsel as "uniquely skilled and efficient in prosecuting casino wage and hour cases." *Bartakovits*, 2022 WL 702300, at *3. Indeed, the case's four primary timekeepers (George Hanson, Todd McGuire, Alex Ricke, and Ryan McClelland) have collectively litigated more than 20 casino wage and hour cases, and are regarded as accomplished wage and hour lawyers with considerable experience, skill, and reputation. Ricke Decl. at ¶¶ 25-30; Stueve Siegel Hanson Firm Resume, Ex. 3.

**x.      The fee is reasonable compared to awards in similar cases.[16]**

This factor relates to the "customary fee factor" above. Nearly ten years ago in a wage and hour class and collective action, Judge Marten awarded Stueve Siegel Hanson (and the Tenth Circuit affirmed) a full lodestar fee (deducting 0.8 hours as non-compensable) at the firm's then-standard hourly rates (including Mr. Hanson's $600/hour rate) resulting in a blended rate of $302 per hour. *Garcia*, 2012 WL 5985561, at *2–9. Here, the proposed blended rate is $367 per hour; an approximate 21% increase over the rates approved by Judge Marten nearly ten years ago and then affirmed by the Tenth Circuit. From an inflation perspective, the $367 blended hourly rate Plaintiff's counsel is recovering in this case is actually marginally less than what they were paid

---

[16] Plaintiff's counsel does not address in great depth the "nature and length of the professional relationship with the client" factor. As this Court has noted, "[t]he meaning of this factor ... and its effect on the calculation of a reasonable fee has always been unclear, and courts applying the *Johnson* factors typically state that this particular standard is irrelevant or immaterial." *Enegren*, 2019 WL 5102177, at *11 (quoting *Barbosa*, 2015 WL 4920292, at *12). Even so, this factor weighs in favor of approving the requested fee.  Plaintiff's counsel have represented minimum wage and tipped casino workers since 2016, have prosecuted more than 20 casino wage and hour collective actions, and have recovered tens of millions of dollars for these minimum wage casino workers. This demonstrated commitment to these workers across the country for many years supports the agreed fee. Ricke Decl. at ¶¶ 25-30. Similarly, this Court has previously noted that the "undesirability of the case" factor can often be subsumed into the "contingent nature of the fee" factor making it neutral in the analysis. *Enegren*, 2019 WL 5102177, at *11.  That said, given the contested nature of the issues in this case, the novel questions of liability under the FLSA, and Boyd Gaming's remediation of the tip credit notice claim, Plaintiff's counsel suggests this case would be undesirable to all but the most capable wage and hour lawyers.

in *Garcia*. The $367 rate represents inflation of approximately 2.1% per year since *Garcia*; modestly less than the nearly 22% cumulative inflation that has occurred over the last ten years and is much lower than the 7% and 4.3% inflation rates for 2021 and 2022, respectively.[17]

Likewise, the proposed rate is significantly lower than the standard hourly rates of the four primary timekeepers in this case. For example, Mr. Hanson and Mr. Ricke's hourly rates have been routinely approved as reasonable on lodestar fee analyses and lodestar cross-checks in the Kansas City area and throughout the country. Ricke Decl. at ¶¶ 38-42.

## IV.     The Court Should Award Plaintiff's Counsel's Reasonable Litigation Expenses.

Separate from Plaintiff's counsel's reasonable fee, Plaintiff's counsel incurred litigation expenses of $85,187.46. Ricke Decl. at ¶ 46. These expenses, described more fully in Mr. Ricke's Declaration, include the cost of distributing collective notice to opt-ins, the cost of mediation, the cost of depositions and transcripts, and the cost of legal research. Each of these expenses is of the kind and character Plaintiff's counsel typically bills to clients and that are not absorbed into overhead. *Id.* at ¶¶ 43-46.

Though Plaintiff's counsel's expenses are $85,187.46, Plaintiff's counsel is limiting the request to reimbursement to the $85,000 set out in the Settlement agreement.  These expenses, which are not reimbursed from the fee award, benefitted all collective members and should be paid from the collective fund. *See, e.g., Boeing Co. v. Van Gemert*, 444 U.S. 472, 482 (1980) (affirming payment of class counsel's fees, costs, and expenses from common settlement fund, citing "each class member's equitable obligation to share the expenses of litigation"); *Enegren*, 2019 WL 5102177, at *12 (awarding expenses out of common fund *in addition* to awarding 40% of common

---

[17] Kimberly Amadeo, *U.S. Inflation Rate by Year: 1929–2023*, The Balance (updated March 28, 2022 ) https://www.thebalance.com/u-s-inflation-rate-history-by-year-and-forecast-3306093 (last visited on May 4, 2022). This compilation of inflation rates was cited with approval by this Court in the context of rate inflation in *Ross*, 325 F.Supp.3d at 1182.

fund as fees). Plaintiff's counsel's expenses should be approved as fair and reasonable and be reimbursed from the common fund.

## V.     The Court Should Approve the Service Award to Plaintiff James for His Considerable Efforts on Behalf of the 800+ Collective Members.

The proposed service award for Plaintiff James of $5,000 to be paid from the collective fund is reasonable. Ex. 1, Settlement Agreement at ¶ IV.B.5. Any amount not approved as a service award remains in the collective fund. *Id.* The $5,000 service award, which represents less than half of 1% of the common fund, is fair and reasonable and should be approved.

"Service payments are a common feature of collective action settlements." *Kyem v. Merakey U.S.*, 2022 WL 425584, at *5 (E.D. Pa. Feb. 11, 2022). Such awards "perform[] the legitimate function of encouraging individuals to undertake the frequently onerous responsibility of [serving as the] named class representative." *Nieberding v. Barrette Outdoor Living, Inc.*, 129 F.Supp.3d 1236, 1251 (D. Kan. 2015) (quoting *Hershey v. ExxonMobil Oil Corp.*, 2012 WL 5306260, at *12 (D. Kan. Oct. 26, 2012)). With these principles in mind, the Court must examine a proposed service award payment to determine whether it is fair and reasonable. *See id.*

Courts within the District of Kansas determine the reasonableness of a requested service award by "considering whether the proposed award adequately reflects the time that the recipient plaintiff spent working on the lawsuit." *Hoffman v. Poulsen Pizza LLC*, 2016 WL 2848919, at *4 (D. Kan. May 16, 2016). This Court has previously found incentive fees reasonable when set between $20-40 per hour. *Enegren*, 2019 WL 5102177 at *7-9 (approving $5,000 service award for 131 hours, representing $38 per hour).[18] This Court has likewise found incentive awards

---

[18] *Koehler v. Freightquote.com, Inc.*, 2016 WL 3743098 at *3 (D. Kan. July 13, 2016) (approving two $10,000 and two $5,000 service awards for 100 hours, on average, that each plaintiff devoted to the case, representing an average of $75 per hour). *See also In re Sprint Corp. ERISA Litig.*, 443 F. Supp. 1249, 1271 (D. Kan. 2006) (awarding $5,000 service awards where plaintiffs spent 80

appropriate in common fund cases where the award represents one percent or less of the common fund. *See, e.g., Nieberding*, 129 F.Supp.3d at 1251 (citing *Freebird, Inc. v. Cimarex Energy Co.*, 46 Kan. App. 2d 631, 646 (2011)).

Plaintiff James actively participated and assisted Plaintiff's counsel in all phases of this litigation. Plaintiff James devoted approximately three years and 126 hours to the prosecution of this case. *See* James Decl. at ¶ 3. This includes working with Plaintiff's counsel during the initial case investigation phase and the preparation of the original Complaint. *Id.* at ¶ 4. He also assisted with initial Rule 26 disclosures, written responses to interrogatories and requests for production of documents, and the collection and production of his own documents. *Id.* at ¶ 5. He routinely fielded questions from co-workers and potential opt-in plaintiffs about the nature of the claims and the status of the litigation. *Id.* at ¶ 6. He travelled from Wichita, Kansas to Kansas City, Missouri for two days to prepare for and appear at his individual deposition, and assisted Plaintiff's counsel in preparing for the corporate representative deposition of Boyd Gaming. *Id.* at ¶ 5. With respect to case resolution, Plaintiff James made himself available by phone during *three* separate mediation and negotiation sessions which ultimately resulted in a settlement in principle to resolve the dispute. *Id.* at ¶ 6. Plaintiff James routinely communicated with counsel during the settlement process. *Id.*

It bears noting that Plaintiff James also took a "reputational risk" by attaching his name to litigation against his *current* employer, and had concerns that his involvement in this litigation could create difficulty securing employment with future employers (especially in the casino industry). *Id.* at ¶ 7. Because this lawsuit is publicly filed and garnered media attention, information

---

hours of time, on average, in furtherance of the lawsuit); *Bruner v. Sprint/United Mgmt. Co.*, 2009 WL 2058762, at *11 (D. Kan. July 14, 2009 (awarding a $5,000 service award).

about his participation in the lawsuit is easily accessible.[19] Future employers may be less likely to hire him if they learn the role he played in this lawsuit.  And most importantly, this settlement would not have occurred had Plaintiff James not stepped forward to protect the rights of other minimum wage workers, and assist Plaintiff's counsel every step of the way.  Plaintiff James refused to engage in pre-certification settlement discussions on his personal claims only and was unwilling to abandon the rights of his fellow workers.  *Id.* at ¶ 8.  He shouldered the entire burden in this case as the only representative plaintiff.  Due in part to Plaintiff James' efforts and persistence in bringing this case, collective members now get the benefit of a favorable settlement providing them with the majority of their claimed unpaid wages.

The proposed service award of $5,000, if approved, would compensate Plaintiff James at a rate of $39.68 per hour for the time devoted to this case, within the hourly range approved by this Court. The requested service award is also within the range of recoveries by collective members in this case, each of whom will receive an individual settlement payment between $50 and $6,254.97, based on a formula accounting for their hourly base wage and number of hours worked during the relevant time periods.  Finally, the requested service award amounts to only 0.42% (less than half of 1%) of the $1,200,000 settlement fund in this case—also within range of those approved by the Court.  *See Enegren*, 2019 WL 5102177, at *7-9 (approving $5,000 service award equating to 1.6% of the $300,000 settlement fund). The $5,000 service award should be approved as fair and reasonable.

---

[19] For example, conducting a simple Google search using the terms "Roger James" and either "Boyd," "Kansas Star" or "casino" will yield multiple links to court filings or news articles related to the instant litigation.

## CONCLUSION

Plaintiff respectfully requests the Court grant the motion and approve all aspects of the settlement as a fair and reasonable resolution of a bona fide dispute under the FLSA. Plaintiff further requests the Court (1) grant final collective certification; (2) approve the settlement payments to collective members; (3) appoint Analytics Consulting LLC as settlement administrator and approve their fees to be paid from the settlement fund as reasonable; (4) approve the $5,000 service award to Plaintiff James to be paid from the settlement fund as reasonable; (5) approve the separately negotiated award of $1,100,000 attorneys' fees to Plaintiff's counsel; and (6) approve Plaintiff's counsel's advanced litigation expenses of $85,000 to be paid from the settlement fund as reasonable. Plaintiff's counsel will submit the parties' agreed proposed approval order to the Court's Chambers via email.

Dated:  May 5, 2022                    Respectfully submitted,

**STUEVE SIEGEL HANSON LLP**
*/s/ Alexander T. Ricke*
George A. Hanson, KS Bar No. 16805
Alexander T. Ricke, KS Bar No. 26302
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone:    (816) 714-7100
Facsimile:    (816) 714-7101
hanson@stuevesiegel.com
ricke@stuevesiegel.com

**McCLELLAND LAW FIRM, P.C.**
Ryan L. McClelland, D. Kan. Bar No. 78128
Michael J. Rahmberg, D. Kan. Bar No. 78725
The Flagship Building
200 Westwoods Drive
Liberty, Missouri 64068-1170
Telephone:    (816) 781-0002
Facsimile:    (816) 781-1984
ryan@mcclellandlawfirm.com
mrahmberg@mcclellandlawfirm.com

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on May 5, 2022, a true and correct copy of the foregoing document was filed electronically through the Court's CM/ECF system, and therefore, will be transmitted to all counsel of record by operation of the Court's CM/ECF system.

By:    */s/ Alexander T. Ricke*

**ATTORNEY FOR PLAINTIFF**