## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |
|---|---|
| **ROGER JAMES,** *individually and on behalf of all others similarly situated,* | |
| **Plaintiff,** | **Case No. 19-2260-DDC-ADM** |
| **v.** | |
| **BOYD GAMING CORPORATION and KANSAS STAR CASINO, LLC,** | |
| **Defendants.** | |

## <u>MEMORANDUM AND ORDER</u>

In May 2019, plaintiff Roger James, individually and on behalf of all others similarly situated, filed this lawsuit against defendants Boyd Gaming Corporation and Kansas Star Casino, LLC.  Doc. 1.  He alleges that defendants violated the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201–219 ("FLSA") by:  (a) paying tipped employees below minimum wage without complying with the FLSA's tip credit notice provisions; and (b) maintaining a mandatory tip pool that fails to comply with the FLSA's rules for these arrangements. *See generally id.*  After more than three years of litigation (which has included a contested conditional certification motion, the court's conditional certification of two FLSA collective actions, and the parties' distribution of notice to those collective action members), the parties successfully mediated the case to resolution.  They report that they have reached a collective action settlement to resolve all FLSA claims at issue.  And now, plaintiff has filed an unopposed motion asking the court to approve that FLSA collective action settlement.

More specifically, plaintiff's Unopposed Motion For Approval of FLSA Collective Action Settlement (Doc. 165) asks the court to:  (1) grant final collective certification; (2)

approve the $1,200,000 settlement fund to pay the claims of collective members; (3) appoint Analytics Consulting LLC as settlement administrator and approve paying its fees from the settlement fund as reasonable; (4) approve as reasonable the $5,000 service award to plaintiff Roger James, payable from the settlement fund; (5) approve as reasonable the separately negotiated award of $1,100,000 in attorneys' fees to plaintiff's counsel; and (6) approve as reasonable plaintiff's counsel's $85,000 in advanced litigation expenses, payable from the settlement fund.  For reasons explained below, the court grants plaintiff's unopposed motion and approves the FLSA settlement.

## I.      Factual and Procedural Background

Plaintiff worked for defendant Boyd Gaming Corporation as a table games dealer at the Kansas Star Casino near Wichita, Kansas.  Doc. 1 at 3 (Compl. ¶ 6).  As a table games dealer, plaintiff earned sub-minimum wage plus tips.  *Id.* at 8–9 (Compl. ¶ 28).  He filed this lawsuit individually and on behalf of all other similarly situated hourly, non-exempt employees who worked at 13 casinos operated by defendants.  He asserts two kinds of FLSA violations.  *See id.* at 17–20 (Compl. ¶¶ 59–70).  Count I alleges that defendants violated the FLSA by paying plaintiff and others similarly situated below the federal minimum wage rate without complying with the "tip credit" notice provision governing employers who pay less than the federal minimum wage.  *Id.* at 17–19 (Compl. ¶¶ 61–66).  Count II alleges defendants violated the FLSA by implementing and maintaining an invalid tip pool which, in turn, failed to pay plaintiff and other similarly situated employees all the tips they were entitled to receive.  *Id.* at 19–20 (Compl. ¶¶ 67–70).

Plaintiff's papers describe the parties' vigorous litigation of this case over the last three years.  *See* Doc. 166 at 13–20.  Indeed, that adversarial process has involved many contested

factual and legal issues—some of which the court has resolved through the parties' motion practice and others which remain disputed. The court summarizes that litigation history, below.

### *Discovery Phase*

After the parties' Rule 26(f) planning conference, the court entered a Scheduling Order that bifurcated discovery into two phases. *See* Doc. 15 at 4–5. The court agreed with the parties that Phase I discovery should address conditional certification issues. *Id.* Also, over plaintiff's objection, the court required the parties to litigate joint-employer issues in Phase I. *Id.* The Scheduling Order required the parties to complete Phase I discovery by April 30, 2020 (later extended to June 29, 2020), and required plaintiff to move for conditional certification by June 1, 2020 (later extended to July 31, 2020). Doc. 15 at 2; Doc. 57. Then, the Scheduling Order required the parties to provide an updated Rule 26(f) report within 30 days of the court's conditional certification ruling, *id.*, and after that event, the parties would proceed to Phase II discovery to address merits-related issues, *id.* at 11.

The parties proceeded with Phase I discovery, serving and responding to interrogatories, requests for production of documents, and requests for admission. *See* Docs. 18–23, 27–28, 30, 33, 37–40, 42–45, 50–54, 58. In response to plaintiff's discovery requests, defendant Boyd Gaming produced more than 5,000 pages of documents from 13 different casino properties, which plaintiff's counsel reviewed for use in discovery, conditional certification, and, ultimately, trial. Doc. 166-2 at 3 (Ricke Decl. ¶ 6). And, in response to defendants' discovery requests, plaintiff James and the 10 pre-certification opt-in plaintiffs produced about 170 pages of documents. *Id.* (Ricke Decl. ¶ 8).

During Phase I discovery, plaintiff served discovery requests specifically seeking information about the joint employer issue that the court included as one of the issues for Phase I

discovery.  *Id.* at 2–3 (Ricke Decl. ¶ 4).  After plaintiff served discovery on this issue, the parties

entered a stipulation in October 2019.  In it, defendant Boyd Gaming agreed not to dispute its

joint employer status for purposes of this case (although defendant Boyd Gaming contests as a

general matter that it was the employer of any collective and limited its stipulation to this case).

*Id.*  According to plaintiff's counsel, the parties' stipulation "obviated the need for further joint

employer discovery and removed a potential obstacle to conditional certification (*i.e.*, [p]laintiff

James no longer needed to prove Boyd Gaming employed the workers at each of the 13 casinos

as a threshold predicate to conditional certification)."  *Id.*

In January 2020, plaintiff's counsel deposed "the highest-ranking human resources

official at [defendant] Boyd Gaming—Chris Smith, the Vice President of Human Resources."

*Id.* at 3 (Ricke Decl. ¶ 7).  Also, plaintiff's counsel deposed "the highest-ranking human

resources official for the Kansas Star casino property—Allison Bair, Kansas Star's Director of

Human Resources."  *Id.*  And, that same month, defendants examined plaintiff James "during an

all-day deposition."  *Id.* (Ricke Decl. ¶ 8); *see also* Doc. 45.

Plaintiff's counsel represents that the parties, during the Phase I discovery process,

"engaged in many discovery meet and confer calls and exchanged several letters regarding

discovery disputes[,]" but "ultimately resolved these issues short of [c]ourt intervention[.]"  *Id.* at

3–4 (Ricke Decl. ¶ 9).

### *Conditional FLSA Certification and Notice*

On July 31, 2020, plaintiff filed a Motion for Conditional FLSA Certification and

Issuance of Notice to Similarly Situated Employees.  Doc. 59.  Plaintiff's counsel describes the

motion as "thoroughly supported, vigorously opposed," and one that "presented an issue of first

impression [about] tip pooling and an infrequently analyzed issue [about] tip credit notice."  Doc.

166-2 at 4 (Ricke Decl. ¶ 10). Defendants opposed the motion. Doc. 67. Plaintiff filed a Reply,

Doc. 70, which prompted defendants to file a Motion for Leave to file a Surreply, Doc. 71.

Plaintiff opposed defendants' Motion for Leave, Doc. 72, and defendants submitted a Reply in

further support of their Motion for Leave to File a Surreply, Doc. 73. To say the least, the parties

thoroughly briefed the conditional certification motion.

On March 2, 2021, the court entered a 56-page Memorandum and Order. Among other

rulings, this Order granted plaintiff's request for conditional collective action certification of two

collectives under the FLSA. Doc. 78 at 18–43, 54; *see also James v. Boyd Gaming Corp.*, 522 F.

Supp. 3d 892 (D. Kan. 2021). *First*, the court conditionally certified the Tip Credit Notice

Collective under § 216(b) of the FLSA, defined as:

> All persons employed at a relevant Boyd Gaming casino during the relevant time
> period and paid a base hourly wage of less than the applicable federal minimum
> wage of $7.25 per hour.

Doc. 78 at 18–19, 28–29. *Second*, the court conditionally certified the Tip Pool Collective under

§ 216(b) of the FLSA, defined as:

> All persons employed as a table games dealer and included within a tip pooling
> arrangement at a relevant Boyd Gaming casino during the relevant time period.

*Id.* at 29, 43. Also, the court ordered the parties to submit a Joint Proposed Notice Plan to the

court. *Id.* at 55.

In April 2021, the court approved the parties' Joint Proposed Notice Plan. Doc. 83.

Plaintiff's counsel then worked with the notice administrator (Angeion) to distribute notice of the

certified collectives by email, text, and U.S. Mail. Doc. 166-2 at 4 (Ricke Decl. ¶ 12).

Ultimately, the notice administrator distributed notice to 4,218 potential opt-ins. *Id.* at 4–5

(Ricke Decl. ¶ 13). Of that total, about 1,200 were eligible to participate in both collectives. *Id.*

When the 90-day opt-in period ended, 828 collective members had submitted Consent to Join

forms. *Id.* Plaintiff's counsel communicated with each collective member, filed their Consent to Join form in the case, collected relevant employment information, and coded that information into plaintiff's counsel's proprietary client database. *Id.* Plaintiff's counsel describes this effort as a "significant undertaking." *Id.*

### Mediation & Settlement

In the fall of 2021, after completing the notice and opt-in process, the parties agreed to discuss settlement for the certified collectives. *Id.* at 5–6 (Ricke Decl. ¶ 15). They engaged a wage and hour mediator—Francis X. Neuner of Neuner Mediation & Dispute Resolution—for a mediation on November 30, 2021. *Id.* Before the mediation, the parties briefed their positions on the merits and damages to the mediator. *Id.* Also, plaintiff's counsel analyzed the daily time records of each collective member (which, counsel represents, amounted to thousands of individual daily time records) to create a collective-wide damage model. *Id.*

After an all-day and in-person mediation on November 30, 2021, the parties reached an agreement and signed a term sheet containing substantive terms of the settlement for the collective with an agreement to negotiate separately plaintiff's counsel's entitlement to attorneys' fees under the FLSA. *Id.* at 6 (Ricke Decl. ¶ 16) (citing 29 U.S.C. § 216(b)). The parties reconvened in person on December 16, 2021, for an all-day negotiation among counsel about plaintiff's counsel's attorneys' fees. *Id.* On the evening of December 16, the parties reached a resolution on attorneys' fees. *Id.* Plaintiff's counsel reports that, with plaintiff James's support, plaintiff's counsel insisted on recovering attorneys' fees separately from amounts recovered for the collective members. *Id.* Plaintiff's counsel says that they did this so "that collective members keep more of their unpaid wages" instead of having "their payments . . . reduced by a percentage (typically one-third) to compensate [p]laintiff's counsel." *Id.* The

parties eventually memorialized the final terms of their settlement into the written Joint Stipulation of Settlement and Release ("Settlement Agreement"), attached as an exhibit to plaintiff's Unopposed Motion seeking approval of the settlement. Doc. 166-3 (Ricke Decl. Ex. 1).

### Notice of Collective Action Settlement

On April 21, 2022, Analytics Consulting LLC sent notice of the proposed FLSA settlement to 828 collective members (mostly by email with some sent by U.S. Mail). Doc. 167 at 1 (Status Report ¶ 1); *see also* Doc. 166-4 (Ricke Decl. Ex. 2). Of the notices that Analytics Consulting LLC sent by email, 38 were returned as undeliverable. Doc. 166-6 at 2 (Mitchell Decl. ¶ 8). So, on April 22, 2022, Analytics Consulting LLC sent the notice by mail to those 38 collective members. *Id.* As of May 3, 2022, Analytics Consulting LLC had received seven notices—ones that it initially had sent by mail—returned by the USPS as undeliverable. *Id.* (Mitchell Decl. ¶ 9). Since then, plaintiff's counsel has called each collective member and secured updated address or email address information. *Id.* And, plaintiff's counsel sent the notice to those seven collective action members using the updated email addresses. *Id.*

The notice sent to collective action members advised them of their rights with respect to the settlement, including the right to object to it. Doc. 167 at 1 (Status Report ¶ 1). The notice informed collective members that they would have 21 days from the date of mailing—or until May 12, 2022—to object to the settlement. *Id.* (Status Report ¶ 3); *see also* Doc. 166-4 at 3 (Ricke Decl. Ex. 2). The notice explained that collective members could lodge their objections by email or U.S. Mail. *Id.* (Status Report ¶ 3); *see also* Doc. 166-4 at 3 (Ricke Decl. Ex. 2). As of May 20, 2022, neither plaintiff's counsel nor Analytics Consulting LLC has received any objection to the proposed settlement. Doc. 168 at 2 (Second Status Report ¶ 4).

Plaintiff's counsel asserts that their description of the notice to collective action members satisfies the requirement that "'when a hearing [on FLSA settlement approval] is not requested, the plaintiff, at the very least, must notify the court that the opt-in plaintiffs had notice of the settlement and an opportunity to object.'"  Doc. 166 at 19 (quoting *Foster v. Robert Brogden's Olathe Buick GMC, Inc.*, No. 17-2095-DDC-JPO, 2019 WL 1002046, at *9 n.4 (D. Kan. Feb. 28, 2019)).

## II.     Legal Standard

The parties to an FLSA action must present a settlement of those claims to the court "for review and a determination that the settlement is fair and reasonable." *Barbosa v. Nat'l Beef Packing Co., LLC*, No. 12-2311-KHV, 2015 WL 4920292, at *3 (D. Kan. Aug. 18, 2015) (citing *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1353 (11th Cir. 1982)).  "To approve an FLSA settlement, the Court must find that the litigation involves a bona fide dispute and that the proposed settlement is fair and equitable to all parties concerned." *Id.* (citing *Lynn's Food Stores, Inc.*, 679 F.2d at 1354).

The court may enter a stipulated judgment in an FLSA action "only after scrutinizing the settlement for fairness." *Id.* (citing *Peterson v. Mortg. Sources, Corp.*, No. 08-2660-KHV, 2011 WL 3793963, at *4 (D. Kan. Aug. 25, 2011)); *see also Tommey v. Comput. Scis. Corp.*, No. 11-CV-02214-EFM, 2015 WL 1623025, at *1 (D. Kan. Apr. 13, 2015) (citation omitted).  "If the settlement reflects a reasonable compromise over issues such as FLSA coverage or computation of back wages that are actually in dispute, the Court may approve the settlement to promote the policy of encouraging settlement of litigation." *Gambrell v. Weber Carpet, Inc.*, No. 10-2131-KHV, 2012 WL 5306273, at *2 (D. Kan. Oct. 29, 2012) (citing *Lynn's Food Stores*, 679 F.2d at 1354).

Also, when parties settle FLSA claims before the court has made a final certification ruling, the court must make a final certification finding before it can approve an FLSA collective action settlement. *Barbosa*, 2015 WL 4920292, at *3 (citing *McCaffrey v. Mortg. Sources, Corp.*, No. 08-2660-KHV, 2011 WL 32436, at *2 (D. Kan. Jan. 5, 2011)).

## III.   Analysis

Plaintiff's unopposed motion asks the court to grant final collective certification and approve the parties' FLSA settlement as fair and equitable to all parties involved. Before addressing plaintiff's requests, the court provides a summary of the Settlement Agreement's terms.

### A.  Overview of the Parties' Settlement

The FLSA requires plaintiffs to join a collective action by opting in to the lawsuit. *See* 29 U.S.C. § 216(b) ("No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought."). Thus, the parties' FLSA settlement here binds only the 828 members of the conditionally certified Tip Credit Notice Collective and the Tip Pool Collective who returned consent to join forms. *See* Doc. 166-3 at 2–3, 6, 12 (Ricke Decl. Ex. 1) (Settlement Agreement ¶¶ I.B.1., I.B.2., III.B., IV.F.2.).

The Settlement Agreement requires defendant Boyd Gaming to create a $1,200,000 common fund that will: (1) pay awards to collective members; (2) pay the cost of settlement administration (which is capped at $16,436); (3) pay a proposed service award to plaintiff James in the amount of $5,000; and (4) reimburse plaintiff's counsel's advanced litigation expenses in the amount of $85,000. *Id.* at 6, 8, 9 (Ricke Decl. Ex. 1) (Settlement Agreement ¶¶ IV.B.1., IV.B.3.c., IV.B.4., IV.B.5.). The Settlement Agreement provides for distribution of settlement

payments pro rata to collective members based on their respective damages within each collective. *Id.* at 6–7 (Ricke Decl. Ex. 1) (Settlement Agreement ¶¶ IV.B.2.a., IV.B.2.b.). The Settlement Agreement explains that it allocates, after expenses, 51% of the net settlement fund to the Tip Credit Notice Collective and 49% of the net settlement fund to the Tip Pool Collective. *Id.* at 7 (Ricke Decl. Ex. 1) (Settlement Agreement ¶ IV.B.2.b.). This distribution "tracks the approximate distribution of alleged damages claimed . . . between the two collectives." *Id.* The Settlement Agreement also requires defendant Boyd Gaming to pay separately its share of employer payroll taxes in addition to the $1,200,000 fund. *Id.* at 9 (Ricke Decl. Ex. 1) (Settlement Agreement ¶ IV.B.6.).

To determine the collective members' damages, plaintiff's counsel explains that they created a collective-wide damages model. Doc. 166-2 at 7 (Ricke Decl. ¶ 21). They created the model after reviewing thousands of individual pay records for each collective member and engaging an expert to help them analyze the data. *Id.* Using that data, counsel calculated tip credit damages of $1,323,163 through July 2021, based on the wage and hour data defendant Boyd Gaming had produced for mediation. *Id.* Plaintiff's counsel then extrapolated an additional $30,482.91 in tip credit damages based on the number of collective members who were dealers, still working at defendant Boyd Gaming, and still participating in a dealer tip pool through the release date of December 31, 2021. *Id.* Plaintiff's counsel attests that the $1,200,000 fund represents 88% of claimed tip credit damages. *Id.*

Also, plaintiff's counsel explains another measure of damages available under the FLSA for only the tip pooling claim, "which is 'all such tips unlawfully kept by the employer.'" *Id.* at 7–8 (Ricke Decl. ¶ 22) (quoting 29 U.S.C. § 216(b)). Plaintiff's counsel measured these damages by assuming defendants unlawfully distributed all tips to Dual Rate Supervisors (an

allegation defendant Boyd Gaming denies, and most likely, would have contested had the litigation proceeded). *Id.* Under this assumed scenario, all opt-in plaintiffs would receive their proportional share of the unlawfully distributed tips. *Id.* Plaintiff's counsel relied on data produced by defendant Boyd Gaming showing that in 2017, 2018, 2019, 2020, and 2021, it distributed $902,738.56 in dealer tips to Dual Rate Supervisors for PTO. *Id.* Plaintiff's counsel has identified 1,632 workers who were eligible to participate in the tip pool collective and 388 workers who opted into the tip pool collective (*i.e.*, 24%). *Id.* Plaintiff's counsel then assumed that (1) defendants unlawfully paid all of the tips paid to Dual Rate Supervisors, (2) all of the tip payments were made inside the limitations periods for each collective member, and (3) all collective members were working during those workweeks. *Id.* And, based on these assumptions, counsel calculated that collective members' proportional share of those tips reasonably amounted to about $216,657 (24% of the total). *Id.* Plaintiff's counsel represents that when one includes "this best-day damages scenario into the total damages figure, the $1,200,000 common fund still represents 76% of tip credit and misallocated tip damages." *Id.*

For collective action members, plaintiff's counsel calculates that the individual mean average per capita settlement payment is more than $1,320. *Id.* at 7 (Ricke Decl. ¶ 7). The largest settlement payment is more than $6,200. *Id.* For 200 collective members, they will receive settlement payments exceeding $2,000. *Id.* And, no collective member will receive a settlement payment of less than $50. *Id.* Plaintiff's counsel describes these settlement payments as "meaningful amounts in any settlement," but particularly here where collective action members are minimum wage and tipped workers. *Id.*

The Settlement Agreement requires defendants to fund the settlement within 14 days after the court approves the settlement. Doc. 166-3 at 12–13 (Ricke Decl. Ex. 1) (Settlement

Agreement ¶¶ IV.G.1.).  And, it requires the settlement administrator to issue checks directly to collective members within 30 days after the court approves the settlement.  *Id.* at 13 (Ricke Decl. Ex. 1) (Settlement Agreement ¶ IV.H.1.).  The Settlement Agreement provides that the settlement administrator will treat settlement payments as 50% wages and 50% non-wages.  *Id.* at 14 (Ricke Decl. Ex. 1) (Settlement Agreement ¶ IV.H.2.).  If a collective member does not deposit the settlement check within 120 days, the Settlement Agreement requires the settlement administrator to send the payment to the unclaimed property division of the state where the collective member lives to hold on the collective member's behalf.  *Id.*  None of the settlement payments will revert to defendant Boyd Gaming.

The Settlement Agreement requires opt-in plaintiffs to release defendants and their affiliates "from any and all federal, state, local, and common law wage and hour claims, whether known or unknown, related to the tip credit and tip pooling" including, but not limited to, the claims asserted in this lawsuit.  *Id.* at 9–10 (Ricke Decl. Ex. 1) (Settlement Agreement ¶ IV.C.1.).  But, no opt-in plaintiff waives any claims "that may arise after December 31, 2021." *Id.* at 10 (Ricke Decl. Ex. 1) (Settlement Agreement ¶ IV.C.3.).  And, the release doesn't require collective members to release claims other than those related to wage and hour claims.  *See generally id.*

The Settlement Agreement provides for a $5,000 service award to plaintiff James, payable from the common fund and subject to the court's approval.  *Id.* at 9 (Ricke Decl. Ex. 1) (Settlement Agreement ¶ IV.B.5.).  Also, it allocates $16,436, payable from the common fund, to pay settlement administration costs.  *Id.* (Ricke Decl. Ex. 1) (Settlement Agreement ¶ IV.B.4.).  And, separate from and in addition to the common fund, the Settlement Agreement provides that

defendants will pay plaintiff's counsel $1,100,000 in attorneys' fees. *Id.* at 8 (Ricke Decl. Ex. 1) (Settlement Agreement ¶ IV.B.3.b.).

### B. Final Collective Action Certification

As already discussed, the court previously granted *conditional* certification of two collectives. But, the court hasn't certified a final collective action yet. Because the parties have settled their FLSA claims before the court has made a final certification ruling, the court must enter a final certification finding before it can approve the settlement. *See Barbosa*, 2015 WL 4920292, at *3 (citing *McCaffrey*, 2011 WL 32436, at *2). The FLSA provides that an employee may bring a collective action on behalf of other employees who are "similarly situated." 29 U.S.C. § 216(b). To determine whether employees are "similarly situated" for purposes of final collective action certification, the court considers several factors. They include: "(1) the disparate factual and employment settings of individual plaintiffs; (2) various defenses available to defendant[s] which appear to be individual to each plaintiff; and (3) fairness and procedural considerations." *Gambrell*, 2012 WL 5306273, at *3 (citing *Thiessen v. Gen. Elec. Cap. Corp.*, 267 F.3d 1095, 1103 (10th Cir. 2001)).

For the *first* factor, plaintiff asserts that the court should enter final collective certification for the same reasons that it granted conditional certification for the similarly situated collective action members. With the Tip Credit Notice Collective, plaintiff alleges that collective members are similarly situated because defendant Boyd Gaming employed each collective member at one of its casinos, paid each member a direct cash wage less than $7.25 plus tips, and attempted to take an FLSA tip credit for each worker. Also, plaintiff asserts that each collective member is similarly situated because defendants failed to provide them notice of the tip credit. And, to the extent defendants seek to shoulder their burden under the FLSA to prove that they did provide

notice of the tip credit, each collective action member is similarly situated in defendants' showing of how it provided notice to collective action members.

With the Tip Pool Collective, plaintiff alleges that collective members are similarly situated because defendant Boyd Gaming employed each member as a table games dealer, subjected those collective members to a mandatory tip pool, and used the table games dealers' tip pool to pay PTO for Dual Rate Supervisors. Whether plaintiff and all similarly situated employees can prove that defendants' tip pool practices violated the FLSA will turn on the same facts and issues—*i.e.*, determining the amount of PTO defendants paid out of the tip pool to Dual Rate Supervisors, explaining how that PTO was accrued, and litigating whether Dual Rate Supervisors are non-tipped or supervisory employees.

All these facts show that collective members worked in similar employment settings and their FLSA claims involve similar factual questions. So, the first factor favors final collective action certification.

For the *second* factor, plaintiff asserts that no individual defenses exist that would prevent the court from finding that collective action members are similarly situated. For the Tip Credit Notice Collective, plaintiff asserts that defendant Boyd Gaming had no policy of giving notice to its sub-minimum wage workers about the tip credit. This factual assertion thus applies to each collective member. And, this allegation doesn't present individual defenses to the claims involving alleged violations of the tip credit notice provisions. For the Tip Pool Collective, plaintiff asserts that it doesn't know of any individual defenses that would apply to this collective. Instead, the defenses asserted to date in the litigation are ones that apply equally to each collective action members' claims. So, the second factor also favors final collection action certification.

Finally, for the *third* factor, the court finds that fairness and procedural considerations favor final collective action certification. "[A]llowing plaintiffs to pool their resources for litigation" favors collective action treatment. *See Barbosa*, 2015 WL 4920292, at *5 (citing *Fulton v. TLC Lawn Care, Inc.*, No. 10-2645-KHV, 2012 WL 1788140, at *3 (D. Kan. May 17, 2012)). Here, it's more efficient and less costly for collective action members to assert their FLSA claims collectively instead of filing 828 individual lawsuits presenting the same common factual and legal questions and involve only a few thousand dollars in controversy in each individual case. Also, the policy of encouraging settlement of litigation favors final collective action certification. *Gambrell*, 2012 WL 5306273, at *4 (citing *Lynn's Food Stores, Inc.*, 679 F.2d at 1354).

After considering the *Thiessen* factors, the court concludes that all three factors favor final collective action certification. The court thus certifies a final collective action for both the Tip Credit Notice Collective and the Tip Pool Collective.

### C. FLSA Settlement Approval

Next, the court addresses plaintiff's request that the court approve the parties' FLSA collective action settlement. As explained above, when parties settle FLSA claims, they must present the settlement to the court to review and decide whether the settlement is fair and reasonable. *Tommey*, 2015 WL 1623025, at *1; *see also Gambrell*, 2012 WL 5306273, at *2 (citing *Lynn's Food Stores, Inc.*, 679 F.2d at 1352) ("When employees file suit against their employer to recover back wages under the FLSA, the parties must present any proposed settlement to the district court for review and a determination whether the settlement is fair and reasonable."). To approve an FLSA settlement, the court must determine whether: "(1) the litigation involves a bona fide dispute, (2) the proposed settlement is fair and equitable to all

parties concerned[,] and (3) the proposed settlement contains an award of reasonable attorney's fees." *Barbosa*, 2015 WL 4920292, at *5 (citing *McCaffrey*, 2011 WL 32436, at *2).  The court addresses each consideration below.

### 1.  First Factor:  Bona Fide Dispute

Before approving an FLSA settlement, the parties must submit sufficient information for the court to conclude that a bona fide dispute exists.  *McCaffrey*, 2011 WL 32436, at *4 (citing *Dees v. Hydradry, Inc.*, 706 F. Supp. 2d 1227, 1241 (M.D. Fla. 2010)).  To satisfy this obligation, the parties must provide the court with:

> (1) a description of the nature of the dispute (for example, a disagreement over coverage, exemption or computation of hours worked or rate of pay); (2) a description of the employer's business and the type of work performed by the employees; (3) the employer's reasons for disputing the employees' right to a minimum wage or overtime; (4) the employees' justification for the disputed wages; and (5) if the parties dispute the computation of wages owed, each party's estimate of the number of hours worked and the applicable wage.

*Id.*

The court finds that plaintiff has submitted information sufficient for the court to find a bona fide dispute exists here.  As already discussed, *see supra* Part I., plaintiff worked for defendant Boyd Gaming as a table games dealer at one of its casinos, earning sub-minimum wage plus tips.  Plaintiff asserts FLSA claims individually, and on behalf of all other similarly situated hourly, non-exempt employees who worked at 13 casinos operated by defendants. Plaintiff alleges that defendants violated the FLSA in two ways:  (1) by paying plaintiff and others similarly situated less than the federal minimum wage rate without complying with the tip credit notice provision governing employers who pay less than the federal minimum wage; and (2) by implementing and maintaining an invalid tip pool which, in turn, failed to pay plaintiff and other similarly situated employees all of the tips to which they were entitled.  The first FLSA

claim is asserted by the Tip Credit Notice Collective; the second FLSA claim is asserted by the Tip Pool Collective.

For the Tip Credit Notice Collective, plaintiff asserts that defendants failed to inform collective members of the tip credit, as the FLSA requires. *See* 29 U.S.C. § 203(m)(2)(A) (prohibiting employers from applying tip credit "with respect to any tipped employee unless such employee has been informed by the employer of the provisions of this subsection"). As a consequence, plaintiff argues that collective members are entitled to recover the difference between their direct cash wage and $7.25 (the federal minimum wage) for each hour worked during the limitations period. Doc. 166 at 24. Defendants deny plaintiff's allegations that they failed to give employees proper notice of the tip credit. To the contrary, defendants assert that they "provided notice of the FLSA's tip credit requirements in several documents or by verbal statements, or a combination of both." Doc. 166-3 at 2 (Ricke Decl. Ex. 1) (Settlement Agreement ¶ I.A.).

For the Tip Pool Collective, plaintiff alleges that defendants maintained an unlawful tip pool for dealers because they distributed tips from that pool to non-tipped, supervisory employees called Dual Rate Supervisors. Plaintiff asserts this practice violated the FLSA under 29 U.S.C. § 203(m)(2)(A)(ii). Doc. 166 at 24. And, plaintiff contends, as a consequence, he and other similarly situated employees are entitled to a void of the tip credit and a return of the unlawfully distributed tips. *Id.* (citing 29 U.S.C. § 216(b)). Defendants also deny the allegations about the tip pool. Instead, they assert that they "produced both documents and testimony demonstrating that no tips were improperly distributed and, accordingly, [d]efendants denied, and continue to deny and vigorously dispute, that any tips were dispersed improperly at any of these casinos." Doc. 166-3 at 2 (Ricke Decl. Ex. 1) (Settlement Agreement ¶ I.A.).

The court concludes that the claims and defenses in this case present a bona fide dispute whether defendants violated the FLSA, with the potential for either side to prevail if the case continued.

### 2.   Second Factor:  Fairness and Equity

The court next considers whether the proposed settlement is a fair and equitable one.  To qualify as "fair and reasonable, an FLSA settlement must provide adequate compensation to the employee and must not frustrate the FLSA policy rationales." *Solis v. Top Brass, Inc.*, No. 14-cv-00219-KMT, 2014 WL 4357486, at *3 (D. Colo. Sept. 3, 2014).  To determine if the proposed settlement is fair and equitable, courts regularly examine the factors that apply to proposed class action settlements under Rule 23(e).  *Tommey*, 2015 WL 1623025, at *2.  Those factors include:

> (1) whether the proposed settlement was fairly and honestly negotiated, (2) whether serious questions of law and fact exist that place the ultimate outcome of the litigation in doubt, (3) whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation, and (4) the judgment of the parties that the settlement is fair and reasonable.

*Id.*  But, while these factors may demonstrate that a settlement agreement is fair and reasonable, our court recognizes that they are not determinative.  *See McCaffrey*, 2011 WL 32436, at *5 (explaining that the Rule 23(e) factors "provide a general framework for the Court's determination whether an FLSA settlement is fair, but they are not determinative").  In addition to the four factors listed above, the court also must determine "that the proposed settlement is fair and equitable to all parties in light of the history and policy of the FLSA."  *Gambrell*, 2012 WL 5306273, at *5.

After reviewing the parties' proposed settlement, the court finds that it satisfies the Rule 23(e) factors.

*First*, the settlement was fairly and honestly negotiated. After more than two years of litigation—including the contested conditional certification motion—the parties engaged an experienced wage and hour mediator to mediate this dispute. The parties met for an all-day and in-person mediation on November 30, 2021, where they eventually reached an agreement and signed a term sheet containing the substantive terms of the settlement for the collective with an agreement to negotiate separately plaintiff's counsel's entitlement to attorneys' fees under the FLSA. On December 16, the parties reconvened for an all-day negotiation among counsel about plaintiff's counsel's attorneys' fees. By evening they had reached an agreement on attorneys' fees. Plaintiff has shown that the parties reached their agreement after arm's-length negotiations between experienced counsel and with the assistance of a skilled mediator. Thus, the first factor favors finding the proposed settlement fair and equitable.

*Second*, plaintiffs have established that the case involves serious questions of law and fact placing the ultimate outcome of the litigation in doubt. The parties strongly dispute whether defendants violated the FLSA's tip credit notice provisions and tip pooling requirements. Defendants contend that they have complied with the FLSA and none of their practices violate any provisions of that statute. Defendants also disputed whether the case should proceed as a collective. The parties' conflicting positions raise substantial and disputed questions of law and fact. The second factor thus favors finding the proposed settlement fair and equitable.

*Third*, the parties' proposed settlement provides the value of an immediate recovery to the opt-in plaintiffs now. Plaintiff's counsel asserts that the $1,200,000 settlement fund represents 88% of claimed tip credit damages, or 76% of tip credit damages plus best-day misallocated tip damages. Doc. 166-2 at 7–8 (Ricke Decl. ¶¶ 21–22). This immediate recovery of a significant portion of claimed damages outweighs the mere possibility of future relief after

protracted and expensive litigation.  As plaintiff's counsel attests, the FLSA collective claims "faced the potential for risk at summary judgment, collective decertification, and trial[,]" and even if successful at those later stages of litigation, "any potential recovery" for collective members on those claims still would remain "years away."  *Id.* at 8 (Ricke Decl. ¶ 23).  Thus, the third factor favors a finding that the proposed settlement is fair and equitable.

*Last*, plaintiff asserts that the settlement is fair, reasonable, and adequate.  Defendants don't contest that assertion.  And, the court agrees that the settlement agreement is fair, reasonable, and adequate.  Plaintiff has shown that the parties negotiated the Settlement Agreement through experienced and motivated counsel.  As discussed, the Settlement Agreement provides considerable relief to collective members.  Also, the Settlement Agreement reasonably distributes settlement payments to collective members on a pro rata basis, with no collective member receiving a payment of less than $50.  As already explained, plaintiff's counsel notified opt-in plaintiffs of the Settlement Agreement and gave them an opportunity to object to the settlement terms.  None have objected.  And, the timing for raising objections (as explained in the notice) has expired.  All of these facts favor approving the proposed settlement as fair and equitable.

The court thus finds that all four factors favor approving the proposed settlement as fair and equitable.  But, in addition to the four factors, the court also must determine "that the proposed settlement is fair and equitable to all parties in light of the history and policy of the FLSA."  *Gambrell*, 2012 WL 5306273, at *5.  The court has reviewed the parties' proposed settlement with those considerations in mind.  And, it proceeds to examine several additional considerations to determine whether the Settlement Agreement is fair and equitable.  They include:  (i) whether opt-in plaintiffs received notice of the proposed settlement and an

opportunity to object; (ii) how plaintiff's counsel plans to distribute the settlement fund; (iii) whether the proposed $5,000 service award to the named plaintiff is fair and equitable; (iv) whether the court should appoint Analytics Consulting LLC as settlement administrator and approve paying its fees from the settlement fund as reasonable; and (v) whether the court should approve paying plaintiff's counsel $85,000 in advanced litigation expenses, payable from the settlement fund.  The court addresses each consideration, in turn, below.

### a.  Notice of the Proposed Settlement

The FLSA does not require a fairness hearing like that required for settling Rule 23 class actions.  *Tommey*, 2015 WL 1623025, at *1.  But courts routinely hold fairness hearings in FLSA actions unless the parties demonstrate that the opt-in plaintiffs had notice of the settlement and an opportunity to object.  *Stubrud v. Daland Corp.*, No. 14-2252-JWL, 2015 WL 5093250, at *1 (D. Kan. Aug. 28, 2015) (first citing *Tommey*, 2015 WL 1623025, at *1; then citing *Goldsby v. Renosol Seating, LLC*, No. 2:08-0148-KD-N, 2013 WL 6535253, at *10 (S.D. Ala. Dec. 13, 2013)).

As already discussed, *see supra* Part I., the settlement administrator sent notice of the proposed FLSA settlement to the 828 collective members (plaintiffs who opted-in to the collective action).  The notice advised collective members of their rights with respect to the settlement.  *See* Doc. 166-4 (Ricke Decl. Ex. 2).  It provided an explanation of the material terms of the settlement.  *Id.*  And, it notified collective members of their right to object to the settlement within 21 days from the date of the mailing.  *Id.*  As of May 20, 2022, neither plaintiff's counsel nor the settlement administrator has received any objection to the proposed settlement.  Doc. 168 at 2 (Second Status Report ¶ 4).

Based on these representations, plaintiff has submitted sufficient information to establish that all 828 opt-in plaintiffs received notice of the proposed settlement that was fair and reasonable and that advised collective members of their opportunity to object. In these circumstances, the court has decided it need not conduct a fairness hearing.

### b. Distribution of the Settlement Proceeds

As already discussed, *see supra* Part III.A., the Settlement Agreement provides for distributing settlement payments pro rata to collective members based on their respective damages within each collective. Doc. 166-2 at 6–7 (Ricke Decl. Ex. 1) (Settlement Agreement ¶¶ IV.B.2.a., IV.B.2.b.). The Settlement Agreement explains that it allocates, after expenses, 51% of the net settlement fund (*i.e.*, the $1,200,000 fund less expenses, costs, and service award if approved by the court) to the Tip Credit Notice Collective and 49% of the net settlement fund to the Tip Pool Collective. *Id.* at 7 (Ricke Decl. Ex. 1) (Settlement Agreement ¶ IV.B.2.b.). This distribution "tracks the approximate distribution of alleged damages claimed . . . between the two collectives." *Id.* Then, the settlement administrator will distribute settlement payments to each opt-in plaintiff for the two collectives based on plaintiff's counsel's evaluation of "the difference between [each opt-in plaintiff's] base hourly wage and the FLSA's $7.25 minimum wage for all hours worked during the relevant time period." *Id.* (Ricke Decl. Ex. 1) (Settlement Agreement ¶¶ IV.B.2.a.i., IV.B.2.a.ii.). And, each opt-in plaintiff will receive "a minimum payment of $50 for each collective of which the Opt-In Plaintiff is a member." *Id.* (Ricke Decl. Ex. 1) (Settlement Agreement ¶ IV.B.2.b.). Based on plaintiff's counsel's representations, the court concludes the proposed distribution of the net settlement fund is fair and reasonable.

### c. Service Award

The Settlement Agreement provides for a $5,000 service award to plaintiff James, payable from the common fund and subject to the court's approval.  Doc. 166-3 at 9 (Ricke Decl. Ex. 1) (Settlement Agreement ¶ IV.B.5.).  Plaintiff asks the court the approve this service award as reasonable.

The court must "examine any enhancement payment to the class representative to determine whether that person 'has used the class action claim for unfair personal aggrandizement in the settlement, with prejudice to absent putative class members.'"  *Tommey*, 2015 WL 1623025, at *2 (quoting *Peterson v. Mortg. Sources, Corp.*, No. 08-2660-KHV, 2011 WL 3793963, at *4 (D. Kan. Aug. 25, 2011)).  Here, the $5,000 proposed service award is less than 1% of the $1,200,000 common fund.  Plaintiff James testifies that, over the last three years, he has devoted about 126 hours to this case.  Doc. 166-7 at 1 (James Decl. ¶ 3).  Thus, the $5,000 service award compensates plaintiff James at a rate of $39.68 per hour for his work on the case.  Plaintiff James's work has included:  (1) meeting with counsel during the initial investigation phase; (2) gathering documents, information, and communicating with potential witnesses; (3) reviewing almost three years of payroll records; (4) assisting counsel in preparing and reviewing the initial Complaint; (5) assisting counsel with preparing the Rule 26 disclosures and responding to defendants' discovery requests; (6) searching for and gathering documents responsive to defendants' requests for production of documents; (7) traveling from Wichita, Kansas, to Kansas City, Missouri, for two days to prepare for and sit for his deposition; (8) assisting counsel in preparing for the corporate representative deposition of defendants; (9) working with his counsel during the settlement phase by preparing mediation materials, discussing mediation strategy, and making himself available by phone to counsel during three

separate full-day mediation efforts; (10) reviewing the settlement documents and settlement communications; and (11) communicating with opt-in plaintiffs and others at all stages of the litigation about the status of the case.  *Id.* at 1–2 (James Decl. ¶¶ 4–6).  Also, plaintiff James asserts, he believes he took a reputational risk by bringing this lawsuit against his current employer—something that may create difficultly for him in securing future employment, especially in the casino industry.  *Id.* at 2–3 (James Decl. ¶ 7).

Our court previously has "found that $20.00 per hour is a 'reasonable incentive fee.'" Doc. 99 at 13 (quoting *Foster v. Robert Brogden's Olathe Buick GMC, Inc.*, No. 17-2095-DDC-JPO, 2019 WL 1002046, at *7 (D. Kan. Feb. 28, 2019)); *see also Barbosa*, 2015 WL 4920292, at *6 (rejecting proposed service award of $3,500 to each of the two named plaintiffs who spent 24.1 hours and 9.6 hours respectively on the case, and instead concluding that $20 per hour for the time plaintiffs devoted to the case was a fair and reasonable service award); *Peterson*, 2011 WL 3793963, at *8 (finding "$20 per hour is a reasonable incentive fee").  But also, our court has approved service awards at a higher hourly rate when the proposed award was reasonable under the circumstances.  *See, e.g.*, *Enegren v. KC Lodge Ventures LLC*, No. 17-2285-DDC-GEB, 2019 WL 5102177, at *9 (D. Kan. Oct. 11, 2019) (reducing requested service award to $5,000 based on named plaintiff's 131 hours devoted to the case, resulting in $38.16 per hour award); *see also In re Sprint Corp. ERISA Litig.*, 443 F. Supp. 2d 1249, 1271 (D. Kan. 2006) (reducing requested service awards to each of the four named plaintiffs from $15,000 to $5,000, even though the total settlement exceeded $25 million, because the $5,000 award adequately compensated each plaintiff for the 80 hours of time, on average, that each devoted to the lawsuit, resulting in hourly rate of $62.50).

Here, while plaintiff James's hourly rate of $39.68 is on the higher end of hourly rates approved by our court, it doesn't depart significantly from those previously-approved rates. And, plaintiff James has justified the reasonableness of the requested service award based on his detailed summary of the significant work he contributed to the case—from assisting counsel with the initial investigation of the claims to participating in the discovery process (including several days of preparing and sitting for his deposition) to helping counsel resolve the case through mediation and settlement.  On these facts, the court finds the proposed $5,000 service award to plaintiff James is fair and reasonable.

### d.  Settlement Administrator Appointment and Fees

Next, the court considers the portion of the Settlement Agreement that designates Analytics Consulting LLC as settlement administrator and provides for the settlement fund to pay $16,436.00 in settlement administration fees.  Doc. 166-3 at 9 (Ricke Decl. Ex. 1) (Settlement Agreement ¶ IV.B.4.).  The amount of the settlement administration fees is comparable to other settlement administration fees that our court and others have approved as reasonable in FLSA cases.  *See Florece v. Jose Pepper's Rests., LLC*, No. 20-2339-ADM, 2021 WL 5042715, at *2, 9 (D. Kan. Oct. 29, 2021) (approving as reasonable claims administrator's anticipated costs and expenses of $21,500, that was payable from the gross settlement fund); *see also Fields v. KTH Parts Indus., Inc.*, No. 3:19-cv-8, 2022 WL 3223379, at *9 (S.D. Ohio Aug. 9, 2022) (approving payment of $15,621.00 to Analytics Consulting LLC "for its services in administering" FLSA settlement).  The court thus grants plaintiff's request to appoint Analytics Consulting LLC as settlement administrator.  Also, it approves as reasonable the payment of $16,436.00 to Analytics Consulting LLC for settlement administration fees.

### e. Plaintiff's Counsel's Advanced Litigation Expenses

Last, the court addresses plaintiff's counsel's request that the court approve as reasonable an $85,000 payment, made from the settlement fund, to reimburse plaintiff's counsel for advanced litigation expenses. *See* Doc. 166-3 at 8 (Ricke Decl. Ex. 1) (Settlement Agreement ¶ IV.B.3.c.) (providing that defendants agree not to oppose plaintiff's counsel's request for litigation costs not exceeding $85,000). Plaintiff's counsel represents that they have advanced a total of $85,187.46 in litigation expenses. Doc. 166-2 at 18 (Ricke Decl. ¶ 46). But, consistent with the terms of the Settlement Agreement, plaintiff's counsel is limiting their request for expenses to $85,000.

Plaintiff's counsel represents that they incurred these expenses for tasks that they typically bill to clients (and thus aren't typically absorbed into firm overhead expenses). *Id.* at 17 (Ricke Decl. ¶ 43). And, they have itemized the expenses showing that counsel incurred them for tasks such as distributing collective notice to opt-ins, paying the mediator's fees, paying for depositions and transcripts, and conducting legal research. *Id.* at 17–18 (Ricke Decl. ¶ 43–46). The court notes that some $32,000 of the $85,000 requested expenses is for Westlaw charges. *Id.* at 17 (Ricke Decl. ¶ 43). Although this is a significant portion of the total costs— representing more than one-third of the total expenses requested—our Circuit and others have recognized that "Westlaw charges are expenses normally itemized and billed in addition to the hourly rate[,]" and thus, "expenses for those services should be awarded to the extent they are reasonable." *Case v. Unified Sch. Dist. No. 233*, 157 F.3d 1243, 1257–58 (10th Cir. 1998); *see also InvesSys, Inc. v. McGraw-Hill Cos.*, 369 F.3d 16, 22 (1st Cir. 2004) ("[C]omputer-assisted research should be . . . reimbursed under attorney's fee statutes . . . so long as the research cost is in fact paid by the firm to a third-party provider and is customarily charged by the firm to its

clients as a separate disbursement."); *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 369 F.3d 91, 98 (2d Cir. 2004) (holding that "use of online research services likely reduces the number of hours required for an attorney's manual search, thereby lowering the lodestar, and that in the context of a fee-shifting provision, the charges for such online research may properly be included in a fee award [if counsel seeking the expense] normally bills its paying clients for the cost of online research services").

Here, counsel attests that the Westlaw charges are ones that they typically bill to clients. Doc. 166-2 at 17 (Ricke Decl. ¶ 43). And, the court finds, the $32,000 amount of those charges is reasonable. Westlaw is an expensive service. But, it's a necessary expense for legal counsel who require an accurate and efficient way to research the governing law in a pending lawsuit. And, the amount requested is reasonable based on the history of this litigation, the novel and difficult legal issues it presented, and the lengthy briefing submitted to the court during the parties' motion practice. The court thus approves the $85,000 requested expenses as reasonable.

### f.   Conclusion

In sum, the court finds that the proposed settlement is fair and equitable under the Rule 23(e) factors, as well as other considerations "in light of the history and policy of the FLSA." *Gambrell*, 2012 WL 5306273, at *5. Thus, the court finds that the parties' settlement here is a fair and equitable settlement under the FLSA.

### 3.   Third Factor:  Attorneys' Fees Award

Last, the court considers the third factor for approving an FLSA settlement:  whether the proposed settlement contains an award of reasonable attorneys' fees. The FLSA requires the parties to a settlement agreement to include an award of reasonable attorneys' fees and the costs of the action. 29 U.S.C. § 216(b); *see also McCaffrey*, 2011 WL 32436, at *2 (citing *Lee v. The*

*Timberland Co.*, No. C 07-2367-JF, 2008 WL 2492295, at *2 (N.D. Cal. June 19, 2008)).  The court has discretion to determine the amount and reasonableness of the fee, but the FLSA fee award nevertheless is mandatory.  *Barbosa*, 2015 WL 4920292, at *4 (citations omitted).

Here, plaintiff seeks court approval of a $1,100,000 fee award that defendants have agreed to pay, subject to court approval.  Doc. 166-3 at 8 (Ricke Decl. Ex. 1) (Settlement Agreement ¶ IV.B.3.b.).  Defendants have agreed to pay the attorneys' fee to plaintiff's counsel separately from the collective settlement (*i.e.*, the attorneys' fee award is not paid out of the $1,200,000 settlement fund that will fund the settlement payments to collective members).  Thus, plaintiff argues, the court should measure the fee award's reasonableness under a lodestar analysis—not a percentage of the common fund analysis.  *Cf. Barbosa*, 2015 WL 4920292, at *7 (explaining that, when "a common fund is created by settlement," the Tenth Circuit "applies a hybrid approach, which combines the percentage fee method with the specific factors traditionally used to calculate the lodestar").

Plaintiff recognizes that its fee award "is only modestly less than the result for the collective."  Doc. 166 at 33 n.12.  But, as plaintiff correctly argues, it's not uncommon in FLSA cases for attorneys' fees awards to exceed the damages recovered by employees.  That's because "FLSA cases often involve ordinary, everyday workers who are paid hourly wages and favorable outcomes frequently result in limited recoveries."  *Fisher v. SD Prot. Inc.*, 948 F.3d 593, 603–04 (2d Cir. 2020).  But, the FLSA includes a fee-shifting provision that allows prevailing plaintiffs to recover attorneys' fees.  29 U.S.C. § 216(b).  And, courts have refused to limit recovery of attorneys' fees under the FLSA fee-shifting provision "to a proportional fee of their client's recovery" because, if they did, "no rational attorney would take on these cases unless she were doing so essentially pro bono."  *Fisher*, 948 F.3d at 604.  Thus, courts regularly decline to

impose "a proportionality limit on . . . recoverable attorneys' fees" in FLSA cases.  *Id.* at 605; *see also Garcia v. Tyson Foods, Inc.*, 770 F.3d 1300, 1311 (10th Cir. 2014) (affirming "fee award [that] far exceeded the damages award" because "the fee award need not be proportionate to the damages award" and the district court "acted within its discretion" in approving the award); *Howe v. Hoffman-Curtis Partners Ltd., LLP*, 215 F. App'x 341, 342 (5th Cir. 2007) (affirming $129,805 attorneys' fee award that exceeded the $23,357 damages award because "it is not uncommon that attorney fee requests can exceed the amount of judgment in the case by many multiples").

Although these cases involved FLSA awards to plaintiffs—and not an FLSA settlement like the one at issue here—the court finds the reasoning applies equally here.  Plaintiff's counsel litigated this contentious case for more than three years.  It was reasonable for counsel to incur significant attorneys' fees during that time based on the amount of work required to initiate the case, proceed with discovery, move for conditional certification, and ultimately negotiate a settlement.  The court sees no reason here to apply a percentage of the fee analysis to the FLSA settlement when the parties negotiated the attorneys' fees separately from the collective action settlement and defendants will pay those fees to plaintiff's counsel separately from the common settlement fund that will fund the collective members' settlement payments.

So, to determine the reasonableness of the requested attorneys' fees award, the court considers the lodestar amount, "which represents the number of hours reasonably expended multiplied by a reasonable hourly rate."  *Solis v. Top Brass, Inc.*, No. 14-cv-00219-KMT, 2014 WL 4357486, at *4 (D. Kan. Sept. 3, 2014) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) (further citation omitted)); *see also Hobbs v. Tandem Env't Sols., Inc.*, No. 10-1204-KHV, 2012 WL 4747166, at *3 (D. Kan. Oct. 4, 2012).  Also, the court considers the 12 factors

set out in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87 (1989).  *Hobbs*, 2012 WL 4747166, at *3.

Those factors are:

> (1) time and labor required, (2) novelty and difficulty of the questions presented by the case, (3) skill requisite to perform the legal service properly, (4) preclusion of other employment by the attorneys due to acceptance of the case, (5) customary fee, (6) whether the fee is fixed or contingent, (7) any time limitations imposed by the client or circumstances, (8) amount involved and results obtained, (9) experience, reputation, and ability of the attorneys, (10) 'undesirability' of the case, (11) nature and length of the professional relationship with the client and (12) awards in similar cases.

*Id.* (first citing *Rosenbaum v. MacAllister*, 64 F.3d 1439, 1445 (10th Cir. 1995); then citing *Johnson*, 488 F.2d at 717–19).  The court analyzes these factors below.

### a.  Factor 1:  Time and Labor Required

Plaintiff's counsel represents that they have devoted 2,991.6 hours to this matter during its three years plus life span.  Doc. 166-2 at 12–13 (Ricke Decl. ¶¶ 32–36).  As already discussed, *see supra* Part I., the tasks included investigating plaintiff's claims, drafting and filing the Complaint, serving and responding to written discovery, taking and defending depositions, researching and drafting the contested conditional certification motion, providing notice to collective action members, negotiating the settlement, working with the settlement administrator to provide notice of the settlement to the collective members, drafting the settlement agreement, and filing this motion for approval.  The court finds the amount of time that counsel devoted to the lawsuit is reasonable.

Six attorneys and three paralegals from the Stueve Siegel Hanson law firm billed the majority of hours devoted to the lawsuit.  And, two attorneys and one paralegal from the McClelland law firm billed the remainder.  The lawyers at both firms have extensive experience litigating wage and hour lawsuits.  *See id.* at 9–11 (Ricke Decl. ¶¶ 25, 28–29); *see also* Doc. 166-

5 (Ricke Decl. Ex. 3) (providing education and professional background, as well as

representative experience, of three Stueve Siegel Hanson attorneys who billed time to this

matter).  Applying the attorneys' and paralegals' standard hourly rates to the 2,991.6 hours they

worked on this matter, plaintiff's counsel calculates a lodestar of $2,119,277.50.  Doc. 166-2 at

13 (Ricke Decl. ¶ 35).  The lodestar is significantly more than the $1,100,000 attorneys' fee

award that counsel seeks in this case.  As plaintiff's counsel correctly calculates, the requested

award represents a 0.507 multiplier, or roughly 50% reduction, of counsel's customary lodestar

fee.  *Id.*

When one divides the requested $1,100,000 fee award by the 2,991.6 hours of attorney

and paralegal time devoted to the case, it produces a blended hourly rate of $367 per hour.  *Id.*

(Ricke Decl. ¶ 36).  As counsel correctly asserts, this blended rate is comparable to the blended

hourly rate of $302.29 that our court approved almost 10 years ago in another FLSA case.  *See*

*Garcia v. Tyson Foods, Inc.*, No. 06-2198-JTM, 2012 WL 5985561, at *4 (D. Kan. Nov. 29,

2012) (finding reasonable an "effective blended hourly rate of $302.29" and applying that hourly

rate to the lodestar calculation), *aff'd*, 770 F.3d 1300 (10th Cir. 2014).  Adjusting for inflation,

the $367 blended rate here is roughly equivalent to, or even less than, the $302.29 blended

hourly rate that *Garcia* approved in 2012.  *See Ross v. Jenkins*, 325 F. Supp. 3d 1141, 1182 (D.

Kan. 2018) (adjusting the court's previously approved paralegal rates to accommodate inflation).

This blended hourly rate also is less than other blended hourly rates approved by our

court in FLSA cases for counsel with similar experience.  *See, e.g.*, *In re Bank of Am. Wage &*

*Hour Emp. Litig.*, No. 10-MD-2138-JWL, 2013 WL 6670602, at *3 (D. Kan. Dec. 18, 2013)

(calculating a lodestar with a blended hourly rate of $488); *Bruner v. Sprint/United Mgmt. Co.*,

Nos. 07-2164-KHV, 08-2133-KHV, 08-2149-KHV, 2009 WL 2058762, at *10 (D. Kan. July 14,

2009) (awarding plaintiffs' counsel a "generous" fee award in an FLSA settlement using an hourly rate of $590.91).

The court also recognizes that counsel will incur additional time to complete the settlement and conclude the litigation—time that counsel has not yet recorded and thus the lodestar does not reflect.  The lodestar will continue to increase as counsel performs this additional work, and it will exceed the requested award by an even greater amount.  The court concludes that the requested $1,100,000 attorneys' fees award is consistent with the time and labor required in this matter.  This first factor thus favors approving the award.

### b.  Factors 2 and 3:  Novelty and Difficulty of the Questions Presented and Skill Required to Perform the Legal Service Properly

Plaintiff's counsel asserts that this wage and hour case presented novel and complex issues that remain unsettled under Tenth Circuit law.  The court agrees.  It is quite familiar with the difficult legal questions presented in the parties' extensive and thorough briefing on the conditional certification motion.  And, indeed, the court recognized the absence of Tenth Circuit law on one particular issue in its conditional certification Order.  *See James*, 522 F. Supp. 3d at 911 (noting that "defendants are right that the Tenth Circuit has not ruled on this issue" (internal quotation marks omitted)).  Also, as already discussed, counsel here is quite skilled in litigating wage and hour cases.  The two law firms representing the collective members have extensive experience in this area of law.  This skill and experience most likely contributed to their success in securing conditional certification of the two collectives and resolving the litigation through a settlement that provides significant benefits to collective members.  The court thus finds that these two factors favor approving the requested fee award.

### c.  Factor 4:  Preclusion of Other Employment

Plaintiff's counsel represents that the time devoted to this lawsuit—almost 3,000 hours—has precluded other employment.  Doc. 166-2 at 16 (Ricke Decl. ¶ 42).  The court agrees that the time and effort spent litigating the case demonstrates that the lawsuit precluded plaintiff's counsel from working on other matters.  This factor thus favors approving the fee award.

### d.  Factor 5:  Customary Fee

Plaintiff correctly asserts that the "Fair Labor Standards Act provides a right to attorneys' fees for prevailing plaintiffs."  *Garcia*, 770 F.3d at 1308 (citing 29 U.S.C. § 216(b)).  And, if FLSA plaintiffs "obtained 'excellent results,' they should fully recover their fees[.]"  *Id.* at 1311 (quoting *Hensley*, 461 U.S. at 436); *see also id.* (affirming attorneys' fee award calculated using the lodestar).  Here, plaintiff argues, the requested fee is less than the "customary fee" in FLSA cases because it's significantly less than (roughly half) the lodestar calculated using the 2,991.6 hours worked multiplied by counsel's standard hourly rates.  The court agrees.  The requested fee award is less than the "customary fee" in FLSA cases litigated through a damages award.  And, although the collective members never recovered an FLSA damages award here, plaintiff's counsel assisted them by avoiding the uncertainty of prevailing on their FLSA claims through continued litigation by negotiating a settlement that achieves a significant result for the collective members.  This factor also favors approving the requested fee award.

### e.  Factor 6:  Whether the Fee Is Fixed or Contingent

Plaintiff's counsel took this case on a contingency basis, and to date, they have not received compensation for their time.  Doc. 166-2 at 12 (Ricke Decl. ¶ 31).  Our court has recognized the "risk undertaken" when counsel agrees to pursue "claims on a contingent-fee basis."  *In re Syngenta AG MIR 162 Corn Litig.*, 357 F. Supp. 3d 1094, 1115 (D. Kan. 2018).

But also, our court has recognized that it's the job of the courts, not the parties, to determine the fees in FLSA actions.  *See Bruner*, 2009 WL 2058762, at *8.  A contingency fee agreement is only one of many relevant factors, and it provides no conclusive evidence of the reasonableness of a fee award.  *Id.*  This factor thus is neutral.

### f.   Factor 7:  Time Limitations

Plaintiff's counsel asserts here that it faced time limitations because the statute of limitations runs on FLSA collective members' claims until they file a consent to join the action. 29 U.S.C. § 216(b).  Plaintiff's counsel contends that they had to balance the need to achieve conditional certification as quickly as possible (also during a pandemic) with the need to develop a sufficient discovery record to support certification.  The court recognizes the time constraints imposed on counsel were real.  But, the court finds that those time limitations are inherent in any engagement and not specific to an FLSA action like this one (even if litigated during a pandemic).  The court finds this factor a neutral one.

### g.   Factor 8:  Amount Involved and Results Obtained

Plaintiff's counsel secured a favorable result.  Each opt-in plaintiff will receive a monetary settlement from the common fund computed on a *pro rata* basis using an equitable formula based on the difference between each opt-in plaintiff's base hourly wage and the FLSA's $7.25 minimum wage for all hours worked during the relevant time period.  The average per capita settlement payment is more than $1,320.  Doc. 166-2 at 7 (Ricke Decl. ¶ 20).  And, no collective member has objected to the settlement or the requested attorneys' fee award.

Defendants continue to contest their liability, so the ultimate outcome of this litigation (if it had not settled) remains in doubt.  The settlement avoids the uncertainty and rigors of

summary judgment practice and trial and produces a favorable result for the opt-in plaintiffs. This factor favors approving the fee award.

### h.   Factor 9:  Attorneys' Experience, Reputation, and Ability

The court already has discussed the experience, reputation, and ability of the attorneys above.  As noted, plaintiff's counsel has experience litigating employment cases, particularly wage and hour cases.  The skill and experience of counsel is reflected in the blended hourly rate that the court approved above.  Thus, the court already has accounted for this factor.  And so, the court finds, this factor is neutral one.

### i.   Factor 10:  Undesirability of the Case

Plaintiff's counsel recognizes that this court previously has found that the "undesirability of the case" factor is a neutral one when the court already has taken into account the contingency nature of the case.  But, plaintiff's counsel asserts that the novel and difficult FLSA issues presented by this case's facts made it undesirable to all but the most capable wage and hour lawyers.  The court agrees with that assertion, but the court already has accounted for both the case's novel and difficult legal issues and the skill required to litigate this case, when assessing the second and third *Johnson* factors.  *See supra* Part III.C.3.b.  Thus, this tenth *Johnson* factor is neutral to the analysis.

### j.   Factor 11:  Nature and Length of the Professional Relationship

Our court has explained "[t]he meaning of this factor . . . and its effect on the calculation of a reasonable fee has always been unclear, and courts applying the *Johnson* factors typically state that this particular standard is irrelevant or immaterial."  *Barbosa*, 2015 WL 4920292, at *12 (citing *Bruner*, 2009 WL 2058762, at *9 (further citation omitted)).  But, here, plaintiff's counsel asserts this factor favors approving the requested attorneys' fee award based on

counsel's experience and success in prosecuting wage and hour cases for casino workers in this case and some 20 other cases. Plaintiff's counsel argues that its commitment to casino workers across the country supports the fee award. The court finds plaintiff's counsel's arguments persuasive. And, it finds that this factor favors approving the fee award, but just slightly.

### k. Factor 12: Awards in Similar Cases

As already discussed, the requested fee award comports with awards approved in similar cases. *See supra* Part III.C.3.a. (collecting cases). Also, as plaintiff's counsel asserts, the blended $367 rate is significantly less than the standard hourly rate that counsel customarily charges and the rate that courts have approved in other cases. Doc. 166-2 at 13–16 (Ricke Decl. ¶¶ 38–42). The court finds that this last *Johnson* factor favors approving the settlement as reasonable.

In sum, based on its analysis of the lodestar and *Johnson* factors, the court concludes the attorneys' fees requested are fair and reasonable. The court thus grants plaintiff's request and approves the $1,100,000 requested attorneys' fees award.

### IV.  Conclusion

For reasons explained, the court grants plaintiff's Unopposed Motion For Approval of FLSA Collective Action Settlement (Doc. 165). Specifically, the court:

- grants final collective certification;

- approves the $1,200,000 settlement fund to pay the claims of collective members;

- appoints Analytics Consulting LLC as settlement administrator and approves paying its fees from the settlement fund as reasonable;

- approves as reasonable the $5,000 service award to plaintiff Roger James, payable from the settlement fund;

- approves as reasonable the separately negotiated award of $1,100,000 attorneys' fees to plaintiff's counsel; and

- approves as reasonable plaintiff's counsel's $85,000 in advanced litigation expenses that will be paid from the settlement fund.

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiff's Unopposed Motion For Approval of FLSA Collective Action Settlement (Doc. 165) is granted.

**IT IS FURTHER ORDERED THAT** the Clerk is directed to enter the parties' proposed Final Order and Judgment Granting Approval of FLSA Collective Action Settlement and Dismissing Collective Members and Defendants with Prejudice.

**IT IS SO ORDERED.**

**Dated this 27th day of September, 2022, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**